Case 5:26-cv-01720-XR    Document 1    Filed 03/16/26    Page 1 of 75

Charles Bruff

98 McLennan Oak

San Antonio, Texas 78240

318-452-8978

Plaintiff in Pro Se

FILED

MAR 16 2026

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                    DEPUTY CLERK

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF TEXAS

# SAN ANTONIO DIVISION

| | |
|---|---|
| CHARLES BRUFF,<br><br>     **Plaintiff**,<br><br>vs.<br><br>USAA HEALTH AND WELFARE BENEFITS PLAN,<br><br>USAA EDUCATIONAL ASSISTANCE PLAN,<br><br>UNITED STATES AUTOMOBILE ASSOCIATION,<br><br>AND LINCOLN NATIONAL LIFE INSURANCE COMPANY,<br><br>     **Defendants**. | Case No.: #:##-cv-####<br><br>SA26CA1720 XR<br><br>**ERISA COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## JURISDICTION

1. Plaintiff brings this action for monetary and equitable relief pursuant to §§ 502(a)(1) and 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1) and 1132(a)(3). This Court has subject matter jurisdiction pursuant to ERISA §§ 502(e) and (f), 29 U.S.C. §§ 1132(e) and (f), and 28 U.S.C. § 1331.

## VENUE

2. Venue lies in the Western District of Texas pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). Defendants USAA Educational Assistance Plan and USAA Health and Welfare Benefits Plan are based in and primarily do business in San Antonio, Texas. Defendant Lincoln National Life Insurance Company ("Lincoln") administers the USAA Long Term Disability Plan under ERISA and Texas law. Plaintiff resides in this district, the denials at issue occurred here, and Defendants may be found in this district.

## PARTIES

3. Plaintiff Charles T. Bruff is a participant in the USAA plans as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). Plaintiff is also considered legally disabled by the Social Security Administration and eligible for long-term disability benefits under the USAA plan.

4. Defendants USAA Educational Assistance Plan and USAA Health and Welfare Benefits Plan are welfare benefit plans as defined under ERISA § 3(1), 29 U.S.C. § 1002(1) (collectively, the "USAA Plans").

5. Defendant Lincoln is the plan administrator for the short- and long-term disability plans under the USAA Health and Welfare Benefits Plan, with fiduciary duties under 29 U.S.C. § 1002(21)(A).

6. Defendant United States Automobile Association ("USAA") administers insurance policy contracts through multiple subsidiaries, including the entities named herein.

## FACTS

7. On or around March 31, 2025, Plaintiff applied for short-term disability benefits under the USAA Health and Welfare Benefits Plan following a mental health crisis.

8. Plaintiff was terminated from active employment at USAA on or around April 1, 2025.

9. Plaintiff was approved for Short-Term Disability Benefits by Lincoln effective March 22, 2025. (Exhibit A)

10. Plaintiff was approved for long-term disability benefits effective September 18, 2025. (Exhibit B)

11. Plaintiff's disability approval began prior to termination and has continued through present. Plaintiff currently receives health insurance, life insurance,

Complaint - 3

cash disability benefits, and dental insurance under the USAA Health and Welfare Benefits Plan as an LTD participant.

12. Plaintiff was employed by USAA beginning in or around August 2016.

13. Plaintiff has been denied benefits under the USAA Education Plan without a formal notice of denial as required under ERISA § 503, 29 U.S.C. § 1133, and 29 C.F.R. § 2560.503-1. Despite requests, Defendants have not provided a formal denial letter or any policy refuting Plaintiff's eligibility. On March 3, 2026, a USAA Health and Welfare Benefits Center representative named Chris confirmed by phone that the Benefits Center is unable to provide a formal notice of denial for either semester. (Exhibit EDU1) The applicable SPD language preserving eligibility for employees on disability leave is set forth in the Fifth Claim. (Exhibit C)

14. The USAA Educational Assistance Plan is an employee welfare benefit plan established and maintained by USAA, governed by a written Summary Plan Description with specific eligibility criteria administered through USAA's BenefitConnect benefits infrastructure alongside USAA's LTD, health, and welfare plans. ERISA coverage of this plan is addressed in the Fifth Claim.

15. USAA operates multiple insurance subsidiaries. Members are assigned to a company of placement based on employment status; employees with five or more years of service are placed in the highest tier, USAA Company. USAA provided Plaintiff documentation confirming that termination status affects insurance rates, with the specific policy set forth in USAA's

September 16, 2025 letter to the Texas Department of Insurance. (Exhibit TDI1)

16. On or around September 1, 2025, Plaintiff's homeowners insurance policy renewed. USAA placed Plaintiff in CIC Company of Placement with a corresponding rate increase. Multiple USAA representatives confirmed that had Plaintiff been classified as disability-retired in the member-side system, placement would have remained USAA Company. (Exhibit TDI1)

17. It is unlawful in Texas and most states to increase insurance rates based on disability or a finding of disability. Tex. Ins. Code § 544.001. USAA has maintained that the rate increase was due to termination, not disability—but Plaintiff became disabled before termination and remains disabled under USAA's own LTD Plan.

18. Plaintiff is currently undergoing treatment for Cerebral Palsy, Autism Spectrum Disorder, and Post-Traumatic Stress Disorder. Denial of services frustrates Plaintiff's ability to follow the discharge plan issued by the Menninger Clinic following multiple hospitalizations.

19. On or around January 9, 2026, Plaintiff was referred to Lincoln Financial Vocational Rehabilitation, a service offered under the LTD policy. (Exhibit E) Contrary to the policy, vocational rehabilitation is not defined in the contract. (Exhibit LTDPOL) On or around January 20, 2026, a Lincoln Vocational Rehabilitation representative contacted Plaintiff. On January 27, 2026, Plaintiff was denied vocational rehabilitation services without a formal denial letter as required by ERISA § 503. (Exhibit F)

20. The combination of informal denials by multiple parties without formal denial letters has made it significantly harder for Plaintiff to access State Vocational Rehabilitation, which requires exhaustion of all private funding sources first. (34 C.F.R. § 361.53 & Texas Labor Code § 352.052)

21. Defendant Lincoln requested that Plaintiff file for Social Security Disability Insurance (SSDI). (Exhibit G)

22. Having prior experience with the SSDI process, Plaintiff requested his complete claims file from Lincoln to support an accurate application. Lincoln informed Plaintiff that under no circumstances would the file be provided until or unless Plaintiff is denied benefits by Lincoln. (Exhibit H; Exhibit R) This violates ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), which entitles participants to plan documents at any time.

23. The September 17, 2025 letter (Exhibit G) created an immediate and concrete need for access to Plaintiff's claims file. Lincoln had stated in writing that Plaintiff might have capacity to return to work, then reversed that position without explanation approximately three months later and directed Plaintiff to apply for a federal program requiring proof of the opposite. (Exhibit SS1) Without access to the claims file Lincoln was simultaneously building and withholding, Plaintiff could not verify whether Lincoln's internal assessments were consistent with the information it was transmitting to Social Security through Brown & Brown.

24. Plaintiff was then asked to sign an authorization releasing his entire claims file to Lincoln's vendor, Brown and Brown—while Lincoln simultaneously

refused to provide that same file to Plaintiff. (Exhibit I; Exhibit H) Plaintiff has already authorized release of all claims files. (Brown1)

25. Plaintiff informed Lincoln that under Social Security regulations (42 U.S.C. § 423 and 20 C.F.R. § 404.1512) he is required to submit a complete application with no omissions, and that the claims file contains facts necessary for that application. Lincoln refused regardless—again violating § 104(b)(4). (Exhibit K; Exhibit R)

26. Plaintiff made repeated requests for the definition of "Mental Illness, Substance Abuse and/or Non-Verifiable Symptoms Limitation," which was applied to Plaintiff at LTD approval despite his multiple overlapping physical and psychiatric disabilities. (Exhibit L) Plaintiff also requested explanation of the three-month review schedule, which Lincoln has not substantiated. (Exhibit M)

27. Plaintiff requested copies of his prior Lincoln disability claims files from 2021 to provide to Social Security. Lincoln denied this request. (Exhibit N) This undermines Lincoln's stated policy that files are released only upon denial—the 2021 claims are closed and not subject to appeal. Plaintiff has verified the 2021 claim remains available in Lincoln's system. (Exhibit O)

28. When Plaintiff raises Lincoln's lack of defined policies or compares Lincoln's processes to Social Security's standards, Lincoln states either that it has no internal processes or that "Social Security is different." (Exhibit P) Plaintiff requested a written policy on letterhead justifying the refusal to provide the claims file. Lincoln has not responded. (Exhibit H, Document 3) Lincoln

subsequently issued a written refusal closing all further requests for the claims file. (Exhibit H)

29. Plaintiff's combined medical expenses in 2025 exceeded $100,000. Because the USAA plan provides health insurance only through LTD participation, the risk of losing health coverage causes severe emotional distress compounding Plaintiff's PTSD.

## DEEMED EXHAUSTION

30. The exhaustion requirement under ERISA is not absolute, and its application differs across the claims presented here. For the benefit claims brought under § 502(a)(1)(B) (Third, Fourth, Fifth, and Sixth Claims), exhaustion is excused under the deemed exhaustion doctrine, the futility doctrine, or both. For the penalty claim under § 502(a)(1)(A) and § 502(c) (First Claim), no exhaustion requirement applies as a matter of law. For the equitable claims under § 502(a)(3) (Second and Seventh Claims), exhaustion is either inapplicable or excused. Each basis is addressed in turn.

31. **Regulatory Framework**: 29 C.F.R. § 2560.503-1(l) provides that when a plan fails to strictly adhere to all claim determination and appeal requirements under applicable federal law, the claimant is deemed to have exhausted the plan's internal appeal requirements and may proceed directly to court under § 502(a) of ERISA. This is not a claimant-side election — it is an automatic consequence of the plan's own procedural noncompliance.

The USAA Comprehensive Health Care Arrangement SPD codifies this rule in identical terms, stating that failure to strictly adhere to all claim determination and appeal requirements triggers deemed exhaustion and permits the participant to pursue any available remedies under § 502(a) of ERISA. (Exhibit HCPLAN)

32. **The Safe Harbor Exception Is Unavailable**: Under both 29 C.F.R. § 2560.503-1(l)(2)(ii) and the USAA SPD's own exhaustion provision a plan may avoid the deemed exhaustion consequence only if its violation was minor, unlikely to influence the outcome, for good cause or beyond the plan's control, and part of an ongoing good faith exchange with the claimant. Critically, the SPD states expressly: "This exception is not available if the rule violation is part of a pattern or practice of violations by the Claims Administrator or the Plan." (Exhibit HCPLAN) The violations documented across this complaint — covering three separate benefit determinations (vocational rehabilitation, educational assistance, and APIP), two separate defendants (Lincoln and USAA), sustained document refusals spanning multiple months, and application of an unexplained benefit limitation without the disclosures required by § 503 — constitute a pattern and practice of noncompliance, not isolated minor violations. No individual failure stands alone: each is part of a broader course of conduct in which both Defendants have systematically declined to issue formal written denials, provide appeal rights, or produce documents to which Plaintiff is entitled. The safe harbor exception is categorically unavailable on these facts. (Exhibit DOCTIME)

33. **First Claim — Document Penalty: No Exhaustion Required**. The First Claim seeks statutory penalties under ERISA § 502(c) for Defendants' refusal to furnish plan documents upon written request. Penalty claims under § 502(a)(1)(A) and § 502(c) are not benefit claims and do not require administrative exhaustion. The obligation to furnish documents is independent of any claim determination process, and the penalty arises automatically from the administrator's failure to comply — not from an adverse benefit determination subject to appeal. Plaintiff may therefore proceed on the First Claim without exhaustion of any kind.

34. **Second Claim — Declaratory Relief on the Limitation:** No Process to Exhaust. The Second Claim seeks a declaration that the Mental Illness / Non-Verifiable Symptoms Limitation was applied without the disclosures required by ERISA § 503 and 29 C.F.R. § 2560.503-1(g)(1). Lincoln applied the Limitation at LTD approval without identifying which prong it applied, which conditions triggered it, or what causation standard it used. Plaintiff had no notice that a separate, time-limited benefit determination had been made and therefore had nothing to appeal. The administrative record was frozen at the moment the undisclosed determination was made. Because the failure to disclose was itself the violation, no internal remedy could cure it. Separately, to the extent exhaustion is considered applicable to a § 502(a)(3) equitable claim, it is excused under the futility doctrine because any future review would rest on the same undisclosed determination.

35. **Third Claim — Vocational Rehabilitation: Deemed Exhausted.** Lincoln denied vocational rehabilitation benefits by referring Plaintiff to a state payer-of-last-resort program on January 27, 2026, without issuing any formal written denial notice as required by ERISA § 503. Lincoln simultaneously declined to evaluate Plaintiff's specific circumstances, review the Menninger Clinic discharge plan, or issue any appealable decision — then closed the referral without notice. (Exhibit F; Exhibit E) A claimant who is never given a § 503-compliant denial notice has no appeal to exhaust. Administrative remedies are deemed exhausted under § 2560.503-1(l) because Lincoln failed to strictly adhere to the procedural requirements governing adverse benefit determinations.

36. **Fourth Claim — APIP: Deemed Exhausted.** On February 20, 2026, USAA denied Plaintiff's APIP claim through the ServiceNow system (Case No. HRC0549446) without a formal written denial notice, without citing any specific plan provision, and without informing Plaintiff of any right to appeal. (Exhibit APIP4) Plaintiff immediately requested a formal denial letter and information regarding his appeal rights on the same date. USAA has provided neither as of the date of this filing. This is not a case where Plaintiff declined to exhaust available procedures — it is a case where USAA extinguished those procedures by failing to provide them. Administrative remedies are deemed exhausted under § 2560.503-1(l).

37. **Fifth Claim — Educational Assistance: Deemed Exhausted.** Defendants denied USAA educational assistance benefits through informal email and

BenefitConnect communications without a formal written denial notice, specific plan provision citations, or any description of appeal rights or procedures, as required by ERISA § 503 and 29 C.F.R. § 2560.503-1. On February 5, 2026, Plaintiff explicitly requested a formal denial letter on letterhead, and USAA confirmed in writing that none would be issued. Plaintiff has made repeated written requests for a proper denial letter and appeal information. None has been provided. On March 3, 2026, a Benefits Center representative confirmed by phone that the Benefits Center is unable to provide a formal notice of denial for either semester. (Exhibit S) Administrative remedies are deemed exhausted under § 2560.503-1(l).

38. **Sixth Claim — Company of Placement: Administrative Remedies Exhausted.** Plaintiff pursued available internal and regulatory remedies before filing this action. Following the reclassification to CIC Company of Placement, between approximately August and December 2025, Plaintiff contacted USAA member-side services on multiple occasions to request correction of his classification and restoration of USAA Company placement. Those contacts did not result in any resolution, any written response explaining the basis for the reclassification, or any offer of a formal review process. Plaintiff then filed a complaint with the Texas Department of Insurance (TDI Problem Report ID: 433325). USAA responded in writing to TDI on September 16, 2025, confirming and defending its policy. TDI closed the complaint on January 12, 2026, stating that the matter involved "contract disputes, factual disputes, or disputes of the legal interpretation of

law" beyond TDI's authority to resolve, and directing Plaintiff to seek judicial relief. (Exhibit TDI1) After receiving TDI's closure letter, Plaintiff again contacted USAA member-side services and requested that USAA reach out directly to the individual USAA representative identified in TDI's denial correspondence to seek resolution. USAA did not provide any resolution through that channel either. USAA has at no point offered or identified any internal ERISA administrative appeal process for the placement reclassification. Having pursued multiple informal internal contacts, the available state regulatory remedy to its conclusion, and a post-denial direct escalation request — all without any offer of a formal review process or resolution — Plaintiff has exhausted all available administrative remedies for this claim. Further attempts at internal resolution would be futile. *Bourgeois v. Pension Trust Fund,* 215 F.3d 475, 479 (5th Cir. 2000).

39. **Seventh Claim — § 407 Violation: No Exhaustion Required; Alternatively, Futile.** The Seventh Claim seeks equitable relief under § 502(a)(3) to enjoin Lincoln's collection scheme targeting Plaintiff's anticipated SSDI retroactive benefits. The claim does not seek recovery of withheld plan benefits — it seeks to enjoin conduct that violates 42 U.S.C. § 407, a federal statute entirely external to the plan. There is no internal process within the USAA plan, and no Lincoln claims procedure, that could evaluate whether Lincoln's collection scheme violates § 407 — that question is purely legal and not within any plan administrator's authority to resolve. Alternatively, even if exhaustion were technically applicable, it is

excused under the futility doctrine: the threatened harm — reduction of current LTD payments based on an estimated SSDI benefit, and seizure of retroactive SSDI funds upon award — is imminent and irreparable, and Lincoln's own documents establish it has already taken all preparatory steps necessary to execute that harm. Requiring Plaintiff to exhaust an internal appeal before seeking an injunction would eliminate the only meaningful opportunity to prevent the violation from occurring.

40. Fifth Circuit Authority and Alternative Futility. The Fifth Circuit has recognized that significant procedural failures in notice requirements excuse exhaustion and deem remedies exhausted. *Theriot v. Building Trades United Pension Trust Fund,* 989 F. App'x 392 (5th Cir. 2021) (excusing exhaustion where denial notice failed to substantially comply with ERISA requirements, including omission of appeal rights and voluntary appeal procedures); *Lacy v. Fulbright & Jaworski,* 405 F.3d 254 (5th Cir. 2005) (same). These holdings apply with full force here, where not a single formal denial notice complying with § 503 has been issued by either Defendant for any claim at issue. Alternatively, further appeals would be futile. *Bourgeois v. Pension Trust Fund,* 215 F.3d 475, 479 (5th Cir. 2000). Where both Defendants have consistently refused to issue formal denial notices, provide appeal rights, or produce relevant documents across multiple claims over an extended period, any internal appeal would be pointless. Plaintiff cannot meaningfully appeal determinations whose stated

reasons he has never been told, using procedures he has never been given, with a claims file he has been refused.

## **FIRST CLAIM FOR RELIEF**

**[Penalty Pursuant to ERISA § 502(a)(1)(A), 29 U.S.C. § 1132(a)(1)(A) —**

**Against All Defendants]**

41. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

42. ERISA § 502(c), 29 U.S.C. § 1132(c), provides that a plan administrator who fails to furnish required information within 30 days of a written request may be liable in the Court's discretion in an amount up to $110 per day from the date of failure or refusal. 29 C.F.R. § 2575.502c-1. ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), requires a plan administrator to furnish to a beneficiary upon written request the instruments pursuant to which the plan is established or maintained.

43. Defendants repeatedly refused to provide necessary documents upon written request, including but not limited to:

   a. Any internal guidelines, claim handling policies, or operational standards governing how Lincoln determines: (i) which conditions qualify as 'Mental Illness' under the DSM; (ii) which symptoms qualify as 'Non-Verifiable Symptoms' in practice; and (iii) how Lincoln

determines whether a disability is 'due to' a Limitation-covered condition versus a physical condition with overlapping symptoms.

b. The current LTD claims file and recent STD claims file. (Lincoln)

c. Claims files from the 2021 STD and LTD claims, needed for complete Social Security disclosures. (Lincoln)

d. Any policy document supporting Lincoln's position that the claims file is released only upon final denial;

e. any policy defining the three-month review frequency;

f. any internal policy outlining Lincoln's medical review methodology, including the undefined standard of "severe global functional impairment." (Lincoln)

g. Medical documents transmitted to Brown & Brown and refused to Plaintiff. (Lincoln)

h. Policy defining the vocational rehabilitation program; formal denial letter after adverse benefit determination and referral to state rehabilitation; any rationale supporting referral to a payer-of-last-resort state program without a prior private denial. (Lincoln Vocational)

i. Valid denial letters with appeal rights for the USAA Educational Assistance Program for Fall 2025 and Spring 2026. (USAA)

j. Written plan language from any Defendant explicitly stating that terminated disabled employees are not entitled to active employee benefits. Lincoln's STD approval letter states "you will receive

benefits as you normally receive pay from USAA."; no formal denial of active benefits was ever issued to contest this plan document during the STD period. (Exhibit A)

k. The USAA employee handbook in effect on March 22, 2025 (Exhibit APIP4, Message 5 of 8), requested in the absence of formal denial notices to identify any basis for stripping plan benefits upon termination.

l. A formal written denial notice for the USAA Annual Performance Incentive Plan (APIP) for the 2025 plan year, including the specific plan provision relied upon and a description of appeal rights and procedures, as required by ERISA § 503 and 29 C.F.R. § 2560.503-1. (Exhibit APIP3; Exhibit APIP4) (USAA)

m. The 2025 APIP Summary Plan Description itself.

44. These documents are required for Plaintiff to appeal adverse benefit determinations and to provide complete, accurate information to Social Security as required by Lincoln. Lincoln's LTD Technical Specialist, Kristianne Corporan, acknowledged in writing that Lincoln cannot provide published guidelines comparable to Social Security's standards and that it evaluates each claim individually with no standardized review intervals. (Exhibit L; Exhibit J; Exhibit M)

45. Under Social Security regulations, 20 C.F.R. § 404.1512, an SSDI application must be complete and accurate. Lincoln's withholding of a full year's worth of medical and vocational review records constitutes a material

omission in Plaintiff's required SSDI disclosure, creating independent legal exposure for Plaintiff through no fault of his own.

WHEREFORE, as to the First Claim, Plaintiff respectfully requests: (a) a finding that each Defendant violated ERISA § 104(b)(4) and § 502(c) with respect to each category of documents listed in ¶43; (b) imposition of statutory penalties at the Court's discretion up to $110 per day per violation from the date of each refusal; (c) an order compelling production of all documents listed in ¶43; (d) attorneys' fees and costs under ERISA § 502(g); and (e) such other relief as the Court deems just and proper.

## SECOND CLAIM FOR RELIEF

**[Declaratory Relief — Unenforceability of Overbroad Limitation]**

**[ERISA § 502(a)(1)(B) and § 502(a)(3) — Against Defendant Lincoln]**

46. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

47. ERISA § 502(a)(1)(B) authorizes a beneficiary to recover benefits due, enforce plan rights, or clarify rights to future benefits. ERISA § 502(a)(3) authorizes appropriate equitable relief to redress ERISA violations. Declaratory relief as to the enforceability of a plan provision is available under both subsections.

48. Defendant Lincoln's policy contains a combined limitation captioned "Mental Illness and/or Substance Abuse and/or Non-Verifiable Symptoms Limitation" ("Limitation"), capping benefits at 24 months for any disability

"due to" Mental Illness, Substance Abuse, or Non-Verifiable Symptoms, or any combination thereof. The Limitation was applied at LTD approval; the 24-month period is currently running.

49. The Limitation bundles three distinct triggers using disjunctive "and/or" construction, so the 24-month cap is activated by any one trigger independently. The "Non-Verifiable Symptoms" prong is defined as "subjective complaints to a Physician which cannot be diagnosed using tests, procedures or clinical examinations typically accepted in the practice of medicine," with a non-exhaustive list—"may include, but are not limited to"—that includes pain, fatigue, dizziness, numbness, and stiffness. These are the primary presenting symptoms of a vast range of objectively diagnosed physical conditions, including musculoskeletal, neurological, autoimmune, and cardiac disorders. As written, the definition has no limiting principle: any claim involving pain or fatigue is potentially subject to the 24-month cap regardless of objective physical diagnosis. A plan provision that swallows the benefit it purports to limit is not a targeted restriction—it is a mechanism granting Lincoln unlimited discretion to cap any claim it chooses.

50. Federal courts have found insurance policy limitations unenforceable on exactly this basis. *Lynd v. Reliance Standard Life Ins. Co.,* 94 F.3d 979, 984 (5th Cir. 1996) (mental illness limitation necessarily ambiguous when undefined and susceptible to multiple reasonable interpretations); *George v. Reliance Standard Life Ins. Co.,* 776 F.3d 349, 355–56 (5th Cir. 2015)

Complaint - 19

(limitation inapplicable where physical conditions independently support disability finding); *Patterson v. Hughes Aircraft Co.,* 11 F.3d 948, 949–50 (9th Cir. 1993) (mental illness limitation ambiguous because unclear whether referencing cause or symptoms); *Phillips v. Lincoln National Life Ins. Co.,* 774 F. Supp. 495, 501 (N.D. Ill. 1991), *aff'd* 978 F.2d 302 (7th Cir. 1992) (Lincoln's predecessor limitation ambiguous because extending it to conditions "no reasonable person would consider mental illness" revealed a definition lacking any principled limiting scope). The DOL's ERISA Advisory Council confirmed in its December 2023 report that open-ended symptom-based limitations create a documented risk of "misclassification of physical conditions as psychiatric impairments" and are inconsistent with general medical principles. (Exhibit LTDREPORT)

51. Lincoln compounded this structural defect by applying the Limitation at LTD approval without disclosing: (i) which of the three disjunctive prongs it applied; (ii) which specific conditions or symptoms triggered the applicable prong; or (iii) what causation analysis it performed. ERISA § 503 and 29 C.F.R. § 2560.503-1(g)(1) required Lincoln to provide specific reasons and specific plan provision citations. Lincoln provided neither. When Plaintiff asked Lincoln to explain its review methodology and how it differed from Social Security's standards, Lincoln's LTD Technical Specialist stated in writing: "private LTD policies do not publish detailed review schedules like SSDI" and "there is no other explanation or information I can provide to you." Lincoln's corporate representative confirmed by phone that Lincoln "do[es]

Complaint - 20

it case by case" with "no set time," and that no further information would be provided. Lincoln never identified which prong of the Limitation applied, which diagnosis triggered it, or what standard it used. (Exhibit L; Exhibit J)

52. This failure is permanent. The administrative record was frozen at the moment Lincoln applied the Limitation. No future action by Lincoln can retroactively supply an interpretation that was never made. Any basis Lincoln offers going forward is post-hoc rationalization entitled to no deference under *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101 (1989). Under *contra proferentem,* the ambiguity Lincoln created in the Limitation belongs to Lincoln. Because Lincoln never articulated an interpretation at the time of the decision, there is nothing in the administrative record to which a reviewing court can defer, and the claim is ripe for declaratory resolution now.

WHEREFORE, as to the Second Claim, Plaintiff respectfully requests: (a) a declaration that the Limitation is inapplicable to Plaintiff's claim because the administrative record contains no contemporaneous articulation by Lincoln of the basis for its application; (b) in the alternative or in addition, a declaration that the Limitation is ambiguous and unenforceable as applied to Plaintiff's physically based, objectively diagnosed conditions under *contra proferentem;* (c) a declaration that any future enforcement of the Limitation is subject to de novo review with no deference attaching to any position Lincoln articulates after the date of LTD approval; and (d) attorneys' fees and costs under ERISA § 502(g).

**THIRD CLAIM FOR RELIEF**

**[Breach of Fiduciary Duty — Multiple Theories]**

**[ERISA §§ 404(a), 409(a), and 502(a)(2)/(a)(3) — Against Defendant Lincoln]**

53. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

54. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires a plan fiduciary to discharge its duties solely in the interest of plan participants. ERISA § 409(a), 29 U.S.C. § 1109(a), makes a breaching fiduciary personally liable for resulting losses and subject to equitable relief. ERISA § 502(a)(2) and (a)(3) authorize civil actions for relief under § 409(a) and appropriate equitable relief to redress violations, respectively. In *Cigna Corp. v. Amara*, 563 U.S. 421 (2011), the Supreme Court confirmed that § 502(a)(3) authorizes equitable surcharge against a breaching fiduciary for losses beyond mere recovery of withheld benefits. Lincoln is a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Theory A: Vocational Rehabilitation — Improper Referral and Failure to Issue Required Denial Notice**

55. Lincoln breached its fiduciary duties under § 404(a) by failing to provide vocational rehabilitation benefits owed under the plan and instead referring Plaintiff to the Texas Workforce Commission Vocational Rehabilitation Services (TWS-VRS)—a state payer-of-last-resort program—without

issuing a formal written denial notice as required by ERISA § 503 and 29 C.F.R. § 2560.503-1. (Exhibit F; Exhibit E)

56. On January 27, 2026, Lincoln's Vocational Rehabilitation Counselor Aleysia Chambers referred Plaintiff to TWS-VRS, acknowledged in writing that TWS-VRS is the "payer of last resort," and outlined a four-step process requiring prior private-source denials before state benefits could be accessed—while simultaneously submitting Plaintiff's information to the state portal. Lincoln thus placed Plaintiff in the position of needing a private denial it refused to issue in order to access a state program it had already referred Plaintiff to. This constitutes imprudent cost-shifting that prioritizes Lincoln's financial interest over Plaintiff's documented therapeutic need for structured, goal-directed activity. (Exhibit F; Exhibit E)

57. Lincoln's financial motivation to deny vocational rehabilitation was compounded by the Rehabilitation Incentive Benefit in the LTD policy. Under the policy, if Lincoln approves a Rehabilitation Program and Plaintiff fully participates, Lincoln is contractually required to increase Plaintiff's monthly benefit percentage from 60% to 70%—a 10-percentage-point increase representing a direct, ongoing, additional cost to Lincoln for the duration of the program. Denial of vocational rehabilitation therefore eliminates two simultaneous financial obligations: the cost of providing the private rehabilitation program itself, and the contractual obligation to pay the increased monthly benefit during participation. (Exhibit LTDPOL) A fiduciary making an individual benefits determination while holding that dual financial

interest bears a heightened obligation to demonstrate that the denial was based on plan terms rather than self-interest. Lincoln issued no written denial, provided no plan-based rationale, closed the vocational rehabilitation referral without notice, and instead redirected Plaintiff to a state payer-of-last-resort—a course of action that eliminates both costs simultaneously while leaving Plaintiff without the private benefit the plan promises. This dual-cost avoidance structure provides direct, concrete evidence that Lincoln's refusal to engage with Plaintiff's rehabilitation needs was driven by financial self-interest rather than a good-faith evaluation of Plaintiff's eligibility under the plan.

58. Plaintiff requested written clarification. Lincoln did not respond substantively and did not issue a § 503-compliant denial notice. Lincoln's January 9, 2026 response from LTD Technical Specialist Kristianne Corporan acknowledged that education "sometimes" qualifies for vocational rehabilitation but declined to evaluate Plaintiff's specific circumstances, review the Menninger Clinic discharge plan, or issue any appealable decision—then closed the vocational rehabilitation referral without notice. (Exhibit E)

**Theory B: Overbroad Limitation — Knowing, Continuing Breach of Fiduciary Duty**

59. Lincoln breached its duties of loyalty and prudence under § 404(a) by applying the Mental Illness Limitation at LTD approval without the

disclosures required by ERISA § 503 and 29 C.F.R. § 2560.503-1(g)(1), as detailed in the Second Claim.

60. This breach was not inadvertent. In *Phillips v. Lincoln National Life Ins. Co.*, 774 F. Supp. 495 (N.D. Ill. 1991), *aff'd* 978 F.2d 302 (7th Cir. 1992)—a case brought against this same Defendant—a court found Lincoln's mental illness limitation overbroad. Rather than adopting objective standards, Lincoln over the following decades added the Non-Verifiable Symptoms prong with an explicitly open-ended definition encompassing pain, stiffness, fatigue, dizziness, and numbness. In 2023, the DOL's ERISA Advisory Council—in a proceeding in which Lincoln's industry trade association participated—again documented that open-ended symptom-based limitations create misclassification of physical conditions and are inconsistent with general medical principles. Lincoln continued the same structure. A fiduciary that continues a known, repeatedly documented harmful practice across three decades, after receiving industry-level notice from the federal agency responsible for ERISA oversight, is making a business decision to prioritize its financial interests over those of the beneficiaries it is legally obligated to serve. (Exhibit LTDREPORT)

**Theory C: Contradictory SSDI Assessments and Undisclosed Review Schedule**

61. Lincoln further breached its fiduciary duties by conducting disability reviews on an undisclosed three-month schedule and by reversing, without any written explanation, a written determination about Plaintiff's capacity to

work. On September 17, 2025, Lincoln's Social Security Claims Examiner Shericka W. sent Plaintiff a formal written letter stating that Lincoln did not believe Plaintiff was a good candidate for SSDI because he "may be able to return to work in your own occupation or to work in a lesser occupation before you reach eligibility for SSDI benefits." (Exhibit SS1)

62. Lincoln provided no written assessment, no medical basis, and no policy standard supporting that conclusion. Approximately three months later, in December 2025, Lincoln reversed that determination entirely — sending Plaintiff the Brown & Brown referral packet, requiring an SSDI application by February 2, 2026, and directing its vendor to certify to the Social Security Administration that Plaintiff qualifies for a program that requires inability to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A).

63. Lincoln provided no written explanation for that reversal either. Lincoln thus made two directly contradictory written and operational determinations about Plaintiff's capacity to work within a three-month span — first that return to work was possible, then that total long-term disability was expected — with no written medical basis for either position and no explanation of what changed.

64. This is irreconcilable with Lincoln simultaneously conducting three-month reviews with no disclosed standard. Overly frequent reviews by a private disability insurer can signal to SSA that the insurer believes improvement is likely — a characterization that conflicts directly with the showing of expected continuous disability required for SSDI approval. Lincoln's LTD

Complaint - 26

Technical Specialist Kristianne Corporan acknowledged in writing that she receives review dates from the medical team but does not understand why those intervals are selected. (Exhibit M) Plaintiff made repeated written requests for the criteria Lincoln uses to determine review frequency and has received no substantive response.

**Harm Caused by All Theories**

63. Plaintiff has suffered losses caused by Lincoln's fiduciary breaches that are not compensable through mere benefit recovery, warranting surcharge under *Amara.* These include: (a) frustration of the Menninger Clinic discharge plan recommending structured part-time master's education, causing worsening PTSD and documented barriers to state vocational rehabilitation because no private denial was ever issued; (b) out-of-pocket costs for coursework Lincoln was obligated to evaluate; (c) harm from application of the Limitation without notice, depriving Plaintiff of any opportunity to contest or seek additional documentation; (d) the ongoing harm of living under a benefit cap Lincoln refuses to explain; (e) the conflict between Lincoln's SSDI application requirement and its refusal to produce the claims file needed for a complete application; and (f) harm from Lincoln's contradictory work-capacity assessments and undisclosed review schedule, which created a conflict between Lincoln's internal determinations and Plaintiff's ability to present an accurate and complete SSDI application.

WHEREFORE, as to the Third Claim, Plaintiff respectfully requests: (a) a finding that Lincoln breached its fiduciary duties under §§ 404(a)(1) and 409(a) under Theory A, Theory B, and Theory C; (b) equitable surcharge under *Amara* and § 502(a)(3) for losses caused by Lincoln's breaches, in an amount to be determined at trial; (c) a prospective injunction requiring Lincoln to evaluate Plaintiff's participation in structured part-time education as a qualifying vocational rehabilitation activity and to issue a § 503-compliant written decision within 30 days of the Court's order; (d) a prospective injunction requiring § 503-compliant written notice identifying the specific basis for any future adverse benefit determination before or contemporaneously with that determination; (e) an injunction requiring Lincoln to provide Plaintiff a written explanation of the medical criteria and policy standards used to set his review frequency, and to conduct future reviews on a schedule documented and disclosed in writing with specific medical basis; (f) declaratory relief that Lincoln's referral of Plaintiff to TWS-VRS without a compliant private denial, Lincoln's application of the Limitation without § 503-required notice, and Lincoln's issuance of contradictory undocumented work-capacity determinations each independently violate ERISA fiduciary duties; (g) attorneys' fees and costs under ERISA § 502(g); and (h) such other equitable or remedial relief as the Court deems just and proper under § 409(a).

## FOURTH CLAIM FOR RELIEF

**[Wrongful Denial of Benefits — ERISA § 502(a)(1)(B)]**

**[Annual Performance Incentive Plan — Against USAA]**

64. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

65. The USAA Annual Performance Incentive Plan (APIP) is an ERISA-governed employee benefit plan. USAA's APIP Summary Plan Description establishes that participants receiving long-term disability benefits are eligible to receive APIP payments calculated on a pro-rata basis reflecting their period of active service and approved disability leave. (Exhibit APIP1)

66. **ERISA Coverage of the USAA Annual Performance Incentive Plan**: The USAA Annual Performance Incentive Plan (APIP) is an employee welfare benefit plan subject to ERISA § 3(1), 29 U.S.C. § 1002(1). USAA maintains written APIP eligibility criteria on its internal My Total Rewards website expressly providing that employees receiving LTD benefits are eligible to participate, and that employees who separate due to disability meeting USAA's LTD program definition may be eligible for a prorated award. A written document maintained by an employer that establishes specific benefit eligibility criteria satisfies the threshold requirements for ERISA plan coverage under *Donovan v. Dillingham, 688 F.2d 1367, 1373 (11th Cir. 1982) (en banc)*, and ERISA § 3(1), 29 U.S.C. § 1002(1). In the alternative, to the extent the Court determines the APIP is not governed by ERISA, the APIP constitutes a written compensation agreement under Texas Labor Code § 61.015, and Defendant's failure to pay benefits due under that written agreement constitutes a violation of the Texas Payday Act, Tex. Lab. Code Ch. 61. The APIP payment for the 2025 plan year was made to eligible

employees on or around February 26, 2026. The 180-day deadline for filing a Texas Payday Act wage claim runs from that date.

67. Plaintiff was an active USAA employee earning compensation in 2025 until the onset of his disability, which predates his termination. Plaintiff was approved for LTD benefits effective September 18, 2025. His 2025 earnings and disability payments satisfy the APIP eligibility criteria applicable to disability retirees and LTD participants. (Exhibit APIP2)

68. On or around February 5, 2026, Plaintiff requested a formal denial or approval letter on letterhead through the BenefitConnect system, affirmatively seeking the formal process USAA was obligated to provide. On or around February 10, 2026, Plaintiff formally requested an APIP eligibility determination from USAA Human Resources. (Exhibit APIP3)

69. USAA acknowledged the inquiry on February 13, 2026 (ServiceNow Case No. HRC0549446).

70. On or around February 20, 2026, USAA communicated through the ServiceNow system that Plaintiff was not eligible—without a formal written denial notice, without citing the specific plan provision relied upon, and without informing Plaintiff of any right to appeal. (Exhibit APIP4)

71. ERISA § 503, 29 U.S.C. § 1133, and 29 C.F.R. § 2560.503-1 require that any adverse benefit determination be communicated in writing with specific reasons, specific plan provision citations, a description of additional information needed to perfect the claim, and a description of review procedures. Defendant's informal ServiceNow communication satisfies

none of these requirements. The denial is also arbitrary and capricious: the APIP SPD governing LTD participants does not condition eligibility on maintaining active employment at year-end, and Defendant has offered no plan-based rationale.

WHEREFORE, as to the Fourth Claim, Plaintiff respectfully requests: (a) a declaration that Plaintiff is eligible for APIP benefits for the 2025 plan year under the plan's express terms; (b) a declaration that the denial without formal written notice, specific plan citations, or appeal rights violates ERISA § 503; (c) an order directing Defendant to pay Plaintiff the APIP benefits to which he is entitled, together with pre- and post-judgment interest; (d) attorneys' fees and costs under ERISA § 502(g); and (e) such other and further relief as the Court deems just and proper.

## FIFTH CLAIM FOR RELIEF

**[Wrongful Denial of Benefits — ERISA § 502(a)(1)(B)]**

**[Educational Assistance Plan — Against USAA]**

72. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

73. The USAA Educational Assistance Plan is an employee welfare benefit plan subject to ERISA § 3(1), 29 U.S.C. § 1002(1), which expressly covers plans established or maintained by an employer to provide apprenticeship, training programs, or scholarship funds to participants. *Donovan v.*

*Dillingham, 688 F.2d 1367, 1373 (11th Cir. 1982) (en banc)*. The USAA Educational Assistance Plan satisfies this definition: it is established and maintained by USAA, provides educational reimbursement benefits to employees, and is governed by a written Summary Plan Description with specific eligibility criteria administered through USAA's BenefitConnect infrastructure alongside USAA's LTD, health, and welfare plans. The plan's eligibility criteria are further defined by direct reference to LTD participation status, embedding it within the same administrative structure as USAA's other ERISA-governed benefit plans. To the extent USAA contends the Educational Assistance Plan falls outside ERISA's scope, that position is irreconcilable with the plan's written terms and with the statutory text of ERISA § 3(1).

74. The USAA Educational Assistance SPD expressly states: "Employees on leave of absence, including short term and long-term disability remain eligible." (Exhibit C) Plaintiff has been a participant in the USAA LTD Plan since September 2025 with benefits approved effective September 18, 2025, and therefore satisfies the express eligibility criteria.

75. Defendants wrongfully denied Plaintiff educational assistance benefits and failed to provide any formal written denial notice complying with ERISA § 503, 29 U.S.C. § 1133, and 29 C.F.R. § 2560.503-1. (Exhibit S)

76. In an informal email, Defendants asserted Plaintiff was ineligible solely because he had been terminated and was therefore not on a "leave of absence." This rationale is arbitrary, capricious, and contrary to the plan's

express language. While the SPD contains a "Terminated Employees" section stating that terminated employees are not eligible to participate on a go-forward basis, that provision applies to employees who separate from employment without first becoming disabled. Plaintiff did not simply terminate — he became disabled before termination and was approved for LTD benefits effective September 18, 2025, a status that has continued uninterrupted. The SPD's disability and leave-of-absence eligibility provision, which explicitly preserves eligibility for employees on short- and long-term disability, controls over the general terminated-employee provision as applied to Plaintiff's circumstances. This reading is compelled by the consistent pattern of USAA's own benefit administration: other USAA Summary Plan Descriptions similarly provide that termination generally ends benefits, yet USAA has recognized Plaintiff as a disability retiree — not a terminated employee — for purposes of health insurance, dental insurance, life insurance, and retirement plan participation, each of which he continues to receive at active-employee or disability-retiree rates. USAA's selective application of the "terminated employee" classification to the Education Plan alone, while treating Plaintiff as a disability retiree under every other benefit plan, is inconsistent, arbitrary, and contrary to the reasonable expectations created by the plan documents read as a whole. (Exhibit C; Exhibit EDU1)

77. Furthermore, the chronological facts of Plaintiff's disability establish that he definitively met the Educational Assistance Plan's "leave of absence"

eligibility criteria *before* his termination. Plaintiff suffered a severe medical crisis on March 22, 2025, and Lincoln Financial approved his Short-Term Disability retroactive to March 22, 2025. Plaintiff was not terminated by USAA until April 1, 2025. Therefore, Plaintiff was officially on a qualifying, approved "leave of absence" for over a week prior to separation. Under the governing plan documents—and consistent with ERISA principles—once a benefit under the plan is executed and triggered (such as an approved disability leave), a subsequent termination does not strip the participant of the accrued "benefits of the plan." Even if Defendants attempt to strictly enforce the "leave of absence" requirement, Plaintiff unequivocally achieved that status prior to termination. Defendants cannot legally weaponize a subsequent termination to retroactively strip Plaintiff of the educational benefits that had already attached to his approved disability leave.

78. Plaintiff does not seek duplicative benefits. Any educational assistance awarded under this claim shall not be duplicative of vocational rehabilitation services that may be provided by Lincoln under the LTD Plan. Plaintiff seeks one set of educational benefits sufficient to satisfy his medically necessary need for structured part-time graduate education as recommended in the Menninger Clinic discharge plan. These benefits are not contingent on vocational rehabilitation approval and should function as primary benefits.

WHEREFORE, as to the Fifth Claim, Plaintiff respectfully requests: (a) a declaration that Plaintiff is entitled to educational assistance benefits under the

USAA Educational Assistance Plan; (b) a declaration that LTD status constitutes a "leave of absence" preserving eligibility notwithstanding termination; (c) a declaration that Defendants' denial based on termination status violates the plan's express language; (d) an order directing Defendants to provide the educational assistance benefits to which Plaintiff is entitled, including reimbursement for qualifying expenses already incurred; (e) a declaration that educational benefits awarded shall not be duplicative of vocational rehabilitation benefits under the LTD Plan; (f) pre- and post-judgment interest on all amounts due; (g) attorneys' fees and costs under ERISA § 502(g); and (h) such other relief as the Court deems just and proper.

## SIXTH CLAIM FOR RELIEF

**[Wrongful Denial of USAA Company of Placement]**

**[ERISA § 502(a)(1)(B) and (a)(3) and Texas Insurance Code § 544.001 —**

**Against USAA]**

79. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

80. USAA operates multiple insurance subsidiaries. Company of placement—specifically, assignment to USAA Company rather than a lower-tier subsidiary such as CIC—is a benefit that differs based on employment and retirement status. In a letter dated September 16, 2025, submitted to the Texas Department of Insurance (TDI Problem Report ID: 433325), USAA

Casualty Insurance Company confirmed in writing: "Regular USAA employees with five or more years of service and USAA retirees are insured through USAA. Regular USAA employees with less than five years of service, and former (non-retired) employees (including those who transition to Long-Term Disability), are insured through USAA Casualty Insurance Company (CIC)." (Exhibit TDI1)

81. By USAA's own admission, retirees are placed in USAA Company while employees who transition to LTD are placed in CIC. Under USAA's member-side enrollment practices, the classification a member holds at separation is permanent. Plaintiff left USAA as a disability retiree and is therefore entitled to USAA Company placement on a permanent basis, consistent with how USAA treats all other retirees. USAA Company placement is not merely a benefit of employment — it is also a benefit of enrollment in USAA's disability plans, because LTD participants who separated due to disability are themselves a recognized retiree category under USAA's own member-side system. The distinction USAA draws between conventional retirees and those separating via LTD is not supported by the permanent-classification principle USAA applies to every other retiree category.

82. Plaintiff had more than five years of service at the time of his disability. On or around September 1, 2025, Plaintiff's homeowners insurance policy renewed and USAA placed Plaintiff in CIC with a corresponding rate increase. The TDI letter confirms USAA upheld this position after regulatory

review, establishing the reclassification as a deliberate policy determination—not an administrative error. (Exhibit TDI1)

83. The distinction USAA draws is arbitrary under ERISA and produces a result prohibited by Texas law. USAA treats Plaintiff as a disability retiree for every other benefit administered under the USAA Plans: Cigna health insurance at the active employee rate, Delta Dental at the active employee rate, and Prudential life insurance at no cost. USAA's own retirement plan treats Plaintiff as a disability retiree for fee purposes. The Comprehensive Health Care Arrangement SPD maintains a formal pre-65 retiree classification. The selective exclusion of company of placement from the disability-retiree benefits USAA otherwise extends to Plaintiff is internally inconsistent across every other benefit program.

84. USAA has maintained that the reclassification was based on termination status, not disability. However, Plaintiff became disabled before separation and remains continuously disabled under USAA's own LTD Plan. Texas Insurance Code § 544.001 prohibits an increase in insurance rates attributable in substance to a finding of disability. Plaintiff filed a complaint with TDI. TDI closed the matter on January 12, 2026, noting that the issues involve "contract disputes, factual disputes, or disputes of the legal interpretation of law" that TDI cannot resolve—confirming exhaustion of available state regulatory remedies and that this Court is the appropriate forum. (Exhibit TDI1)

WHEREFORE, as to the Sixth Claim, Plaintiff respectfully requests: (a) a declaration that Plaintiff's correct member-side classification at separation was disability retiree, and that Plaintiff is entitled to USAA Company placement on a permanent basis retroactive to the September 2025 renewal date; (b) an order directing USAA to correct Plaintiff's classification and restore USAA Company placement accordingly; (c) an award of the difference in insurance premiums paid as a result of the wrongful reclassification from September 2025 through the date of judgment, as equitable surcharge or restitution under § 502(a)(3); (d) attorneys' fees and costs under ERISA § 502(g); and (e) such other equitable relief as the Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF

**[Violation of 42 U.S.C. § 407 and Unlawful Collection of Federally Protected Disability Benefits]**

**[ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) — Against Defendant Lincoln]**

85. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

86. Section 207 of the Social Security Act, 42 U.S.C. § 407, provides in absolute terms that SSDI benefits "shall not be transferable or assignable, at law or in equity," and that "none of the moneys paid or payable" under the Act "shall be subject to execution, levy, attachment, garnishment, or other legal process." In *Philpott v. Essex County Welfare Board,* 409 U.S. 413 (1973),

the Supreme Court held this prohibition is absolute, applies to all creditors without exception, and extends to SSDI funds after deposit in a claimant's bank account. It cannot be circumvented through nominally voluntary authorization where the only alternative is a mandatory repayment obligation.

87. Lincoln contracted with Brown & Brown Absence Services Group to manage SSDI applications for Lincoln's LTD claimants. Brown & Brown's CEO letter dated January 9, 2026, included in Lincoln's packet, states that Brown & Brown has assisted over 200,000 claimants in receiving SSDI. Lincoln's own FAQ in the same packet states that "Lincoln Financial Group will cover Brown & Brown's fee" upon an SSDI award.

88. The SSA-1696 Appointment of Representative form in that packet—executed by Brown & Brown under penalty of perjury—certifies that Brown & Brown "will not charge, collect, or retain a fee for representational services that SSA has not approved." Part C of the SSA-1696, which would have authorized direct payment of an SSA-approved fee from Plaintiff's back pay, was left unchecked. Brown & Brown thus certified to SSA it would take nothing from Plaintiff's back pay, while Lincoln's own document confirms Lincoln will pay Brown & Brown upon award. The only fund available to Lincoln at the time of an SSDI award is the retroactive lump sum it is simultaneously demanding Plaintiff repay. On information and belief, Brown & Brown confirmed over the phone that it collects from SSDI back pay

through Lincoln; Brown & Brown records all calls. Across 200,000 claimants, this is a deliberate and systematic practice.

89. Lincoln's December 23, 2025 cover letter required Plaintiff to initiate an SSDI application by February 2, 2026, and threatened that if Plaintiff failed to comply, Lincoln "may estimate the monthly Social Security Disability benefit" and reduce Plaintiff's current LTD payments accordingly. Lincoln renewed and escalated this demand by letter dated February 2, 2026, explicitly instructing Plaintiff not to spend any retroactive SSDI award because those funds "are due back to Lincoln Financial," and setting a hard deadline of March 6, 2026 for proof of application — after which Lincoln threatened to proceed with benefit reduction. (Exhibit R)

90. Lincoln has already taken the preparatory step required to execute that reduction: it requested Plaintiff's compensation history from USAA—the specific data needed to calculate an estimated SSDI benefit. Brown & Brown separately requested the same data. Two entities acting on Lincoln's behalf both requested the precise data needed to calculate an estimated federal benefit amount, establishing that the estimated offset is not a contingency—it is a prepared and imminent action. This is an anticipatory attachment of a benefit "payable" under § 407, executed before SSA has made any determination and without the process SSA itself would be required to provide. The threatened reduction is further coercive because Lincoln simultaneously withholds the claims file Plaintiff needs for a complete SSDI application while threatening financial harm for non-filing.

Complaint - 40

Plaintiff disclosed to Lincoln that he previously suffered a retroactive SSDI denial as a child—establishing that the risk of an incomplete application is not hypothetical. Lincoln withheld the file regardless.

91. The Disability Payment Options form (GLC-01767), enclosed with Lincoln's letter, presented two options. Option 1: immediate estimated reduction, adjusted upon actual award. Option 2 (the default, under which Plaintiff currently receives benefits): full LTD payments now, with Plaintiff required to "repay any overpayment" immediately upon Lincoln's request after SSDI award. Under either option, if repayment is not made within 60 days, Lincoln "may offset the amount of the overpayment against any current or future benefits payable" and "take any other actions necessary to recover the overpayment." The phrase "any other actions necessary" is a reservation of uncapped collection authority built in as a backstop.

92. The EFT (Electronic Funds Transfer) form, also included in the packet, is a separate collection layer. It states that if Plaintiff is awarded SSDI, "any retroactive benefits received may result in an overpayment" owed to Lincoln, and asks Plaintiff to authorize Brown & Brown to debit Plaintiff's bank account and forward funds to Lincoln. The EFT form contains no mention of offset. A true contractual offset is administered internally—it reduces the insurer's own outgoing payment and requires no action from the claimant. The presence of a third-party vendor form seeking bank credentials to execute a debit is evidence of external debt collection from a deposited federal benefit, not internal benefit coordination. The packet was

delivered via DocuSign requiring Plaintiff's signature on every page. The only available act of non-consent was leaving the bank fields blank, which Plaintiff did. Lincoln cannot characterize the EFT as optional while delivering it through a mandatory signing workflow.

93. Lincoln cannot cure its § 407 violation by routing the collection through a third-party vendor. Brown & Brown Absence Services Group has no insurance relationship with Plaintiff, pays no benefits to Plaintiff, and has no contractual offset rights. In this transaction, Brown & Brown acts purely as a debt collector for Lincoln. Brown & Brown's own EFT form admits this, explicitly labeling the transaction in its subheading as a "Pre - Authorization to conduct electronic funds transfer (EFT) to repay a debt to a third party". By its own drafted terms, the vendor does not characterize this as an internal coordination of concurrent insurance benefits; it characterizes it as external debt collection. Under basic agency principles, Brown & Brown's admission that it is collecting a "debt" binds its principal, Lincoln. Because 42 U.S.C. § 407 categorically prohibits the use of "execution, levy, attachment, garnishment, or other legal process" to collect a debt from Social Security benefits, Lincoln cannot lawfully execute a prohibited collection scheme simply by hiring a vendor to extract the protected federal funds on its behalf.

94. Independent of the statutory § 407 bar, Defendants' collection scheme is precluded by waiver and equitable estoppel based on their sworn representations to the federal government. On January 9, 2026, Brown &

Brown executed an SSA-1696 Appointment of Representative form. In Section 6 of that form, Brown & Brown explicitly checked the box stating: "I waive the right to receive a fee from the claimant, any auxiliary beneficiaries or any other individual, but a third-party entity will pay my fee". The form legally certifies that the claimant "must not be liable for the fee, directly or indirectly".

95. By voluntarily entering the SSA's representative framework and submitting this sworn form under penalty of perjury, Brown & Brown explicitly waived any right to collect from Plaintiff's SSDI funds outside of the SSA's authorized fee process. Because Lincoln directed and funded Brown & Brown's representation, Lincoln is bound by its agent's sworn waiver.

96. Furthermore, Plaintiff relied on Brown & Brown's sworn representation to the SSA that his back pay was safe when he allowed the vendor to access his medical information and assist with his claim. Having induced Plaintiff's cooperation through that sworn representation, Defendants are equitably estopped from utilizing the access they gained to execute an external collection scheme (via the EFT debit) targeting the exact funds they promised the SSA they would not touch. Pleading in the alternative, even if the Court were to find that § 407 contains a narrow "insurer exception" (which Plaintiff denies), Defendants expressly waived any right to utilize it through their SSA-1696 certification.

97. The collection mechanism Lincoln constructed—estimated offset threats, lump-sum repayment demands upon SSDI award, EFT bank account

extraction, and reserved "any other actions necessary" authority—bypasses every protection Congress has established for disability recipients. A lawful garnishment, even if § 407 permitted one (which it does not), would require a court order, be subject to statutory caps under the Consumer Credit Protection Act, and afford Plaintiff procedural protections. Lincoln circumvents all of this by labeling the extraction "voluntary repayment" and demanding 100 percent of the retroactive lump sum immediately upon award with no cap and no process. Once the two-year limitation period expires, Lincoln will have no remaining insurance obligation—any continued pursuit of SSDI funds renders Lincoln simply a creditor, one with no special status and no congressional carve-out under § 407.

98. Lincoln's creditor status is most completely exposed by examining its offset formula as applied to derivative SSDI benefits paid to a covered employee's spouse and dependent children. The policy provides that Lincoln will reduce LTD benefits by the amount that a claimant's spouse or child "receives or is eligible to receive because of his Disability." (LTD Policy, Section 4, Other Income Benefits § 4(b).) The February 2, 2026 demand letter reiterates this formula and instructs Lincoln's vendor to notify Plaintiff to inform SSA of any family members who may be eligible for dependent benefits so that "application and payment for dependent benefits is not delayed." (Exhibit R.)

Complaint - 44

99. The USAA LTD plan insures only the covered employee. Spouses and dependent children are not insureds, not plan participants, and are not parties to any contract with Lincoln. Lincoln collected no premium attributable to them, assumed no underwriting risk with respect to their welfare, and has never paid a dollar of benefit on their behalf. They are complete strangers to the insurance relationship in every legally cognizable sense. Lincoln's formula nonetheless treats their federally awarded benefits as a fund from which Lincoln may satisfy its own contractual obligations—obligations owed exclusively to the employee. That is the definition of a creditor reaching into a non-party's protected asset. The structural § 407 violation is identical whether Lincoln collects directly or routes its demand through the covered employee as an intermediary: in either case the ultimate target is a benefit stream belonging to a person who owes Lincoln nothing and whose federal award Congress has placed beyond the reach of creditors without exception.

100. The child scenario illustrates the violation with the greatest precision. When SSA awards derivative benefits to a minor child based on a parent's disability, SSA does not pay those funds to the parent as the parent's income. SSA pays them to the child and, because the child is a minor, designates the disabled parent as representative payee under 42 U.S.C. § 405(j). The representative payee relationship is a federal fiduciary appointment, not a property transfer. The parent receives the funds in a strictly custodial capacity. Federal law requires the representative payee to

use the child's benefits exclusively for the child's current maintenance and welfare—food, clothing, shelter, medical care, and education. 20 C.F.R. § 404.2040. Any funds not immediately needed for the child's support must be conserved and maintained in a dedicated account held separately from the payee's own funds. 20 C.F.R. § 404.2045. The representative payee is required to submit annual accountings to SSA documenting how every dollar was used and certifying that all expenditures served the child's interests. 20 C.F.R. § 404.2065. The child's benefits never become the parent's property at any point in this process. The parent holds them as a court-recognized federal fiduciary—a trustee in practical terms—with no beneficial interest and no authority to alienate the funds for any purpose other than the child's welfare.

101. Lincoln's repayment demand, directed at the covered employee, necessarily demands that the employee divert the child's federally protected funds to Lincoln. There is no other source from which the employee could satisfy the demand attributable to the child's derivative award: the child's funds are the only asset in the employee's physical possession that corresponds to that portion of the calculated overpayment. Complying with Lincoln's demand would therefore require the employee to misuse representative payee funds—a federal criminal offense under 42 U.S.C. § 408(a)(5), which prohibits converting funds received as representative payee to a use other than the beneficiary's benefit, punishable by up to five years imprisonment and a $250,000 fine. Lincoln's collection demand thus

places the covered employee in an irreconcilable conflict between two federal legal obligations: comply with Lincoln and misallocate funds or protect the child's funds and face Lincoln's threatened collection mechanisms, including reduction of current LTD benefits and the full scope of "any other actions necessary." No contractual provision can lawfully place a beneficiary in that position. A contract that demands performance of an illegal act is void and unenforceable as to that demand. Lincoln cannot enforce a repayment obligation it knows or should know cannot be satisfied without criminal exposure to the person it is demanding payment from.

102. The § 407 violation as applied to the child's benefits is also direct and independent of the representative payee analysis. Section 407 protects benefits paid or payable under the Social Security Act from execution, levy, attachment, garnishment, or other legal process. The child's derivative SSDI award is a benefit paid under the Social Security Act. It belongs to the child. The fact that the disabled parent temporarily holds it in a fiduciary capacity does not convert it into the parent's asset, does not make it available to the parent's creditors, and does not strip it of § 407's protection.

103. The funds held by a representative payee belong to the beneficiary — not the payee — and § 407's absolute bar on creditor collection applies to those funds regardless of who physically holds them or what collection method a creditor employs. *Philpott v. Essex County Welfare Board*, 409 U.S. 413 (1973); *Washington State Dep't of Social & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 383–86 (2003) (treating representative

payee's role as strictly fiduciary, with funds belonging to the beneficiary; § 407 bars "creditor-type acts" against those funds); 20 C.F.R. § 404.2045 (conserved funds "are the property of the beneficiary" and must be returned to beneficiary or successor payee upon termination); *see also Matter of Neavear v. Schweiker*, 674 F.2d 1201, 1205 (7th Cir. 1982); *Dionne v. Bouley*, 757 F.2d 1344, 1355 (1st Cir. 1985); *Lee v. Schweiker*, 739 F.2d 870, 876 (3d Cir. 1984); *Rowan v. Morgan*, 747 F.2d 1052, 1055 (6th Cir. 1984); *Crawford v. Gould*, 56 F.3d 1162, 1166 (9th Cir. 1995); *Tom v. First American Credit Union*, 151 F.3d 1289, 1293 (10th Cir. 1998) (§ 407 exempts SSDI funds "from all creditors, regardless of whether they attempted to reach those funds by way of the court system or by way of self-help remedies").

104. Lincoln is the parent's creditor—it has no claim on the child's funds regardless of who holds them or in what capacity.

105. The spousal scenario presents a structurally parallel but analytically distinct violation. When SSA awards derivative benefits to a spouse based on the covered employee's disability, those benefits are paid directly to the spouse—in the spouse's name, to the spouse's account. The spouse is not a representative payee. The spouse has no fiduciary obligation to the covered employee. The funds are the spouse's property from the moment of deposit. The covered employee has no legal access to them, no right to demand them, and no ability to compel the spouse to surrender them. Lincoln's repayment demand runs solely to the covered employee—the only

person Lincoln has any contractual relationship with. But the funds Lincoln is demanding repayment for are sitting in an account belonging to a person who owes Lincoln nothing, signed nothing with Lincoln, and whose § 407-protected benefits Lincoln has no direct claim on.

106. Lincoln's demand is therefore either a demand that the employee produce funds they do not possess and have no legal right to obtain, or an implicit attempt to reach the spouse's protected award through the employee as a collection intermediary. Either characterization describes conduct § 407 prohibits. The spouse never authorized the EFT that Lincoln sent. The EFT form bears only the covered employee's signature. If derivative spousal benefits flow into a joint account that the employee authorized for EFT, Lincoln would be debiting funds legally belonging to the spouse without the spouse's knowledge or consent—unauthorized collection from a non-party's federally protected benefit stream by direct bank debit. The marital relationship provides Lincoln no legal authority to treat one spouse's federal disability award as available to satisfy the other spouse's private insurance obligations. The § 407 protection is personal to each beneficiary and cannot be waived by a third party, including a spouse. Lincoln has no verification mechanism that could make this collection scheme lawful even in theory. Lincoln cannot subpoena the spouse's SSA records. It cannot audit the spouse's bank account. It cannot compel the spouse to disclose the amount of their derivative award or to participate in any repayment arrangement. It cannot compel a representative payee to divert a child's funds—and if it

tried, it would be soliciting a federal crime. Lincoln's only enforcement lever is against the covered employee: reduce current LTD payments or demand lump-sum repayment for an overpayment calculated in part using benefit streams the employee never received, cannot recover, and has no lawful authority to redirect. This is not a limitation of Lincoln's administrative capacity—it is a structural feature of a collection formula that was designed without regard for the legal identity of the people whose federally protected funds it targets.

107. Under Philpott v. Essex County Welfare Board, 409 U.S. 413 (1973), a sovereign government asserting its own statutory reimbursement rights was immediately enjoined when it attempted to reach a beneficiary's SSDI award. The State of New Jersey at least had a codified statutory claim, occupied a sovereign role, and sought funds belonging to the actual beneficiary before the court. Lincoln asserts no statutory right, occupies no governmental role, possesses no congressional carve-out, and in the spousal and child scenarios seeks to collect from benefit streams belonging to people who are not before the court and who owe Lincoln nothing. Lincoln's position in those scenarios is weaker than New Jersey's was in Philpott in every legally relevant dimension.

108. Brown & Brown caseworker D'Andre informed Plaintiff that SSA processing in Texas currently averages approximately eighteen months for an initial determination; expedited reinstatement carries an estimated eight-month processing time. Lincoln required Plaintiff to apply by February 2, 2026.

Complaint - 50

Even applying immediately upon receipt of Lincoln's December 23 letter, an SSDI award under either pathway may arrive months after Lincoln's current two-year limitation period may have already ended. Lincoln has therefore constructed a system in which it collects the full retroactive SSDI lump sum at the moment of award regardless of whether any concurrent insurance obligation remains. Across 200,000 claimants, a significant portion will have experienced exactly this sequence: LTD benefits ending before SSDI is awarded, followed by Lincoln collecting the entire back pay as "repayment" of an overpayment no longer corresponding to any active benefit stream. In those cases, Lincoln functions not as an insurer coordinating concurrent benefits but as a creditor collecting a debt from federally protected funds in direct violation of § 407.

109. Lincoln's collection structure reveals its own priorities. The primary mechanism is the EFT form, which seeks bank credentials to extract the SSDI retroactive lump sum by direct debit the moment it is awarded. The form states that if the EFT is not utilized, "any debt owed to The Lincoln National Life Insurance Company must be satisfied through direct payment." Declining to provide bank credentials does not avoid the collection demand—it simply changes the delivery method while leaving the target identical: the SSDI funds. Notably, the EFT form contains no mention of offset. It does not describe the transaction as a coordination of concurrent benefit streams. It describes it as repayment of a debt. Lincoln's own framing in the document it drafted confirms it understands the EFT

mechanism to be debt collection, not benefit coordination—and it chose not to conflate the two in the one document where the distinction would have mattered most.

110. The "any other actions necessary" reservation preserves uncapped collection authority as a backstop if the EFT and direct payment demand prove insufficient. The contractual offset is the last resort, available only if the prior mechanisms fail. A true offset would be the first and only tool—Lincoln reduces its outgoing payment, the claimant receives the difference, and no federal funds are touched. Lincoln inverts that structure entirely.

111. Under the equitable principles recognized in *Deckert v. Independence Shares Corp.,* 311 U.S. 282 (1940), a court of equity will not assist a party in enforcing a scheme that is itself unlawful. The unlawful element here is not the offset provision—it is everything Lincoln does before reaching it.

WHEREFORE, as to the Seventh Claim, Plaintiff respectfully requests: (a) a declaration that Lincoln's demand for repayment from Plaintiff's SSDI retroactive benefits, and all mechanisms designed to collect such repayment, violate 42 U.S.C. § 407 and are void and unenforceable as applied to Plaintiff's SSDI funds; (b) a permanent injunction prohibiting Lincoln from reducing Plaintiff's current LTD benefits based on any estimated or projected SSDI benefit prior to an actual SSA award; (c) a permanent injunction prohibiting Lincoln and its agents, including Brown & Brown, from executing or attempting any EFT, direct debit, direct payment demand, or other collection action against Plaintiff's SSDI retroactive benefits or any account into which such benefits have been deposited; (d) an order for

disgorgement of any fees paid or to be paid by Lincoln to Brown & Brown from SSDI-derived funds, on the grounds that such payment is financed by the unlawful collection scheme and is inconsistent with Brown & Brown's sworn SSA-1696 certification; (e) equitable surcharge under ERISA § 502(a)(3) for any losses Plaintiff has suffered or will suffer as a result of Lincoln's estimated offset threats and unlawful collection scheme; (f) attorneys' fees and costs under ERISA § 502(g); and (g) such other equitable and declaratory relief as the Court deems just and proper.

## EIGHTH CLAIM FOR RELIEF

**[Equitable Surcharge and Recovery of Plan Benefits — ERISA § 502(a)(1)(B) and § 502(a)(3)]**

**[Aggregate Financial Harm Caused by Arbitrary Classification and Fiduciary Concealment — Against USAA and Lincoln]**

104. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

105. Under ERISA § 502(a)(1)(B), a participant may recover benefits due under the terms of a plan. Under ERISA § 502(a)(3) and the Supreme Court's ruling in Cigna Corp. v. Amara, 563 U.S. 421 (2011), a participant may recover "make-whole" equitable surcharge for financial losses caused by a plan administrator's breach of fiduciary duty, including the failure to properly

disclose plan terms or the arbitrary and inconsistent administration of plan benefits.

106. Under the express written terms of USAA's interrelated benefit plans, individuals receiving Short-Term and Long-Term Disability benefits are afforded specific eligibility protections. For example, the USAA Annual Performance Incentive Plan (APIP) explicitly preserves eligibility for employees who separate due to disability. Similarly, the Educational Assistance Plan explicitly preserves eligibility for employees on an approved leave of absence, including short-term and long-term disability.

107. The chronological facts establish that Plaintiff's rights to the benefits of the plan attached under these disability frameworks prior to his separation from the company. Lincoln Financial approved Plaintiff's Short-Term Disability retroactive to March 22, 2025, effectively placing him on an approved disability leave of absence on that date.

108. Despite this approved disability status, Defendants engaged in a systematic, bad-faith pattern of arbitrary classification. Instead of treating Plaintiff as an individual entitled to benefits under the disability framework, USAA elected to classify Plaintiff as a generic "former employee" under several interrelated plans, selectively stripping him of accrued financial protections. By willfully ignoring the plans' express carve-outs for disabled participants, USAA's administration was arbitrary, capricious, and contrary to the written plan documents.

109. This arbitrary classification resulted in the wrongful deprivation of employer-subsidized health insurance during the Short-Term Disability period. USAA stripped Plaintiff of active-employee health rates and unlawfully forced him to pay exorbitant COBRA premiums from April to September 2025. Demonstrating bad faith, USAA completely failed to issue a formal, ERISA-compliant § 503 denial notice justifying this loss of active-rate health benefits. USAA informally informed Plaintiff that active-rate health benefits would be restored upon LTD transition, but never provided any plan document supporting that distinction. USAA's actions directly contradict its own administrative precedent: during Plaintiff's prior approved Short-Term Disability claim in 2021, USAA continued to provide Plaintiff with health benefits at the active-employee rate well beyond the expiration of his 12 weeks of FMLA leave.

110. Furthermore, USAA actively attempted to conceal the financial harm resulting from this arbitrary classification by weaponizing its disclosure obligations. When Plaintiff requested his governing plan documents, USAA artificially limited the scope of documents it provided to its third-party vendor, Claim Appeal Fiduciary Services, equipping the vendor to produce only three specific documents: the STD, LTD, and Comprehensive Welfare SPDs. (Exhibit USAA2)

111. USAA deliberately omitted the SPDs for the 2025 Annual Performance Incentive Plan (APIP), the Educational Assistance Program, the 401(k) Plan, and the Pension Plan from the production package. When Plaintiff

explicitly notified the fiduciary that he had not received all of the plan documents, the fiduciary could not cure the omissions, admitting in writing on September 16, 2025: "we provided the documents that USAA asked us to provide." This confirms that the failure to disclose the complete, interrelated plan documents originated directly from USAA's internal limitations. (Exhibit USAA2)

112. Each of these withheld documents contains specific provisions preserving benefits for employees on disability leave or those who separate due to disability. Had Plaintiff not possessed independent access to the internal USAA MyTotalRewards portal, and had he not proactively saved a copy of the Educational Assistance SPD prior to his disability, USAA's concealment would have successfully hidden the existence of these benefits entirely. Plaintiff would never have known of the thousands of dollars in financial losses he suffered due to USAA's arbitrary "former employee" classification. (Exhibit USAA2)

113. Because Plaintiff successfully uncovered the concealed SPDs, he was able to definitively calculate the aggregate financial harm caused by Defendants' arbitrary classifications, failures to provide formal denial notices, and fiduciary breaches. As documented in Exhibit S, the total fixed liquidated damages as of March 2026 amount to $34,950.47, consisting of the wrongfully withheld funds and resulting penalties detailed in paragraphs 114 through 120.

114. First, Plaintiff suffered a $7,000.00 financial loss due to the USAA Educational Assistance Plan denial. This represents out-of-pocket tuition costs for Fall 2025 and Spring 2026 resulting from USAA's arbitrary refusal to honor the SPD's leave of absence eligibility protection.

115. Second, Plaintiff suffered a $12,459.37 financial loss due to the USAA APIP denial. Plaintiff accumulated over $75,000 in explicitly defined Incentive Eligible Earnings (IEE) through salary and STD payments, yet USAA denied the payout citing the nature of his separation, defying the plan's explicit protection for those separating due to disability.

116. Third, Plaintiff suffered a $4,320.68 financial loss related to withheld 401(k) employer match and resulting tax penalties. By arbitrarily refusing to update Plaintiff's status under the plan as on an approved STD (as they had done during his 2021 disability), USAA unlawfully withheld its standard 401K match and contributions and forced Plaintiff to incur $779.14 in excess federal tax. (Exhibit RETIRE)

117. USAA's selective classification pattern is further confirmed by its own pension administration. Fidelity NetBenefits records establish that USAA credited Plaintiff's 2025 pension pay credits—treating him as a disability participant for pension purposes—while simultaneously using a generic "former employee" status to deny APIP, educational assistance, and the 401(k) employer match. USAA cannot classify Plaintiff as a disability participant when doing so costs nothing and as a terminated former employee when doing so avoids discretionary payments. (Exhibit RETIRE)

118. Fourth, Plaintiff suffered a $4,584.00 financial loss in excess COBRA premium costs. This harm was incurred from April to September 2025 due to USAA's refusal to provide active-employee rate health insurance during the STD period, forcing Plaintiff to pay $764.00 per month in excess COBRA premiums without ever issuing a formal Section 503 denial notice, and in direct contradiction to USAA's own handling of Plaintiff's 2021 STD claim. (Exhibit RETIRE)

119. Fifth, Plaintiff suffered a $400.00 financial loss due to a USAA CIC reclassification penalty. This represents the annual difference in homeowner insurance premiums resulting from USAA wrongfully stripping Plaintiff of USAA Company placement upon renewal based on his classification as a former employee rather than a disability retiree. This harm is ongoing with each policy renewal.

120. Sixth, Plaintiff suffered a $6,186.42 dollar accrued (through March 2026) financial loss from the withheld Rehabilitation Incentive Benefit. This represents lost LTD income resulting from Lincoln Financial's breach of fiduciary duty in refusing to process Plaintiff's vocational rehabilitation for structured part-time education, denying Plaintiff the contractual 10 percent monthly benefit increase. Crucially, Lincoln never issued a formal ERISA Section 503 denial letter regarding vocational rehabilitation or the associated incentive benefit. Because Lincoln failed to issue a formal, written denial with a plan-based rationale and appeal rights, any post-hoc rationale Lincoln now offers for denying the Rehabilitation Incentive Benefit

is post-hoc rationalization entitled to no deference under *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101 (1989).

121. In addition to the fixed damages above, Plaintiff continues to suffer ongoing monthly damages of $1,031.07 due to the continuing deprivation of the Rehabilitation Incentive Benefit.

122. Defendants' administration of these plans was arbitrary, capricious, and fundamentally tainted by a conflict of interest, as evidenced by USAA's failure to issue formal Section 503 denial letters and its explicit instructions to its fiduciary to hide the very plan documents that exposed their financial liabilities.

WHEREFORE, as to the Eighth Claim, Plaintiff respectfully requests: (a) A declaration that USAA's classification of Plaintiff as a generic "former employee" rather than an individual entitled to the disability protections of the Education, APIP, 401(k), Health, and Pension plans is arbitrary, capricious, and contrary to the express terms of the plans and USAA's own administrative precedent; (b) A declaration that Plaintiff's rights to the disability-specific benefits of the USAA plans attached on his date of disability (March 22, 2025); (c) A declaration that USAA breached its fiduciary duties under ERISA Section 104(b)(4) and Section 404(a) by failing to provide complete and interrelated plan documents to its third-party vendor for disclosure, thereby attempting to conceal Plaintiff's benefit eligibility; (d) An award of all combined withheld benefits and equitable surcharge under *Amara* and ERISA Section 502(a)(3), in an amount to be determined at trial, to make Plaintiff whole for the financial harm caused by Defendants' arbitrary

classifications, fiduciary breaches, and concealment of plan documents, including all amounts accrued through the date of judgment; (e) An award of ongoing monthly damages continuing to accrue from the date of this filing forward at a rate of $1,031.07 per month, or such other amount as the evidence establishes, until Defendants cure the violations giving rise to those damages; (f) Pre-judgment and post-judgment interest on all wrongfully withheld funds to compensate for the lost time value of money; (g) Attorneys' fees and costs under ERISA Section 502(g); and (h) Such other equitable and remedial relief as the Court deems just and proper.

## CONSTITUTIONAL RESERVATION

*(Preserved for Appellate Review; Controlled by Circuit Precedent at the District Level)*

123. Plaintiff does not ask this Court to grant relief on constitutional grounds. Plaintiff acknowledges that the constitutional questions identified in this section are controlled by existing circuit precedent at the district court level and that this Court is bound to apply that precedent. Plaintiff raises these questions solely to preserve them for appellate review, and respectfully submits that they present substantial federal questions warranting consideration by the Court of Appeals and, ultimately, the Supreme Court of the United States, in light of significant doctrinal developments since the controlling precedents were established.

Complaint - 60

## I. The Private Non-Delegation Problem

124. The classical non-delegation doctrine holds that Congress may not delegate its legislative power to private parties. *Carter v. Carter Coal Co.,* 298 U.S. 238, 311 (1936). Unlike the public non-delegation doctrine—which asks whether Congress gave an executive agency sufficient guidance—the private non-delegation doctrine has no "intelligible principle" safety valve. When Congress delegates regulatory power to a private party, the delegation is categorically impermissible. *Carter Coal* has never been overruled.

125. ERISA's structure interacts with the private non-delegation problem in a specific and previously underexamined way. ERISA § 514, 29 U.S.C. § 1144, broadly preempts all state laws that "relate to" an employee benefit plan. Under *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41 (1987), and *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134 (1985), ERISA completely preempts state bad faith insurance claims, leaving beneficiaries with only the federal remedial scheme. That scheme caps recovery at the value of withheld benefits and forecloses punitive, extracontractual, and consequential damages—the very remedies that state tort law uses to deter insurer misconduct.

126. The critical constitutional question arises from the interaction between preemption and the discretionary clause. A private party—Lincoln—drafts a discretionary clause into its plan document. Under *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101 (1989), that privately drafted clause triggers

deferential judicial review of Lincoln's own benefit determinations. The *Firestone* Court warned that discretionary authority granted to plan administrators could swallow ERISA's fiduciary duties if left unchecked. Combined with ERISA's preemption of state bad faith remedies, the result is that Lincoln—through its own unilateral drafting choices—has effectively defined the scope of its own immunity from meaningful legal accountability. No federal agency approved the discretionary clause language. No federal standard governs its scope. Congress did not determine that plan administrators who draft discretionary clauses should receive judicial deference and simultaneously be immune from state tort law. Lincoln determined that, by drafting its own plan document.

127. The constitutional anomaly identified in the preceding paragraph has sharpened considerably in light of the Supreme Court's 2024 decision in Loper Bright Enterprises v. Raimondo, 144 S. Ct. 2244 (2024), which overruled Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984). Under Loper Bright, federal agencies—entities Congress created, authorized by statute, and subject to the full apparatus of administrative law including notice-and-comment rulemaking, congressional oversight, and judicial review—now receive no deference on questions of statutory interpretation. Courts exercise independent judgment and give agency interpretations only the persuasive weight they merit on the merits. A federal agency interpreting the statute Congress charged it to administer is entitled to nothing more. Lincoln, by contrast, is a private

insurer that drafted its own discretionary clause and inserted it into a group contract sold to an employer. That self-authored language, under Firestone and its progeny, entitles Lincoln to abuse-of-discretion review of its own benefit determinations—meaning a court will uphold Lincoln's decision unless it is unreasonable, even if the court would independently reach a different conclusion. The result is precise and stark: post-Loper Bright, Lincoln enjoys greater insulation from judicial scrutiny than the Environmental Protection Agency, the Social Security Administration, or any other federal agency interpreting the statutes Congress assigned to them. Lincoln has no democratic accountability, no rulemaking obligation, no administrative record requirement, and no congressional mandate—yet it receives more deferential review than any entity that has all of those things. This inversion is not a collateral consequence of ERISA's structure— it is the logical endpoint of allowing a private actor to draft the standard of its own judicial review into a contract shielded by federal preemption. Loper Bright did not create this anomaly, but it renders it visible and constitutionally untenable in a way that prior doctrine obscured: the Supreme Court has now told us what rigorous judicial oversight of powerful institutions looks like, and Lincoln receives something more favorable than that without any of the justifications that might warrant it.

128. Approximately twenty states, including Texas—the state whose law expressly governs Plaintiff's contract—concluded that discretionary clauses are contrary to public policy and enacted regulations prohibiting them.

Complaint - 63

ERISA preemption overrides those state legislative acts as applied to insured plans, and the deemer clause eliminates even that partial protection for self-funded plans—not because Congress determined that discretionary clauses are good policy, but as an unremarked side effect of a preemption regime Congress enacted for entirely different purposes.

129. This is the structure *Carter Coal* condemned: the use of federal law as the mechanism by which a private party acquires regulatory power over others, without any congressional determination of the scope of that power, and without any accountability to the public interest.

130. In *Carter Coal,* coal producers set wage and hour rules for their competitors. Here, Lincoln sets the scope of its own accountability to the people it is paid to protect. The latter is not obviously less constitutionally troubling than the former. The *Firestone* warning, the DOL's 2023 ERISA Advisory Council documentation confirming that the danger materialized in the form of systematic MH/SUD misclassification across decades of plan operation, and the current Court's signal in *Gundy v. United States,* 139 S. Ct. 2116 (2019)—where Justice Gorsuch, joined by three other Justices, expressed the view that the non-delegation doctrine requires serious reinvigoration, and Justice Kavanaugh has written separately in support of revisiting the doctrine—converge into a developed record: the Court warned of the problem, empirical evidence confirms it occurred, and the current Court has signaled receptiveness to reconsidering the framework. The private

delegation dimension of ERISA has not been squarely presented to the post-*Gundy* Court.

131. This structural constitutional flaw is not limited to ERISA's remedial scheme; it is a systemic feature of modern corporate adherence contracts shielded by federal preemption. In drafting its mandatory Arbitration Agreement, USAA literally parsed the United States Code, unilaterally selecting which of Congress's laws it would allow the courts to enforce and which it would sequester in a private forum. USAA utilized the Federal Arbitration Act to explicitly strip employees of their right to access the courts for violations of the ADA, FMLA, Title VII, the FLSA, the NLRA, and SOX. (Exhibit USAA1)

132. The inclusion of SOX is particularly egregious: by forcing whistleblower claims under the Sarbanes-Oxley Act into a confidential arbitral forum, USAA—a massive financial institution—has effectively immunized itself from public scrutiny and public oversight for financial misconduct, subverting a federal statute expressly enacted by Congress to protect the public from corporate fraud. Simultaneously, USAA treated state sovereignty with indiscriminate disregard, employing broad catch-all provisions to preempt "any other federal, state, or local statutory or other remedy" and all "state, or local common law claims" without even bothering to name them. Because this broad preemption extends perpetually even after the termination of employment, the agreement operates as a self-updating, prospective nullification of state legislative power. Any future civil law or tort passed by a state legislature is automatically swallowed by the

private agreement the moment it is enacted, granting USAA a perpetual veto over future democratic legislation.

133. Plaintiff is only able to bring the present ERISA and state insurance claims before this Court because USAA's contract voluntarily carved out exceptions for ERISA benefit plans and USAA member insurance policies. If USAA had not voluntarily exempted ERISA, Plaintiff would be bound to arbitrate even ERISA fiduciary breach claims, effectively allowing a private corporation to use the FAA and Congress's preemption power to veto the exclusive federal jurisdiction and public accountability Congress deliberately constructed for fiduciary oversight. (Exhibit USAA1)

134. The breadth of this contractual preemption raises a question that goes beyond the FAA's ordinary operation. The Supremacy Clause makes federal law supreme over conflicting state law — but it presupposes that what displaces state law carries its own constitutional legitimacy. When Congress enacts a federal regulatory scheme that preempts state law, the displacing regime is itself subject to democratic accountability, judicial oversight, and the structural guarantees of federal law. The FAA's alternate forum offers none of this. Beyond a minimal "evident partiality" standard authorizing vacatur in extreme cases — a standard courts have held is substantially weaker than the impartiality required of judges — the FAA imposes no requirements on the forum that replaces the courts. It does not require that arbitrators have any expertise in the subject matter they adjudicate. It imposes no obligation to follow the law, issue reasoned

decisions, or submit to meaningful review of legal or factual errors. A company invoking the FAA may construct an entirely self-referential forum — its own arbitrators, its own procedures, its own standards — and under current doctrine it is not required to do otherwise.

135. USAA may have chosen a reputable provider, but the law did not require it to. The constitutional question is therefore not whether an alternate forum exists, but whether Congress can authorize any private actor to deploy a legally unaccountable alternate forum as a wholesale substitute for fifty state legal systems on a perpetual, self-updating basis — covering claims Congress has never addressed and has no intention of addressing.

136. The Supremacy Clause resolves conflicts between governmental sovereigns. It was not designed to arm a private corporation with the power to displace state law and substitute a forum that carries none of the structural guarantees — neutrality, accountability, reasoned decision-making — that make courts constitutionally legitimate in the first place. Plaintiff preserves this question for appellate review.

137. The constitutional offense is identical whether an insurer uses ERISA to draft a discretionary clause limiting the standard of judicial review, or an employer uses the FAA to draft an arbitration clause eliminating the judicial forum entirely: in both instances, a private actor utilizes federal preemption to unilaterally dictate the scope of its own immunity from the judicial system.

138. Defendants will undoubtedly argue that this agreement does not force employees to surrender any substantive legal rights, but merely changes

the forum in which those rights are heard, as the agreement claims to create only a "procedural mechanism". However, the constitutional offense of this open-ended, self-updating delegation of power is compounded by the fact that it completely annihilates the legal requirement of informed consent. Because the agreement indiscriminately captures "any other federal, state, or local statutory or other remedy" and all "common law claims" based on events occurring not only during and after employment, but also perpetually before the contract was even signed, no amount of legal training, and no review by the world's best contract lawyer, could allow an employee to truly identify the full scope of the laws they are subjecting to this alternative forum.

139. Furthermore, the agreement explicitly binds the "heirs, successors, [and] beneficiaries" of the employee, operating to potentially unilaterally shift the Seventh Amendment rights of unborn children and future generations who never saw, let alone signed, the document. Consequently, the agreement does not represent a mutual "meeting of the minds" regarding a specific alternative venue; rather, it operates as a blind, compulsory change of forum for an indefinite, unknowable universe of civil law. One cannot meaningfully consent to a change of forum for rights they cannot identify, especially when that change of forum stretches boundlessly into both the past and the future, and can potentially bind individuals who do not exist yet.

140. The danger of this unchecked delegation of power is not hypothetical; it is a rapidly escalating crisis. According to a 2025 empirical study published in

Complaint - 68

the *Minnesota Law Review* (David Horton, *Forced Arbitration in the Fortune 500*, 109 Minn. L. Rev. 2165 (2025)), nearly 80% of Fortune 500 enterprises now mandate arbitration, with 77% of those clauses expressly prohibiting class actions. This near-total corporate takeover of the justice system aligns with data from the Economic Policy Institute (Alexander J.S. Colvin, *The Growing Use of Mandatory Arbitration*, EPI (2018)) and the National Employment Law Project (NELP), which projected that by 2024, more than 80% of all private-sector non-union workers would be subject to forced arbitration and class-action waivers as a non-negotiable condition of employment. By allowing corporations like USAA to utilize the FAA to universally opt out of the judicial branch, the current legal framework has effectively privatized the enforcement of virtually all civil law governing the American workplace, replacing democratic accountability and public jurisprudence with a secret, corporate-controlled dispute resolution apparatus.

## II. The Structural Due Process Problem

137. LTD benefits are earned compensation—a component of the employment relationship, withheld from wages and allocated to insurance protection against catastrophic loss of income. They constitute a protected property interest under the Fifth Amendment. *Mathews v. Eldridge,* 424 U.S. 319 (1976), requires that deprivation of a protected property interest be accompanied by process proportionate to the weight of the interest and the risk of erroneous deprivation. Where the government designs a remedial

Complaint - 69

scheme that governs how a protected property interest may be taken, the adequacy of that scheme is a constitutional question, not merely a statutory one.

138. The constitutional problem with ERISA's remedial scheme, as interpreted and applied, is structural and self-reinforcing. Congress preempted state law to create a uniform federal scheme. The federal scheme provides only benefit-value recovery with no punitive or consequential damages. The Supreme Court then added, in *Firestone,* that insurers who draft discretionary clauses receive deferential judicial review of their own benefit determinations. The cumulative result is a system in which the maximum financial exposure for wrongfully denying a meritorious claim is limited to the value of the benefit itself—the same amount the insurer would have paid had it acted correctly. The rational profit-maximizing insurer will deny borderline claims and contest them through the administrative process, knowing that the worst-case outcome is paying what it would have owed anyway, while the expected-value outcome of systematic denial is significant cost savings across the claim population. The structure does not deter wrongful denial—it incentivizes it.

139. This is not a theoretical concern. The DOL's ERISA Advisory Council documented in 2023 that after decades of operation under this scheme, LTD insurers continue to apply MH/SUD limitations of documented overbreadth, generating widespread misclassification of physically caused disabilities. The savings clause—ERISA § 514(b)(2)(A)—provides no

practical check, because the claims handling practices that produce systematic denials are not regulated by state insurance law to the degree necessary to counteract the federal scheme's structural incentives. Congress's preemption effectively converted state insurance regulation from a functioning deterrent into a formal relic, without replacing it with any federal deterrent of equivalent force. Whether that exchange is constitutionally adequate—whether it provides the process due to holders of a protected property interest in their disability benefits—is a substantial federal question Plaintiff preserves here.

140. Lincoln's conduct with respect to Plaintiff's SSDI benefits illustrates the structural problem in concrete terms. Section 207 of the Social Security Act, 42 U.S.C. § 407, is an absolute congressional prohibition admitting no exceptions for private creditors. Lincoln, operating under ERISA's preemptive shield and armed with a discretionary clause it drafted itself, has constructed a collection scheme reaching directly into Plaintiff's anticipated SSDI award: demanding lump-sum repayment, seeking bank credentials for direct debit, requiring direct cash payment as the alternative, and reserving "any other actions necessary" as a final backstop. In *Philpott v. Essex County Welfare Board,* 409 U.S. 413 (1973), the State of New Jersey—asserting its own sovereign statutory reimbursement rights—was enjoined immediately when it attempted to recover from a beneficiary's SSDI award. A sovereign government with a codified statutory claim was told that § 407 admitted no exception. Lincoln is a private insurer with no sovereign

interest, no statutory reimbursement right, and no congressional carve-out—yet it has constructed a collection scheme more aggressive than New Jersey's, relying on ERISA preemption as the mechanism that places it beyond the accountability that stopped the State of New Jersey entirely. The constitutional question is whether a private party can wield the practical coercive power of a governmental creditor—reaching into a federally protected benefit stream more aggressively than a sovereign state was permitted to—while simultaneously enjoying immunities that no governmental creditor possesses and facing a lack of accountability that no governmental actor would be permitted to enjoy. That question has not been answered in the post-*Gundy* landscape.

141. The practical scope of ERISA's preemptive reach makes the constitutional stakes concrete. Milliman's industry surveys report that group disability insurers carried approximately $23.5 billion in combined LTD, STD, and PFML in-force premium in 2023—virtually all governed by ERISA and beyond the effective reach of state insurance regulation. The entire individual disability income insurance market—the only segment where state regulation operates without federal preemption—generated new annualized premium of $444 million in 2023. The ratio is approximately 50-to-1. Congress included the savings clause in ERISA § 514(b)(2)(A) because it specifically intended for state insurance regulation to remain a functioning co-equal check—confirmed by the existence of EBSA, which Congress designed to share the regulatory load with state insurance

authorities, not replace them. EBSA's documented enforcement capacity of less than one investigator per 12,600 plans is not a failure of implementation—it is proof that Congress never contemplated EBSA bearing the full weight of LTD oversight alone.

142. State Departments of Insurance were not legislated out of existence. Through a combination of expansive judicial interpretations of ERISA's preemption clause and an industry that structured its products to operate within the resulting regulatory vacuum, state insurance regulators have been effectively rendered unable to exercise the oversight role Congress assigned them. The partner Congress relied upon to share the regulatory load has not disappeared—it simply cannot reach the market that matters. Approximately twenty states concluded that discretionary clauses are contrary to public policy and enacted regulations prohibiting them. Several circuits have upheld those bans as applied to insured plans. But the deemer clause places self-funded plans entirely beyond the savings clause's reach—meaning that a self-funded plan administrator who drafts a discretionary clause into its own contract effectively nullifies the considered legislative judgment of twenty state legislatures through a single privately drafted contract provision. No federal agency authorized that outcome. Congress did not intend it. It is the consequence of a preemption regime that judicial construction and industry structuring have together stretched far beyond the purposes for which it was enacted.

**III. Reservation of Right**

143. Plaintiff reserves the right to develop and brief these constitutional questions more fully on appeal. Plaintiff does not concede the constitutional adequacy of ERISA's remedial scheme or the Federal Arbitration Act's preemptive scope as applied to the facts of this case. Plaintiff specifically does not concede that *Massachusetts Mutual Life Insurance Co. v. Russell* or *Epic Systems Corp. v. Lewis* forecloses the constitutional questions identified above. *Russell* was decided before *Firestone* added the deference layer to the scheme—a deference layer that the *Firestone* Court itself warned could prove corrosive to ERISA's fiduciary protections.

144. Similarly, while *Epic Systems* elevated the FAA over other federal statutes, it was decided as a matter of statutory interpretation and did not resolve the underlying Article I private non-delegation offense of allowing a corporation to use federal preemption to prospectively veto virtually all civil law. Both precedents were established before *Gundy* signaled the current Court's interest in revisiting non-delegation principles. The constitutional question Plaintiff identifies—whether a private actor can use Congress's preemption power (whether through ERISA or the FAA) to unilaterally define the scope of its own immunity from accountability to the civil justice system—has not been squarely addressed in the post-*Gundy* constitutional landscape by any federal appellate court.

Dated: 3/13/2026

Complaint - 74

Respectfully submitted,

_Chucx Bw_

Charles T. Bruff

Plaintiff in Pro Se

98 McLennan Oak

San Antonio, Texas 78240

Date 03/16/26