# Advisory Council on Employee Welfare and Pension Benefit Plans

# Report to the Honorable Julie A. Su, United States Acting Secretary of Labor

# Long-Term Disability Benefits and Mental Health Disparity

**December 2023**

**NOTICE**

This report was produced by the Advisory Council on Employee Welfare and Pension Benefit Plans, usually referred to as the ERISA Advisory Council (the "Council"). The Council was established under Section 512 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") to advise the Secretary of Labor (the "Secretary") on matters related to welfare and pension benefit plans. This report examines the issue of the ubiquitous lack of mental health parity regarding duration limits in disability benefit plans.

The contents of this report do not represent the position of the Secretary or of the Department of Labor (the "Department").

## LIST OF COUNCIL MEMBERS

Shaun C. O'Brien, Council Chair

Megan Broderick, Council Vice Chair and Issue Chair

Mayoung Nham, Issue Vice Chair

Mark DeBofsky, Drafting Team Member

Beth Halberstadt, Drafting Team Member

Tonya Manning, Drafting Team Member

Alice Palmer, Drafting Team Member

John M. (Jack) Towarnicky, Drafting Team Member

Dave Gray

Marcelle J. Henry

Mercedes D. Ikard

Jeffrey Lewis

Gwendolyn Mazzola

Edward A. Schwartz

Holly Verdeyen

## ABSTRACT

The 2023 ERISA Advisory Council examined the scope and impact of existing limitations on long-term disability ("LTD") benefits for mental health and substance use disorder ("MH/SUD") conditions. The examination noted that the majority of insured LTD benefits have a 24-month limit on the duration of benefits for disabilities resulting from MH/SUD conditions, while benefits for disabilities due to other medical conditions typically continue until retirement age. The Council examined the extent, prevalence, rationale and impact of benefit limitations for disabilities due to MH/SUD conditions.

The Mental Health Parity and Addiction Equity Act ("MHPAEA"), which requires parity for coverage of medical/surgical and MH/SUD conditions, applies only to medical plans and does not apply to LTD benefits. The Council's examination noted that one state (Vermont) mandates mental health parity in disability insurance, and human rights/anti-discrimination laws in Canada also mandate mental health parity for disability insurance. The Council noted disability insurance is regulated by state insurance departments, and not the Department. However, the Council expects some of its findings and recommendations may assist the Department in determining whether there is a need for measures to address these duration limitations.

## ACKNOWLEDGEMENTS

The Council recognizes the following individuals and organizations who provided testimony or information that assisted the Council in its deliberations and the preparation of its report. Notwithstanding their contributions, any errors in the report rest with the Council alone. The witnesses are shown in alphabetical order on the date of their testimony. Their submitted written testimony can be found at https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council.

**July 17, 2023**

Ruben Navarro, International Association of Fire Fighters

Swapnil Prabha, Unum

**July 19, 2023**

Phil Keller, Vermont Department of Insurance (Retired)

Mala Rafik, Attorney, Rosenfeld and Rafik

Steven Rothke, Ph.D., Neuropsychologist

**Aug. 29, 2023**

Henry Conroe, M.D., Psychiatrist

Christine Hildebrand, Canada Life

Sarah Yousuf, Mental Health Legal Advisors Committee

**Sept. 19, 2023**

Steve Clayburn, Actuary, American Council of Life Insurers

Patrick Kennedy and David Lloyd, The Kennedy Forum

**Sept. 20, 2023**

Edward Jamieson, Insurance Broker, Jamieson Financial Services

Gene Price, Carpenter Trust Funds

**Sept. 21, 2023**

Bridget Bearden, Employee Benefit Research Institute

Richard (Rick) Leavitt, Ph.D., Actuary, Smith Group/Guy Carpenter

Dr. Marion (Taffy) McCoy and Ty Turner, Social Security Administration

**TABLE OF CONTENTS**

I.      EXECUTIVE SUMMARY ...................................................................................................8

II.     PRIOR COUNCIL REPORTS .........................................................................................9

III.    BACKGROUND .................................................................................................................10

IV.     WITNESS TESTIMONY ..................................................................................................16

V.      DATA AND SURVEY INSIGHTS....................................................................................38

VI.     COUNCIL OBSERVATIONS ..........................................................................................42

VII.    RECOMMENDATIONS AND RATIONALES ..............................................................55

## I.    EXECUTIVE SUMMARY

As diagnosis, treatment and psychometric testing for MH/SUD conditions has improved in sophistication, excluding or limiting LTD coverage for MH/SUD conditions has become increasingly questionable. In fact, some witnesses view the exclusion or limitation of coverage for these types of ailments and conditions as a form of legal discrimination. Thus in 2023, the Council undertook an effort to evaluate the basis for excluding or limiting LTD coverage for MH/SUD conditions, in both fully insured and self-insured LTD benefits.

In furtherance of this effort, the Council heard from witnesses representing a variety of constituencies, including representatives from the state of Vermont and representatives from the Canadian LTD insurance market, both of which require LTD insurance parity for MH/SUD conditions. The Council also heard testimony and received data and insights from actuaries, doctors, lawyers and mental health advocates, as well as individuals representing multiemployer plans, self-insured single employer plans and members of the insurance industry issuing policies to the insured plan market.

Based on the testimony received, the Council has concluded that psychometric testing and other tools used by insurers to evaluate and confirm claims of MH/SUD conditions is sufficiently advanced to mitigate potential risk of fraud that may have previously been associated with MH/SUD conditions. Consequently, the Council recommends the Department take the following actions:

1. Encourage Congress to adopt LTD insurance parity requirements consistent with the spirit of MHPAEA mandates for MH/SUD and physical conditions, and strongly encourage employers to consider whether exclusions and MH/SUD limitations are necessary in the current environment.
2. Commission research of LTD insurance to address unknown actuarial and cost implications of removing the duration limits and to identify the underlying rationale for these limitations.
3. Urge the insurance industry to present plan sponsors with coverage options without duration limits for MH/SUD conditions.
4. Provide education to plan sponsors on impact of duration limitations in LTD policies.

## II.     PRIOR COUNCIL REPORTS

In 2012, the Council studied access to employer-sponsored LTD coverage as well as post-disability income replacement and its impact on retirement security. Its report, Managing Disability Risks in an Environment of Individual Responsibility, included recommendations focused on education, regulation updates and three items of guidance: (1) auto-enrollment; (2) characterization of long-term disability as welfare benefits when paid after normal retirement age; and (3) post-disability continuation of retirement benefit accruals and contributions. The report did not address LTD coverage for MH/SUD conditions.

## III.    BACKGROUND

### A.  Overview

Many employers offer LTD benefits to their employees. Most employers fund their LTD benefits through the purchase of insurance, while others self-insure. Unlike individual disability income insurance, group LTD benefits are usually offered to employees without individual underwriting, and eligibility is dependent on the employee working a specified number of hours per week (usually 30 hours), with benefit coverage commencing after the employee has been employed for a certain length of time. Most employer-sponsored LTD benefits are non-contributory in part to guarantee 100% participation. A minority require employee contributions on either an after-tax or pre-tax basis, via a cafeteria plan election. Some employers provide a choice of taxable or tax-free LTD benefits where all costs are paid by employees on a pre-tax or an after-tax basis, respectively, and the employer contribution is in the form of a benefits credit.

To mitigate the risk of adverse selection, most group LTD policies exclude coverage for pre-existing conditions. Typically, if the employee is claiming disability benefits for a condition for which the employee has received treatment or undergone testing during a specified look-back period, which may run as long as one year, the employee is ineligible to receive disability payments if they become disabled during their first year of employment. However, employees with pre-existing conditions, as defined by the policy, are nonetheless able to qualify for benefits if their disability begins after they have been covered for at least one year.

LTD insurance coverage protects workers in the event sickness or injury precludes them from working for an extended period of time and provides income replacement benefits after satisfaction of the elimination period, which is typically 90 or 180 days (i.e., 3 or 6 months).

Generally, all types of sicknesses or injuries qualify for the payment of benefits, except for self-inflicted injuries, injuries incurred in the commission of a crime and injuries sustained in an active war zone. So long as the claimant remains disabled, most LTD policies provide benefit payments until the claimant reaches either age 65 or the Social Security normal retirement age, subject to coordination of payments with other sources of income such as Social Security disability benefits or workers' compensation payments. When disability occurs on or after the employee reaches the age of 60, the

duration of benefits is generally limited, based on a schedule contained in the policy, which is dependent on the claimant's age at disability onset. There is, however, one ubiquitous exception to that duration — disabilities due to MH/SUD conditions. The Council heard testimony that only 1% of group disability policies sold in the U.S. do not have MH/SUD limitations, which typically limit the duration of payments for such conditions to a maximum of 24 months.

Prior to MHPAEA, it was common for health plans to treat mental health conditions disparately. Almost all individual and group policies and plans excluded or limited mental health treatment.

Correspondingly, as noted above, disability insurance policies have historically also provided inferior benefits for such conditions. At the time that disparate treatment of psychiatrically based disability benefit claims was initiated, less was known about MH/SUD conditions or how to treat such conditions than what is known today. Indeed, even the diagnosis and classification of psychiatric conditions did not become standardized until the 1980 issuance of the third edition of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* ("DSM"). Shortly thereafter, the Social Security Administration ("SSA") issued revised criteria for evaluating psychiatric disabilities in conformity with the DSM's nomenclature.

Based on the widespread use and acceptance of the DSM, many disability insurers began to adopt that publication as the benchmark used to define conditions subject to the duration limitation in their policies for payment of benefits on account of MH/SUD conditions. Earlier definitions of conditions encompassed by the MH/SUD limitation had proven problematic, with courts deeming such definitions ambiguous. However, the inclusion of any condition listed in the DSM within the limitation for disability claims resulting from MH/SUD conditions has created problems of its own. A host of neurocognitive conditions such as Alzheimer's disease, traumatic brain injuries and other conditions such as obstructive sleep apnea are listed in the DSM and would thus be subject to the limitation, although some policies contain exceptions for such conditions.

In recent years, mental health advocates have been successful in enacting legislation to redress discrimination against mental illness. In 1992, the Americans with Disabilities Act[1] ("ADA") became law in the U.S. The ADA protects individuals suffering from physical and mental disabilities against

---

[1] 42 U.S.C. § 12101, et seq.

discrimination in their workplace and enables their access to places of public accommodation. Congress also passed a law in the 1990s requiring mental health parity in health insurance, but due to weaknesses in that law, Congress replaced it with MHPAEA[2] in 2010. MHPAEA equalizes health insurance reimbursement for expenses relating to medical and surgical treatment and treatment of MH/SUD conditions.

In addition to the public policy expressed in the ADA and MHPAEA, tremendous advances have been made in the treatment of MH/SUD conditions. New drugs and improved psychotherapy modalities have made MH/SUD conditions more treatable and even curable for most people. Improvements in diagnostics, especially in psychometric testing and radiologic imaging, have also enabled clinicians to better understand mental illness and validate the legitimacy of patients' symptom complaints. Thus, the chronic nature of mental illness has been significantly reduced, and insurers' concerns about validation of disability benefit claims have lessened. There remains, however, a segment of the population suffering from MH/SUD conditions who do not improve following treatment with a qualified provider and who are no less disabled than individuals suffering from untreatable cardiovascular or neurologic conditions.

It is against this backdrop that the 2023 Council undertook a study of mental health parity in LTD benefits. It examined the scope and impact of employee benefit plans' limitations on LTD benefits for MH/SUD conditions. It also studied the extent, prevalence, rationale and impact of these limitations on disability benefits, including whether certain health conditions have been misclassified as being subject to such limitations, and made several recommendations based on its findings.

The Council notes that MHPAEA, which requires parity for coverage of medical/surgical and MH/SUD conditions, does not apply to LTD plans. However, one state (Vermont) has mandated mental health parity in disability insurance[3], and human rights laws in Canada[4] have been interpreted to mandate mental health parity in disability insurance. The Council examined various aspects of this issue and heard testimony from numerous stakeholders and experts, including psychiatrists, psychologists, actuaries,

---

[2] Pub. L. No. 110-343 §§ 511-512, 122 Stat. 3381 (codified at 26 U.S.C. § 9812, 29 U.S.C. § 1185a, 42 U.S.C. § 300gg-26).
[3] State of Vermont, Department of Banking, Insurance, Securities and Health Care Administration, Revised HCA Bulletin 127: Discrimination Against Disability Due to a Mental Health Condition Prohibited in Disability Income Replacement Insurance (October 22, 2008).
[4] *See Battlefords and District Co-operative Ltd. V. Gibbs,* [1996] 3 SCR 566 (Supreme Court of Canada October 31, 1996).

attorneys, mental health advocates and representatives of the disability insurance industry, organized labor and SSA.

The recommendations made by the Council are intended to assist the Department in determining whether there is a need for measures to address these limitations. They also will inform and educate employers and plan sponsors about the vulnerabilities their employees/participants face and the resources available to address them.

### B. Caselaw

The disparity in disability insurance coverage for MH/SUD conditions has been the subject of a host of court decisions. Litigants have challenged coverage disparities for MH/SUD conditions with a wide array of legal arguments that have met with varying degrees of success. A California appellate court ruling, *Bosetti v. U.S. Life,*[5] catalogued cases from across the U.S. that have discussed mental illness limitations and when such limitations may be inapplicable. That court found, "When mental symptoms arise from a separate physical causal event, or physical symptoms arise from a separate mental causal event, we believe the term 'mental disorder' (absent a dispositively precise definition in the policy) is necessarily ambiguous."[6] Another frequently cited case is *Patterson v. Hughes Aircraft Co.*[7], in which the court ruled that a plan's definition of mental illness was ambiguous because it was unclear whether benefit limitations relating to such conditions referenced the cause of the claimed disabling condition or its symptoms. The same rationale was used by an Illinois federal district court, which observed in *Phillips v. Lincoln Nat'l Life Ins. Co.*[8]:

> There is no question that some conditions are marked primarily by symptoms of dementia and aberrant behavior yet would not be considered mental illnesses. Indeed, under Lincoln's proposed "unambiguous" meaning of "mental illness," an accident victim who exhibits abnormal behavior as the result of a traumatic head injury, a person suffering from brain cancer who develops unusual behavior and an elderly person who has contracted Alzheimer's Disease would all be considered mentally ill.

---

[5] *Bosetti v. U.S. Life Ins. Co. in the City of New York,* 175 Cal. App. 4th 1208 (Cal. App. 2009).
[6] *Id.* at 1233.
[7] *Patterson v. Hughes Aircraft Co.,* 11 F.3d 948, 949-50 (9th Cir. 1993).
[8] *Phillips v. Lincoln Nat'l Life Ins. Co.*, 774 F. Supp. 495, 501 (N.D. Ill. 1991); aff'd 978 F.2d 302 (7th Cir. 1992).

Finally, *Fitts v. Unum*[9] addressed whether bipolar disorder fell within a limitation that defined "mental illness" as "mental, nervous or emotional diseases or disorders of any type." The plaintiff maintained that bipolar illness was a physical condition, while the insurance company disagreed. Although the lower court sided with the plaintiff, the court of appeals found the issue presented a question of fact that could not be resolved as an issue of law.

Other cases have taken differing positions, often based on whether the insurer had been granted discretion to interpret the policy terms. Thus, there has often been confusion as to whether a policy's MH/SUD limitation could be applied to conditions such as bipolar disorder, dementia or traumatic brain injury.

Courts rejected claims that the ADA barred duration limits for MH/SUD conditions. Beginning with *EEOC v. CNA*[10], courts rejected the proposition that Title I of the ADA, which protects against discrimination in employment, was applicable to employee benefits, including group LTD policies. The court explained that Title I was inapplicable because the claim presented had nothing to do with whether an employee could perform their job; and someone unable to perform the duties of their job was no longer a "qualified individual with a disability" entitled to ADA protection. Other federal circuits followed suit.[11]

An alternative argument, that Title III of the ADA protects against discrimination in employee benefits, was similarly rejected on the ground that "Title III relates only to the availability of goods and services and not the content of the goods."[12] Because the protections offered by human rights laws in Canada, unlike the ADA, have been found to encompass the "terms or conditions" of employment, Canada's Supreme Court, in *Battlefords,* ruled that a mental impairment limitation in a disability insurance policy was unlawful.

The only case in the U.S. that has addressed whether a mental health parity law applies to disability benefits was *Sand-Smith v. Liberty Life Assur. Co. of Boston*[13], which found that Montana's mental health

---

[9] *Fitts v. Unum Life Ins. Co. of Am.,* 520 F.3d 499 (D.C. Cir. 2008).
[10] *EEOC v. CAN Ins. Cos.,* 96 F.3d 1039 (7th Cir. 1996).
[11] *See, e.g., Parker v. Metro. Life Ins. Co.,* 121 F.3d 1006 (6th Cir. 1999).
[12] *Weyer v. Twentieth Century Fox Film Corp.,* 198 F.3d 1104, 1114 (9th Cir. 2000) (collecting cases).
[13] *Sand-Smith v. Liberty Life Assur. Co. of Boston,* 2017 WL 41689430 (D. Mont. Sept. 20, 2017).

parity law was drafted in such a way that it encompassed disability insurance. However, Montana subsequently amended its mental health parity law to address only health insurance.

One final point that deserves mention involves comorbidities. Three federal courts of appeal have ruled that irrespective of the presence of a disabling mental health condition, if the claimant has a comorbid physical condition that is itself independently disabling, the MH/SUD limitation is inapplicable.[14]

---

[14] *Krolnik v. Prudential Ins. Co.,* 570 F.3d 841 (7th Cir. 2009); *George v. Reliance Standard Life Ins. Co.,* 776 F.3d 349 (5th Cir. 2015); *Okuno v. Reliance Standard Life Ins. Co.,* 836 F.3d 600 (6th Cir. 2016).

## IV.    WITNESS TESTIMONY

### A.  INDUSTRY EXPERTS

#### 1.  INSURANCE

##### a.  Swapnil Prabha, Unum

The Council heard testimony from Swapnil Prabha, the Vice President of Digital Offerings at Unum, an insurer that sells both short-term disability ("STD") and LTD insurance. Ms. Prabha testified about the insurer's development and ongoing testing of an employer-paid mental health benefit product that could be provided as part of a package of benefits such as group STD and LTD insurance. Unum's hypothesis is that if an employer provides a mental health benefit product to its employees, there is likely to be earlier and increased uptake of mental health treatment services by workers and their covered family members, which will in turn prevent more severe mental health conditions for some and result in improved disability claims experience. Unum also expects that earlier treatment will have other benefits for employers, such as decreased "mental health absenteeism."

Unum's new mental health benefit product generally supplements an employer's group health plan and is considered to be an employee assistance program ("EAP") under ERISA's excepted benefits rules. It is designed, in part, to provide easier and earlier access to services than might occur under an individual's group health plan. Elements include an eight-week coaching program and a 12-week therapy program plus online content such as videos and podcasts. The coaching and therapy programs are limited by the number of weeks; there are no limits on the number of sessions during those time periods. For patients who need more intensive services or services over a longer period, the Unum program will attempt to transition the person to an in-network provider under the patient's group health plan. This could include a hand-off to a primary care physician when there is difficulty getting an appointment with an in-network behavioral health care provider.

Employers that buy this fee-based, non-insurance product and Unum LTD insurance together get a 3% package discount. For larger employers, consideration by Unum's underwriters of an employer's

purchase of this mental health product could also result in lower premiums for Unum's disability insurance.

Ms. Prabha testified that the first employer adopted this benefit in the summer of 2021, with a total of five employers having it in place by the end of 2022. Unum currently is collecting the data needed to assess the program's impact. Initial results could be available at the end of 2024. Shorter-term findings are likely to focus on the uptake of services through the program. Longer-term results will look at the impact on disability insurance claims experience.

### b. Phil Keller, Vermont Department of Insurance (Retired)

Phil Keller was a deputy prosecutor in Vermont for eight years before transferring to the Vermont Department of Financial Regulations where he held a variety of positions including Deputy Commissioner of Security, acting Deputy Commissioner of Insurance and Director of Insurance Regulation. Mr. Keller retired from the Vermont Department of Financial Regulations in 2021.

Mr. Keller stated that the Vermont Department of Insurance issued Bulletin 127 in 2009, which prohibited disability insurers from excluding or limiting the coverage for disabilities, including MH/SUD conditions. The bulletin was issued based on Vermont's mental health parity law, which prohibits unjust or unfair policy terms and health insurance policies, including disability insurance. Prior to the implementation of parity, he stated that insurance carriers lobbied the state and argued that parity would be too costly. However, after parity was implemented, he noted that he never received a complaint that disability insurance had become unaffordable due to the removal of MH/SUD duration limits and is not aware of any insurers leaving the market. Further, Mr. Keller noted a study of LTD claims in Vermont for the period 2008–2016 that was conducted by Susan Fendell. Ms. Fendell's study concluded that Vermont's parity requirement had little or no impact on frequency, duration or cost of disability policies.

In response to questions from the Council, Mr. Keller stated that Vermont did not track whether MH/SUD disabilities were better diagnosed or claims increased after parity was implemented, but he believed it would make sense that individuals would be more forthcoming about MH/SUD issues if they knew disability premiums would not be impacted. When asked why other states had not implemented parity requirements similar to the requirements in Vermont, he guessed that the American Council of Life

Insurers ("ACLI") and other insurance industry lobbying groups have successfully argued that removing the MH/SUD duration limits would result in increased costs.

### c.   Christine Hildebrand, Canada Life

Christine Hildebrand has over 20 years of experience in disability management and currently serves as the Vice President of Health and Ability Strategy for Canada Life. She is also a member of the Canadian Life and Health Insurance Association Mental Health Committee.

Ms. Hildebrand explained that in Canada, LTD coverage is available through an individual policy or a group policy. The premium is sometimes paid by the employer, the employee or a combination of both. If the employee fully pays the premium, then the wage loss replacement is not taxable. If the employer pays the premium, then it is considered a taxable benefit, and the employee has to pay taxes on wage replacement. The majority of LTD benefits in Canada are paid for by employees and provide non-taxable benefits.

Ms. Hildebrand testified that most Canadian group LTD policies provide coverage and wage replacement until age 65, when an individual can receive an unreduced Canadian pension. She noted that there are a few employers that have asked for coverage beyond age 65, likely due to provincial law that prevents mandatory retirement at age 65.

To be eligible for LTD benefits in Canada, there are three standard definitions of disability: (1) prevented by disease or injury from performing regular job duties at the time your disability started ("own job" definition typically used to evaluate eligibility for STD); (2) prevented from doing your "own occupation"; and (3) prevented from doing any "gainful employment." Ms. Hildebrand stated that Canada Life eliminated exclusions for psychiatric conditions in 1992. She noted that SUD are not treated differently than other MH conditions. They are covered by Canada Life, but there is an expectation that the individual is enrolled in a SUD program.

Ms. Hildebrand testified that mental health claims are a significant driver of claims in the insurance industry in Canada. She stated that 39% of paid claims have a primary diagnosis of a MH condition and

50% of all claims have a MH component. Furthe, 40% of total LTD claims costs are related to a MH condition (primarily depression, anxiety or an adjustment disorder).

Ms. Hildebrand noted that the number of MH claims increased in the early 2000s, so Canada Life developed a strategy to process MH claims. All claim processors received training related to the diagnosis, symptoms and treatment of the most common MH conditions that impact an individual's ability to work. Canada Life also increased its engagement with providers that had experience with MH conditions (behavioral health providers, pharmacogenetic testing, diagnosis screening, etc.) Canada Life has psychologists and psychiatric consultants on its internal staff who review claims, as well as a MH consulting team that mentors and teaches new employees on MH conditions.

In response to questions, Ms. Hildebrand noted anecdotal evidence suggests that there was no decrease in LTD coverage after parity requirements were implemented in 1996. Ms. Hildebrand also noted that in her experience the duration of LTD benefits receipt for MH conditions is typically shorter than it is for musculoskeletal disabilities.

### d. Steve Clayburn, ACLI

Steve Clayburn is the Senior Actuary at ACLI, where he is a member of ACLI's Disability Income Committee and has worked with member company representatives on legislative, regulatory and actuarial issues related to insurance. ACLI is the leading trade association for life and LTD insurance. In oral testimony and a written statement he provided on behalf of ACLI, Mr. Clayburn discussed the distinction between LTD and health insurance coverage, noting that LTD is not subject to any federal mandate, but insurance policies are filed and regulated by state insurance departments.

He stated that ACLI does not support applying parity mandates to LTD benefits. He noted that Congress intentionally limited parity requirements to health coverage through MHPAEA and the Affordable Care Act. He also stated that Congress understood the implications of specifically re-confirming in statutes that "disability income insurance" remains an excepted benefit.

Mr. Clayburn shared an ACLI survey of group LTD carriers showing 49 out of 50 offer LTD policies without mental illness duration limits, but only 1% of purchasers choose the policy option without the mental health duration limit. When asked why a policy without the mental health duration limit is not the default policy option presented to purchasers, he reasoned that a policy with limits is the policy that

most purchasers are accustomed to, so that is what the purchasers ask for at renewal. He stated that although ACLI does not support requiring parity, it would not be opposed to a requirement that insurers must present a policy option without duration limits.

According to Mr. Clayburn, only about 34% of U.S. workers in the private sector are covered by LTD plans, the majority of which are offered by employers as part of a comprehensive benefits package. He reasoned that unlike health coverage, LTD coverage is not required and, thus, it "competes against other types of benefits for a portion of the employer's or employee's limited budget." He stated that if the cost of health coverage continues to increase, employer-sponsored LTD coverage may no longer be offered as part of an employer's benefits package. He also suggested adding cost might negatively impact enrollment. ACLI estimates the average premium load to remove the LTD mental illness duration limit to be 10%–20%, or $2.00–$4.50/month, for median wage workers.

In response to questions from the Council, Mr. Clayburn stated the estimated claims loss ratio for a group LTD policy is 45%–50%, with the majority of the premium going into reserves to pay future claims. He noted there is minimal turnover among employer-sponsored LTD benefits subject to ERISA. ACLI does not conduct sensitivity analysis and does not have data on the cost or the impact on enrollment from removing the duration limit. He further confirmed that his comments about the potential impact on cost and enrollment are as anecdotal as those who propose removal of the duration limit.

## 2.  MEDICAL

### a.  Dr. Steven Rothke, Neuropsychologist

Dr. Steven Rothke is Board-certified in both clinical neuropsychology and rehabilitation psychology with the American Board of Professional Psychology. He serves as Director of the Neuropsychology Testing Laboratory and head of the Department of Psychology at the Rehabilitation Institute of Chicago, now known as the Shirley Ryan AbilityLab. He is also a Clinical Assistant Professor at the Feinberg School of Medicine at Northwestern University. He previously served as President of the Illinois Psychological Association.

Dr. Rothke noted diagnosis of a MH/SUD disability is not the same as an evaluation. An evaluation determines whether an individual can work or perform other daily tasks. A neuropsychological evaluation focuses on two main areas: cognitive function and emotional/psychological function. Evaluation of an

individual's cognitive function involves an assessment of the ability to pay attention and focus over a sustained time; ability to learn new skills and remember them; ability to communicate; ability to take in new information and different aspects of problem solving; ability to make decisions based on the information available; and flexible decision-making (i.e., ability to change based on circumstances and surroundings). Evaluation of an individual's emotional/psychological function involves an assessment of stress; anxiety; depression; delusions or association; and the extent that these conditions impact an individual's ability to work. Dr. Rothke stated testing is robust and standardized. He also noted testing requires active participation by the individual being evaluated, unlike a medical examination of a musculoskeletal condition.

Dr. Rothke testified that evaluation results are verified based on two criteria: reliability (i.e., similarity/frequency of similar findings) and validity (i.e., accuracy). Validity tests are built into the evaluation itself, and if an individual fails two or more of the validity measures, the findings of the evaluation may not be relied upon. He noted, however, that some individuals fail validity tests due to external factors, such as the amount of sleep the individual had prior to the test or other physical impairments. He also noted the evaluation is a snapshot in time, and some MH conditions do not always manifest during the evaluation. Dr. Rothke provided an example of an individual with bi-polar disorder who has manic episodes but may not exhibit those symptoms outside of a manic episode. If validity tests are failed, then the evaluation may be re-conducted or adjusted to be conducted over several days rather than in one session

### b.  Dr. Henry Conroe, Psychiatrist

Dr. Henry Conroe is a board certified psychiatrist who testified about his experience as SSA's Regional Medical Advisor and Chief Psychiatrist for the Chicago region, and his experience a provider of independent medical exams ("IMEs").

Dr. Conroe testified that SSA does not differentiate between physical and MH disability claims with respect to the duration of disability benefits. Some disability claims require re-evaluation after 18

months, two years, or maybe not at all, but differentiation does not appear to be driven by whether the claim involves a physical or MH condition.

Dr. Conroe testified that when reviewing the SSA case file of an individual who claims that he or she has a disabling MH condition, the individual's claim is evaluated by looking at the "whole picture" and a variety of sources, including a comparison of symptoms to a baseline for the claimed condition. This is done to determine whether an individual has a MH condition and whether that condition limits the individual's ability to work.

When conducting IMEs, Dr. Conroe meets directly with the individual to gather information to determine whether an impairment exists and how limiting the condition is, in addition to reviewing records. He performs IMEs and gathers information to make determinations about patients' mental condition. These determinations are to a reasonable degree of medical certainty (i.e., more likely than not).

### 3. FINANCIAL/ACTUARIAL

#### a. Edward Jamieson, Jamieson Financial Services

Edward Jamieson, founder and President of Jamieson Financial Services, testified that there was a time when there was no limitation on nervous and MH conditions. These limitations were added to address the uncertainty in the cost associated with claims for these types of conditions.

Mr. Jamieson also noted that when employers are discussing their employee benefits package, LTD coverage is one of the last benefits discussed because of the size of employers' benefit budgets, the cost of health coverage and the need to prioritize those health benefits, including dental and vision, over this type of coverage. LTD coverage is usually paid for out of whatever is left in the budget after health coverage needs are addressed.

When LTD coverage is purchased, that coverage is proposed to the employer, along with the associated cost, by the benefits broker. Brokers survey carriers to find the best priced coverage available.

It is possible brokers do not look at contract differences because they want to present the most competitively priced offer to their clients.

According to Mr. Jamieson, there is an approximately 25%–35% cost differential in premium for disability insurance with no duration limits. Most insurers will offer unlimited coverage, but they do not lead with this offer because the additional cost could discourage employers from purchasing at all. He noted that group LTD coverage is relatively inexpensive, but without the limit, it goes up substantially. He stated some insurance companies have exited the group LTD insurance business because they were not making a profit.

With respect to individually purchased LTD coverage, he suggested individuals are not choosing to pay for a policy without the MH/SUD duration limit because people's natural tendencies are to think that they will not become disabled, and certainly not disabled with a mental illness. He stated that often the problem with LTD policies is the only people who have coverage are those who know they are going to use it (i.e., there is adverse selection).

Mr. Jamieson stated it is difficult for actuaries to predict the risk on MH/SUD condition-related LTD coverage, which makes profitability predictions even harder to arrive at. Consequently, carriers are willing to underwrite the risk, but they must do it at a price point that will allow them to cover the risk of loss and still derive a profit. This can be hard to pinpoint.

Mr. Jamieson stated disability insurance is not discussed by employers. Further, insurance companies do not have enough experience with mental and nervous condition risk, and they are afraid to take this risk on. Therefore, insurance companies increase the price as a bit of a roadblock to keep people from purchasing unlimited coverage for MH/SUD conditions. According to him, insurers have said they will not offer unlimited LTD coverage to every industry because the increase in mental health conditions and the increase in cost is different for certain industries. However, Mr. Jamieson testified he has never seen a carrier unwilling to offer unlimited LTD policies when the employer has 25 or more employees. He suggested the Department should do more to bring attention to this issue.

### b.  Richard (Rick) Leavitt, Ph.D., Actuary, Smith Group/Guy Carpenter

Dr. Richard Leavitt is the consulting actuary at the Smith Group/Guy Carpenter, where he evaluates pricing projections for LTD, STD, voluntary disability and state-mandated leave products. He

is a member of the American Academy of Actuaries and the Society of Actuaries, where he is a member of the LTD Experience Committee. Dr. Leavitt noted the LTD Experience Committee conducted a claims loss study in 2019 for the period 2009–2017 (2019 LTD Claims Study), which he referred to throughout his testimony.

Dr. Leavitt stated that in the 30 years he has been working on group disability issues, he has been asked several times by carriers to justify the MH/SUD duration limit on benefits. However, the justification for the duration limit was never clear to him. He stated, "From an aggregate point of view, the mental health claims show similar dynamics to regular physical claims. They don't seem to be more volatile. They don't seem to have any distinct trend. They tend to return to work in similar patterns as physical claims." He noted the MH/SUD duration limit has been part of policies since the inception of LTD policies in the 1960s. He believed that due to the subject and nature of MH/SUD claims, carriers were concerned about the risk of abuse and therefore imposed the limit. Dr. Leavitt testified that since the 1960s, there have been significant developments in the study of disabilities and a broader understanding of the mind/body connection. He stated that many physical disabilities have a mental component, and many mental disabilities have a physical component.

According to Dr. Leavitt, all LTD carriers offer an LTD policy option without a MH/SUD duration limit, but there are underwriting rules that restrict the option, such as reducing the maximum benefit payable under an unlimited policy. The 2019 LTD Claims Study showed that fewer than 1% of all LTD policies sold between 2007–2019 have unlimited benefits for MH/SUD disabilities. Since there are so few unlimited policies, it is difficult to assess the cost of removing the duration limit. Carriers are also concerned about anti-selection; employers may ask for policies without duration limits if they have prior knowledge that there are individuals who are likely to file MH/SUD claims. The cost estimate of removing the duration limit is between 5%–30%, but based on premium filings submitted by LTD carriers, he estimated the average cost that carriers apply to removing the duration limit is 17.6%. The uncertainty regarding the cost of removing the duration limits is the primary reason why carriers are hesitant to do so.

Dr. Leavitt reviewed the 2019 LTD Claims Study that showed that 7–8% of all LTD claims in the U.S. have a mental health diagnosis, and of those 7–8% of claims, only 44% continued to receive benefits until the duration limit. Of that 44%, 67% of claims terminated due to the limit, while the remaining

individuals continued receiving benefits due to a physical disability. Therefore, only 2–3% of all LTD claims are terminated due to the MH/SUD duration limit.

Dr. Leavitt noted many actuaries look to the Canadian claims experience after MH/SUD duration limits were removed in the 1990s. A 2009–2015 study of Canadian claims experience shows 30% of all claims during that period were based on a MH/SUD disorder. By contrast, 14.1% of all claims were based on a MH disorder for the period 1984–1988. He stated we have not seen the same rise in MH-related LTD claims in the U.S. Instead, those claims have remained fairly stable in the U.S., if not declining slightly, since the 1990s. His organization monitors the claims experience for Social Security Disability Insurance ("SSDI") benefits to determine whether SSDI trends are similar to LTD trends, but he notes the population of individuals receiving SSDI benefits is very different from those receiving LTD benefits.

### c.   Dr. Marion (Taffy) McCoy and Ty Turner, SSA

Dr. Marion (Taffy) McCoy is a sociologist and has served as a Social Science Analyst with SSA since 2016. Ty Turner is an IT specialist in the Office of Research Demonstration and Employment Support at SSA. Mr. Turner reviewed the two disability programs available through SSA: SSDI and the Supplemental Security Income program ("SSI"). SSDI is available to workers with a qualifying work history who have a disability that prevents them from working full-time for at least a year. By contrast, SSI is a needs-based assistance program that guarantees a minimum level of income for needy, aging, blind or disabled individuals.

SSA evaluates disability benefit applications based on 11 categories of disabilities: neurocognitive disorders; schizophrenia spectrum and other psychotic disorders; depressive, bi-polar and related disorders; intellectual disorders; anxiety and compulsive disorders; somatic symptoms and related disorders; personality and impulse-control disorders; autism spectrum disorders; neurodevelopmental disorders; eating disorders; and trauma and stressor-related disorders. He noted SUD alone is not considered as basis for SSA disability benefits, but if an individual has a MH-related or physical disability separate from the SUD, that individual may still qualify for benefits.

SSA is required to conduct a continuing disability review ("CDR"), which is a medical review of each disability case, at least once every three years after benefits are awarded. Mr. Turner reviewed

statistics collected by SSA between 1998–2008 regarding the cessation of SSDI benefits after a CDR, separated by each category of disability recognized by SSA.

Dr. McCoy noted the total number of SSDI applications received by SSA has decreased by 40% since 2010, and this downward trend has continued. In 2010, there were 3 million disability applications. By 2021, there were 1.8 million applications, and the total number of individuals awarded SSDI benefits was 540,000, with only 65,000 individuals receiving SSDI benefits due to a MH disorder. She stated that the data collected by the SSA shows that the percentage of individuals receiving disability benefits from SSA as compared to the percentage of individuals who are receiving SSA retirement benefits is substantially lower. In 2021, there were more than 65,000 workers who stopped receiving disability benefits because they successfully returned to work; 44% of them had a MH disorder. The majority of individuals who are able to return to work are under 40 years of age. In general, however, most individuals receiving SSDI benefits are not able to return to work and earn enough income to support themselves.

In response to questions, Dr. McCoy noted SSA had recently conducted a study of supported employment that examined individuals who had just applied or had applied in the past 30–60 days for SSDI based on a MH disorder and who were denied benefits. The study found that although these individuals applied for and were denied SSDI benefits based on a MH disorder, the MH disorder was not their primary disabling condition. There was a preponderance of severe comorbidities that these individuals were suffering from, such as chronic heart failure and lung cancer. According to Dr. McCoy, 60% of the individuals studied had 2–3 serious comorbidities.

## B.  MENTAL HEALTH AND SUBSTANCE USE DISORDER ADVOCATES

### a.  Mala Rafik, Rosenfeld and Rafik

Mala Rafik is a partner at Rosenfeld & Rafik, P.C., where she represents individuals who have been denied health or disability benefits. She primarily represents employees of smaller companies and noted that 75%–80% of those companies have a two-year limitation on MH/SUD conditions. She stated that approximately 35%–40% of employers offer disability coverage, and the majority of those employers

cover the total cost. When unlimited MH/SUD coverage is provided, it is usually paid for entirely by the employee. Typically, the employees paying for that coverage are highly compensated employees.

Her clients who have been affected by policy limitations applicable to behavioral health conditions typically fall into three categories:

- Individuals with physical conditions that are misclassified as mental and are denied coverage.
- Individuals developing mental conditions due to their physical conditions and who have their claims denied.
- Individuals with pure MH/SUD conditions that are limited to two years of coverage.

Ms. Rafik stated she believes a limitation on coverage for MH/SUD conditions is discriminatory and perpetuates a negative stigma of MH ailments. She noted there is a misconception that there is no objective test to identify MH conditions, despite the recognition of these conditions by regulatory bodies of authority.

She further described a potential catch-22 for individuals with a history of MH/SUD conditions who seek treatment and later suffer a physical injury. In those instances, their claims might be limited because it is believed that the physical injury is not resolved because of the MH/SUD condition, instead of the physical aliment. Alternatively, if someone who has a MH/SUD condition does not seek treatment for it, the fact that you have not been treated for the condition previously could be used as a basis to deny an LTD claim related to that condition.

Ms. Rafik stated she believes insurers are misusing the MH/SUD limitation to limit their claims loss ratios. Ms. Rafik also shared a story of a client who voluntarily gave up her disability benefits because the steps the insurance company took to confirm or monitor her status made her condition worse.

Ms. Rafik explained the ADA does not prohibit the disparity between coverage for physical disabilities and MH/SUD disabilities; the ADA only requires that if you offer disability insurance, you

offer it equally to all employees. The ADA also does not get into the structure of the benefit that you offer equally to all employees.

### b. Sarah Yousuf, Mental Health Legal Advisors Committee

Sarah Yousuf is the Senior Supervising Attorney for Mental Health Legal Advisors Committee ("MHLAC"). She supervises MHLAC advocates and works with the Executive Director to coordinate advocacy. She also works on community-based and legislative issues related to mental health policing, education and health care policy. MHLAC typically represents clients who have serious mental illnesses, are on SSDI and are incapable of taking care of themselves. MHLAC also works with clients who just need a "mental break," and this was seen especially during COVID when there was a great amount of stress.

MHLAC is an agency under the Massachusetts Supreme Judicial Court that provides information and advice on mental health legal matters and advocates for systemic change. She testified that the MH/SUD duration limit on LTD coverage adds additional stress to someone who has a psychiatric disability, ultimately exacerbating their mental health issues. The denial of benefits because a disability is mental in origin has far-reaching financial consequences, leaving affected individuals unable to support basic everyday needs for themselves and their dependents. Over the past several years, MHLAC has seen claimants apply for government benefits or borrow from family members because they were no longer able to meet their everyday expenses after the MH/SUD duration limit took effect.

She observed this added stress often prolongs an individual's MH condition and prevents them from going back to work. In her experience, it is very clear that a person's MH is exacerbated by the MH/SUD duration limit. They are not able to think clearly or to process what is happening, not only with their mental health condition, but also with the fact that they cannot pay and meet their own basic needs.

Ms. Yousuf argued that by providing them unlimited LTD coverage for individuals suffering from a MH/SUD, employee are relieved of the burden of securing a source of income and can focus solely on their recovery and treatment. She suggested that even the knowledge that adequate disability insurance is

provided enhances an employee's engagement in their work because it demonstrates that an employer is invested in them.

Ms. Yousuf acknowledged that one argument against including parity provisions for psychiatric disabilities is cost, where enhancing coverage would raise premiums. She stated there are models that demonstrate that such arguments are ill founded  She noted Massachusetts implemented health insurance parity provisions in 2000, 2008 and 2022. The predictions of inflated premiums did not occur in 2000 and 2008, while the effects of the 2022 provisions are still being studied. She noted that LTD benefits available to employees in Massachusetts have a 36-month limitation on behavioral health disabilities, but State legislators are in discussions about removing that limit. A bill requiring parity in LTD policies was presented but ultimately did not pass, perhaps partly due to competing priorities.

She noted that in 2008, the insurance division of Vermont's Department of Banking, Insurance, Securities and Healthcare Administration mandated that new disability income replacement policies could not limit or exclude coverage to persons disabled due to a MH condition unless other disabling conditions are similarly limited or excluded. At the time, insurers argued this change would result in a significant increase in premiums  Studies have shown, however, that Vermont's premiums did not differ significantly from nationwide trends after the state enacted these provisions. Furthermore, the majority of filings submitted to bring policies into compliance with the law did not call for accompanying rate adjustments. Among those policies for which rates were adjusted to reflect mental health parity, changes ranged from an increase of 9% to a decrease of 4%, depending on claims experience. In the case of one insurer, several years' worth of data for both STD and LTD group policies indicated that in every year except 2011, loss ratios (claims and administrative expenses paid divided by premiums collected) for policies placed in Vermont were lower than national averages. She argued that while many variables must be considered, the data from Vermont rebuts the contention that equitable coverage will be prohibitively expensive for disability income insurers and their customers.

Ms. Yousuf also argued that former conceptions of psychiatric disabilities are antiquated, and disability insurance policies must change to reflect current trends and research  Previously, there have been notions that psychiatric disabilities are untreatable, and it is difficult to provide coverage for them. The health industry has now embraced the need to provide treatment and recognizes the debilitating effects of untreated mental health conditions. Treatment and understanding of psychiatric disabilities have also

progressed over the decades. There have been advancements in accurately diagnosing someone's illness and implementing safeguards against fraudulent claims.

Ms. Yousuf stated insurers have asserted limitations on psychiatric disabilities are based on actuarial evidence of higher costs; however, physical disabilities are responsible for a higher percentage of new claims, more lost workdays, more cases that convert to LTD and approximately the same or a higher number of STD payments at closure. Ms. Yousuf concluded there is no good reason to exempt disability insurance from anti-discrimination protections and urged the Council to recommend parity provisions in LTD benefits.

### c. Patrick Kennedy and David Lloyd, The Kennedy Forum

The Council heard testimony from Patrick Kennedy and David Lloyd of the Kennedy Forum. Mr. Kennedy served in the U.S. House of Representatives, where he was one of the lead authors of MHPAEA. After leaving Congress, he founded the Kennedy Forum, an organization that focuses on mental health issues, including the implementation of MHPAEA. He currently serves as Co-Lead of the National Action Alliance for Suicide Prevention's Mental Health and Suicide Prevention National Response to COVID-19 and Chair of the Bipartisan Policy Center's Behavioral Health Integration Task Force. Mr. Lloyd is the Chief Policy Officer at the Kennedy Forum and an expert on a range of behavioral health policies, including insurance coverage and MHPAEA, as well as budget and tax issues.

Mr. Kennedy is a strong advocate for mental health parity rights. He noted there is discrimination against and stigma associated with mental illness and that has been become part of our collective way of thinking. Therefore, he continues to push for rights and coverage for individuals with disabilities due to brain illnesses that are equal to those provided for individuals with disabilities due to physical illnesses. He shared his perspective that "the brain [is] part of the body" and that the current practice of including duration limitations for MH/SUD claims in LTD policies is unfair and unethical and violates basic civil rights laws.

Mr. Kennedy does not accept the rationale from insurers and plan sponsors that LTD coverage is limited today because it is less expensive when mental health is limited, as this excuse would not be accepted if certain physical illnesses were denied due to cost. He noted that before MHPAEA was passed, the common belief was that if parity was mandated, costs would increase, and health plans would withdraw

from the marketplace entirely. He observed the opposite has happened since the implementation of MHPAEA; self-insured plans are now seeking more coverage for MH benefits. Mr. Lloyd expressed similar thoughts on the cost excuse and noted research conducted after parity was extended to federal employees indicated there was no impact on overall costs. He also noted when parity in disability insurance was implemented in Vermont, there was no change in premiums. Mr. Lloyd thinks those experiences are instructive for what to expect if mental health parity is expanded to LTD benefits nationally

Mr. Kennedy believes "addressing our ongoing mental health and addiction crisis is a defining issue of our time. We can no longer allow individuals with these conditions to be subject to legalized discrimination." He urged the Council to recommend bringing parity to disability insurance coverage and end discrimination against an individual because their disability is caused by a MH/SUD condition rather than a physical health condition.

### C.  EMPLOYER REPRESENTATIVES

#### a.  Bridget Bearden, Employee Benefit Research Institute

Dr. Bridget Bearden is a research and development strategist and member of the leadership team at the Employee Benefit Research Institute ("EBRI"). In addition to managing the research team, her research contributions include the impact of disability on retirement spending and the 2022 Spending and Retirement Survey. EBRI's mission is to produce and communicate independent, objective, non-partisan data, research and other information about employee benefits. EBRI's work supports employers, policymakers, service providers and others in developing innovative solutions and making policy and design decisions.

Dr. Bearden's testimony drew upon multiple resources, including public data from the National Compensation Survey and the American Community Survey. In addition, Dr. Bearden drew upon proprietary survey data from the EBRI Greenwald Confidence Survey, the EBRI Greenwald Workplace Wellness Survey and some qualitative and exploratory research conducted in preparation of her testimony. She noted this research is not representative of all employers but may inform further research on the topic.

Dr. Bearden shared overall statistics on the prevalence of disability, as well as the incidence of disability among the employed population. She noted the term disability as used in publicly available data

sets is based on a six-category test of whether the individual has a hearing difficulty, vision difficulty, cognitive difficulty, ambulatory difficulty, self-care difficulty or independent living difficulty. She stated that a cognitive difficulty is defined as "The individual, because of a physical, mental or emotional problem, has difficulty remembering, concentrating or making decisions." Dr. Bearden stated that, as of 2021, about 43 million Americans (11%–13% of the civilian, non-institutionalized population) have a disability. While 11% of working-age adults (those ages 18–64) have a disability, the prevalence of disability increases with age, where 1 in 3 civilian Americans over the age of 65 have at least one disability. In 2021, the American Community Survey estimated that of the 145 million people in the labor force, 6% had some kind of disability. Since 2019, there has been a 10% increase in the number of the employed population with a disability. In 2018, cognitive difficulties surpassed ambulatory difficulties as the most reported disability in the employed population. Among workers with a disability, 38% have a cognitive disability. Since 2019, there has been an 18% increase in the number of employees who report having a cognitive difficulty.

Dr. Bearden shared information from a 2022 EBRI survey that asked workers (both part-time and full-time workers) to self-report their mental or emotional well-being or mental health. The answers were provided on a five-point Likert scale (excellent, very good, good, fair or poor). About 1 in 5 reported their mental or emotional well-being or mental health as less than good, about 5% reported it as poor and 13.7% reported it as fair.

Dr. Bearden noted mental illness impacts both current financial security as well as future financial security. Therefore, EBRI measured retirees' and workers' retirement confidence or ability to have enough money to live comfortably throughout retirement. In 2022, EBRI found two-thirds of retirees and workers said they were somewhat or very confident in their ability to have money to last throughout retirement. Fewer than 10% were not at all confident. The EBRI study indicated that MH has a substantial impact on an individual's retirement confidence: 92% of those with excellent self-reported MH are somewhat confident, but only 15% of those with poor self-reported MH are somewhat confident.

Dr. Bearden stated that EBRI used the National Compensation Survey ("NCS"), a survey of business establishments conducted by the U.S. Bureau of Labor Statistics ("BLS"), to determine access to and participation in LTD. The NCS showed about 35% of private-sector establishments offer LTD, with differences in access by employer size. Employers with more than 500 employees are far more likely to

offer LTD than smaller employers. However, the share of small employers offering LTD benefits has grown. There are also differences in access to LTD programs by employment type: Full-time employees have greater access to LTD benefits than part-time employees.

Dr. Bearden also shared information from EBRI's Back to the Workplace Wellness Survey. EBRI was able to analyze data on access and uptake of LTD insurance by MH status. According to that survey, 56% of workers report having access to a LTD policy, and 56% of those with access (coincidentally the same percentage) participate in the offered policy. Dr. Bearden noted there is an uneven awareness of access to employer-sponsored benefits by employer size, employment status and socio-demographic characteristics, similar to what is observed in the offering of retirement and health plans. There are also differences in access for LTD insurance by MH status. The rates of low mental health status are higher among those who are not offered or do not know whether they are offered LTD: 60% of employees with fair or poor mental health are not offered or do not know whether they are offered LTD insurance. Uptake is high for those who self-report their MH as excellent. The uptake drops for those that report their MH as good, and then increases again for those with poor self-reported MH status. Of those employees who have any kind of disability insurance (including both STD and LTD insurance), 40% say they do not have enough coverage or do not know whether they have enough coverage to protect against potential financial risks, while 60% believe they have enough coverage.

Separately, EBRI surveyed individuals who work in the area of benefits (benefits workers) and fielded a brief survey among a small group of employers, which Dr Bearden said was more of a focus group. She noted that, as such, the results are not intended to be representative, but instead exploratory and to inform further research. The survey results indicate that there is inconsistent terminology on MH limitations among employers, consultants, brokers and insurance providers. This is also evident in the different terms used in policies and the various diagnostic codes or categories used that are relative to MH, behavioral health and substance use disorders. The survey results further indicate that despite the lack of standard terminology, MH illness issues, in the broad sense, are a common primary diagnostic category for long-term claims. Benefits workers shared that MH claims are often in the top five diagnostic categories for LTD claims. The survey also confirmed that MH/SUD duration limits are typically 24 months and are the standard default language in most policies. While employers can negotiate and customize this duration limit, the prevalence of customization depends on employer size and industry, use of a broker, awareness and resources, among other factors. Comorbidities, causality and whether the

-33-

disability results in a total loss of the ability to work are all additional and important considerations that require subjective review relative to job responsibilities and policy descriptions.

Dr. Bearden reviewed a spot survey (or focus group) of 11 employers, representing over 300,000 employees across different industries. Ten of the employers offered an LTD policy subject to ERISA, and six of those 10 indicated that their disability income benefits can continue until retirement age, regardless of reason for disability. Four of the 10 indicated that the disability benefits were subject to a duration limit of 24 months. Three of the four that had a duration limit applied it to mental health conditions, while one indicated the limit applied to all pre-existing conditions. Approximately half of the employers surveyed are planning to make changes to their LTD insurance benefits in the next 12–24 months. These changes included carrier changes or making the benefit fully employer paid. Some employers that currently impose a limitation on the mental health benefit indicated they are reviewing these limits, possibly to increase or remove duration limits.

Dr. Bearden noted a significant number of Americans suffer from mental illness or a substance use disorder each year, and while the COVID pandemic exacerbated these issues, it also heightened employers' awareness of and response to employees' MH conditions. She stated there is a clear connection between disability, health and wealth benefits, as well as between physical, mental and financial well-being.

In response to questions, Dr. Bearden stated that in 2018, EBRI found cognitive difficulties surpassed ambulatory difficulties as the most reported disability in the employee population. With the virtual environment, EBRI expected to see ambulatory and other physical limitations become more common in the employee population. Further, she stated that the non-contributory nature of LTD benefits likely contributes to the lack of awareness of disability coverage. Relatedly, it is also not typically part of an employee's annual enrollment. Therefore, the only times employees become aware of LTD benefits are very likely at hire or when they are thinking about whether they might need to take advantage of one of the benefits.

### D.  PARTICIPANT REPRESENTATIVES

#### a.  Ruben Navarro, International Association of Fire Fighters

Ruben Navarro is a Benefit Consultant from the International Association of Fire Fighters ("IAFF"). He previously served as a trustee, the Vice President and President of the Los Angeles Firemen's Relief Association, which provides medical, life insurance and disability insurance to members. He currently serves on the International Foundation of Employee Benefit Plans ("International Foundation") Executive Committee and Board of Directors. He also serves on numerous International Foundation committees, including the Mental Health and Addictions Expert Panel.

Mr. Navarro noted in his experience, it is challenging to determine if someone is disabled due to a mental health disorder. He acknowledged there is a mental health crisis, and the benefit plans that he works with recognize that stress is real. One way the city of Los Angeles and the IAFF have addressed the MH crisis has been to collaborate to hire psychologists to support members and their stressors at work and life. This has been a successful approach to managing the MH of their membership. However, not all plans have this safety net.

He noted MH/SUD claims generally take longer to evaluate than physical claims when making a disability determination, and it is often a slow process, taking 1-1.5 years. He observed that one reason for the longer timeline in evaluating disabilities due to MH/SUD conditions is an individual and a medical provider generally need to build a rapport for the provider to diagnose the MH/SUD condition, whereas a physical disability can be identified through X-rays or other tests. Also, unlike with claims for physical conditions, mental health providers typically do not share records with insurance companies, even if the patient has consented to it.

Mr. Navarro noted, in his experience, most disabilities due to MH/SUD conditions, when treated properly, do result in individuals returning to work prior to exhausting plan limitations.

In response to concerns over costs, Mr. Navarro drew a comparison to when the Affordable Care Act required elimination of the annual and lifetime benefit limits in health care plans. He stated there were

concerns initially raised that insurance companies would go bankrupt, but that did not happen. He suggested the same experience would likely occur if limits were to be eliminated for MH claims.

Mr. Navarro suggested the Council consider three things. First, there should not be a distinction between MH and physical disabilities. Second, training should be created for plans and employers to ensure they are adopting best practices. Third, there should be safety rails established when limits are removed to ensure plans are not taken advantage of.

### b.  Gene Price, Carpenter Trust Funds

The Council heard testimony from Gene Price, who has worked at the executive level with Carpenter funds for over 45 years. Mr. Price currently serves as an administrative consultant to the Southwest and Northwest Carpenter Funds. He is also the past President of the Board of Directors for the International Foundation and the current Chair of the International Foundation's Mental Health and Addictions Expert Panel.

Mr. Price discussed his experience working for multiemployer health and pension plans that cover workers in the construction industry. He stated that in the construction industry, there are high rates of suicide and addiction, so the health plans he works with are actively pursuing efforts to provide MH/SUD benefits. However, he noted the unique structure of multiemployer plans, which are collectively bargained by unions and employers. A collective bargaining agreement ("CBA") protects employees by contractually guaranteeing certain benefit packages, while also protecting employers by fixing the cost of benefit packages over a period of time at amounts that are contractually agreed upon.

The Carpenters health plans he works with offer STD benefits, but none offer LTD benefits. The Carpenters plans have explored offering an insured LTD benefit that would offer either a two-year income replacement benefit or an income replacement benefit until retirement. However, the considerable variability of premiums made offering LTD coverage infeasible because insured benefits with costs that may significantly change from year to year are difficult to account for as part of determining the cost of an overall benefit package in a CBA. A significant change in an annual premium that could not be paid from a plan's reserve assets may require the re-negotiation of a CBA. He further noted that for unionized workers covered by multiemployer defined benefit ("DB") pension plans, long-term income replacement is available through a disability pension. Most multiemployer DB pension plans use the SSDI standard to

determine if an individual is eligible for a disability pension benefit. If an individual has been awarded Social Security disability benefits, then the DB plan will determine that the individual is "disabled" for purposes of being eligible for a disability pension benefit.

## V.    DATA AND SURVEY INSIGHTS

The Council was only able to gather a limited amount of data for employer-sponsored LTD benefits. It does not appear there is sufficient data to accurately assess any increase in premiums that may result from removing the MH/SUD duration limits.

**Coverage ̶ Only a minority of workers have LTD coverage:**

- LTD benefits are primarily provided through employer-sponsored plans; a small percentage of workers have LTD coverage through voluntary benefit plans and individual policies.
- ACLI testimony noted approximately 34% of U.S. workers in private industry (33.7 million workers) are covered by LTD insurance.
- According to the BLS Employee Benefits Survey, the civilian worker participation rate in employer-sponsored LTD coverage increased from 31% in 2011 to 35% in 2023. Almost all employer-sponsored LTD benefits are provided on an employer-pays-all basis — 93% in 2011 and 94% in 2023. That is, employers paid the entire premium for 95% of those who had access to employer-sponsored LTD in 2011 and 97% of those in 2023.
- Many DB pension plans include disability retirement benefits — either a disability income benefit or continued accruals during periods of disability. In 2022, for DB plans with traditional formulas, 80% of workers were in plans that had a disability feature; but only 9% of workers in non-traditional DB plans (e.g., cash balance formulas) had a disability feature. However, the decline in DB plan participation that was noted in the Council's 2012 disability report, Managing Disability Risks in an Environment of Individual Responsibility, has continued. As of the 2020 Form 5500 filings, the Department reported 31.9 million DB pension plan participants, but only 12 million actively participating.

**The cost of LTD coverage is modest and declining:**

- A 2023 Milliman study showed an average annual LTD premium of $281.50 — increasing an average of 1.3% per year over the past 9 years (from $253, 2014–2015).
- The premium rate is declining since the 1.3% annual increase is substantially less than:
  - The 4% per year average increase in the Social Security Wage Index.

- o The 3%-per-year-average increase in volume from the same Milliman survey (from $10.1 billion in 2014 to $12.7 billion in 2023).

**Almost all LTD plans include a MH/SUD duration limit — however, there are exceptions:**

- Most LTD plans (~ 99%) include a duration limit (almost always 24 months) for disabilities related to MH/SUD. Duration limits implemented more than a half century ago remain in place despite the adoption of MHPAEA and the absence of similar limitations in the Social Security disability benefit program for MH conditions. SUDs are not covered at all under Social Security disability, although disability due to organ damage resulting from substance use is covered, as is disability due to comorbid conditions. Most disability plans use both an "own occupation" and "any occupation" disability determination, generally timing the change in definitions so that it coincides with the MH/SUD duration limit.

- ACLI indicated that LTD coverage without MH/SUD duration limits is available from 49 of 50 surveyed insurers, but rarely requested or elected.

- However, an ERISA Industry Committee survey of large/jumbo employers (generally, employers with 10,000 or more employees) confirmed there may be some movement away from duration limits as only 28% of survey respondents always apply their duration limit to all MH/SUD conditions.

**The impact on premium from removing MH/SUD duration limits is uncertain:**

- Dr. Leavitt's review of the 2019 LTD Claims Study showed that 7–8% of all LTD claims in the U.S. have a MH/SUD diagnosis, but only 2–3% of all LTD claims are terminated due to the MH/SUD duration limit.

- Vermont removed duration limits for disabilities due to MH/SUD conditions and did not identify any increase in LTD premiums.

- However:
  - o Canada mandated parity, and Canada Life claims experience indicates MH/SUD represent approximately 39% of approved LTD claims and 41% of the total amount paid for LTD approved claims.
  - o The share of SSDI awards made to workers with MH disorders (not SUD) ranged from a low of 8.3% in 1960 to a high of 26.1% in 1993, falling to 12.1% in 2021. As of December 2021, 25.2% of those receiving SSDI had a psychiatric disability, and 3.9% had an intellectual

disability. In 2015, 35.8% of SSDI recipients had a psychiatric disability, and 11.3% had an intellectual disability.

- A survey of insurance rate filings showed the costs to remove the 24-month limit averaged 17.6% (a range of 9%– 25%), equivalent to a $50 annual premium rate increase (a range of $25–$71).

- While not likely transferable to LTD because of LTD's modest cost, employers have decades of experience in dealing with the increased cost of health coverage. Kaiser Family Foundation surveys showed the cost for single coverage increased from $2,196 in 1998 to $8,435 in 2023, or 5.53% per year, despite an increase in the average single deductible from $175 to $1,735 and an increase in the percentage of plans with a general annual deductible from 51% to 88%. Over the same period, the percentage of plans with non-contributory single coverage declined from 49+% to 13%, and the average employee monthly contributions for employee-only coverage increased from $32 to $123.

**Survey Insights:**

**2022 EBRI/Greenwald Workplace Wellness Survey**
- In this 2022 Survey, 4.7% of workers reported emotional well-being/mental health as "poor," and 13.7% reported it as "fair." That is, 18%, or nearly 1 in 5, reported their mental health as less than "good."
- Survey of 11 plan sponsors, with a total of 300,000 employees, in various industries, showed:
  o Ten offer LTD.
  o Six do not have a duration limit. Four have 24-month duration limits for certain disabilities, and three of the four limits applied to mental health conditions.
  o Eight employers paid all costs.

**Milliman annual survey of LTD insurers from 2014–2023**
- The 2023 survey showed:
  o 24 companies participated, $12.7 billion in LTD in-force 2022 premium, for ~45MM covered participants.
  o Average annual premium was $281.50.

- Surveys since 2014 showed hat the average annual premium has not varied substantially, ranging from $253–$281 (likely increasing consistent with wage increases during that period).

**ERISA Industry Committee ("ERIC") Ad-hoc Survey**

- 70% of surveyed plans were fully insured.
- Duration Limits applied to 60% of all plans, including:
  - 28% applied to all mental health conditions.
  - 15% applied to all mental health conditions excluding serious mental illness.
  - 30% applied to some or all symptom disorders or functional somatic syndromes.

**Matt Greenwald obtained a release from Voya to provide survey data focused on the employer response to COVID, to measure the increase in mental health issues.**

The research had four parts:

- An online survey of 214 health care organizations in the 1st Quarter 2022.
- Seven in-depth interviews with health care organizations in the 1st Quarter 2022.
- An online survey of 301 higher education institutions in the 2nd Quarter 2022.
- Six in-depth interviews with higher education institutions in the 2nd Quarter 2022.

Mr. Greenwald shared five findings he considered relevant:

1. Widespread concern about employee mental health.
2. Among surveyed executives in the health care industry, 83% reported an increase in priority given to help employees with mental health issues. Further, 48% made changes to mental health support, and another 40% were considering changes. Nine in 10 (88%) felt their organizations should do more to address mental health issues. Similar findings were reported by survey respondents from higher education institutions.
3. Organizations increased spending on medical coverage and pay for time not worked, including reducing point of purchase costs for mental health services and increasing work flexibility for those who need time off.
4. Research suggests it may be easier now to address or engage with mental health challenges.
5. No survey questions specifically addressed LTD, and no one volunteered that they were considering changes to adopt or expand disability insurance.

## VI.    COUNCIL OBSERVATIONS

MHPAEA prevents group health plans and health insurance issuers that provide MH/SUD benefits from imposing less favorable benefit limitations on those benefits than on medical/surgical benefits, but this parity requirement does not apply to LTD plans. Most LTD plans today include a 24-month limitation on the duration of benefits for disabilities related to MH/SUD. The Council heard testimony from witnesses representing various stakeholders regarding the basis for such limitations, the impact of this limitation on disabled individuals and the potential impact of removing the limitation provision from LTD plans. The Council's report and recommendations address these issues.

**A.    The Council heard from several witnesses that duration limits should be eliminated because "it's the right thing to do."**

The Council heard from several witnesses that duration limits should be eliminated because "it's the right thing to do." Those witnesses emphasized that it is discriminatory to limit the duration on LTD coverage for MH/SUD conditions but not limit the duration for physical disabilities, and that these limits have devastating implications for impacted families.

It is worth noting SSDI does not have duration limits, but it also does not cover SUDs unless other disabling comorbid conditions are also present.

Patrick Kennedy, a former U.S. Representative and founder of The Kennedy Forum, testified about the moral and economic importance of MH/SUD parity in insurance coverage. He stated that the limitations placed on coverage reinforce the "message that MH/SUDs are shameful and unworthy of financial protections," suggesting that this discrimination implies individuals have control over the condition and it is somehow their fault they have not recovered. This discrimination perpetuates the stigma against those with MH/SUD disabilities.

According to Mr. Kennedy, a key contention of insurers has been based on the unfounded notion that MH/SUD disabilities cannot be verified and are more prone to fraud.

Both Kennedy's and mental health advocate Sarah Yousuf's testimony highlighted the additional costs to taxpayers when LTD benefits are limited for individuals with MH/SUD disabilities. Terminating LTD benefits shifts costs to government-funded programs and may drive up other health care costs.

Kennedy cited specific research from Milliman and Moody's showing individuals not receiving needed MH/SUD medical treatment have physical health care costs that are 2–3 ½ times higher than individuals without MH/SUD conditions. Therefore, terminating LTD benefits for MH/SUD disabilities adds to the financial burden on impacted individuals and families.

Mala Rafik, an attorney who has experience representing chronically ill and disabled clients in private disability benefit claims, testified there are increased rates of suicide when LTD benefits end, and individuals therefore can no longer provide for their families or feel they have become a financial burden to their families.

Despite multiple overtures and requests, the Council received little information from plan sponsors. The Council did not hear from any plan sponsors, insurance industry representatives or LTD claims administrators that MH/SUD duration limits should be eliminated or that addressing them is a priority.

Matt Greenwald, Greenwald Research, submitted a statement describing a survey of hundreds of employers that he conducted for Voya Financial regarding changes to health plans and leave benefits related to mental illness during the COVID pandemic. Plan sponsors indicated a willingness to spend more on mental health-related benefits to keep employees actively at work (e.g., reducing out-of-pocket costs for mental health services, encouraging employees to take time off, increasing work flexibility, etc.), but the survey results did not identify any employer actions to improve STD or LTD benefits. In other words, no employer identified LTD duration limits as a priority, problem or challenge that needed to be addressed even though COVID (including long COVID) exposed significant issues regarding access to mental health services and the need for respite for workers.

While senior industry executives are in favor of removing mental illness limitations, Dr. Richard Leavitt, a consulting actuary at the Smith Group, commented that no single company is willing to be the first to do so out of fear of adverse selection.

The Council recognizes that as only 1% of existing LTD plans do not have duration limits for MH/SUD conditions, significant change may require a MHPAEA-like mandate.

**B. "The brain is part of the body" was a common theme the Council heard from witnesses when rationalizing elimination of duration limits; testing has improved to eliminate the need for this distinction where MH/SUD conditions are concerned.**

An underlying theme that emerged in witness testimony was the question of how and why a condition of the brain is treated differently than the rest of the body. Duration limits that were initially put in place by disability plans starting in the 1960s have not been updated.

A recent ERIC survey of its members (generally employers with 10,000 or more employees) shows that most large/jumbo employers offering LTD coverage continue to apply duration limits but in a more nuanced fashion. Only 28% of survey respondents always apply the duration limit to all MH/SUD conditions. This suggests individual plan sponsors have, over time, reconsidered how duration limits should be applied.

No one today would attempt to challenge the notion that the brain is part of the body. Patrick Kennedy asked, "How could it be that other organs of the body are able to get disability claims, but the brain can't?" This perspective called out the unfairness of this form of legal discrimination.

Christine Hildebrand, Vice President of Health and Ability Strategy at Canada Life, testified that Canada recognizes mental disabilities should not be treated differently than physical disabilities. In 1996, the Canada Supreme Court issued a ruling that Canada's human rights laws made it unlawful for disability insurers to distinguish between physical and mental disability claims. In the U.S., however, the ADA has been found inapplicable to insurance policies.

Witnesses addressed the lack of scientific support for distinguishing between mental health and physical LTD claims. Mental health advocate, Sarah Yousuf, testified, "The long-term disability insurance industry must get with the times. Psychiatric disabilities are as real and as diagnosable and as treatable as physical disabilities are, and they must be covered equally."

When asked if there truly is a difference between a mental health claim and a physical claim, forensic psychologist, Dr. Henry Conroe, simply stated in his opinion, "No." According to Dr. Conroe, there are well-defined criteria for mental health conditions that are listed in the DSM. Those criteria bring rigor to diagnosing mental health claims, and that rigor is similar to what is seen in diagnosing physical

impairments. The DSM is widely accepted as the summary of classifications and standards for diagnosing MH/SUD conditions.

**C. Cost is the primary reason expressed by plan sponsors and insurers for including duration limits over the past 60+ years; however, there is not enough credible experience or actuarial data to quantify what these additional costs may be.**

Data strongly suggests there would be a cost to remove the duration limits. For example, as of December 2021, 25.2% of all disabled workers receiving SSDI benefits had a psychiatric disability and 3.9% had an intellectual disability. During her testimony, Dr. Marion McCoy of SSA shared Table 40 from SSA's 2021 *Annual Statistical Report on the Social Security Disability Insurance Program*; it showed the share of SSDI awards that went to workers with mental disorders from 1960–2021 ranged from a low of 8.3% in 1960 to a high of 26.1% in 1993, settling at 12.1% in 2021.[15]

Given the prevalence of duration limits, however, it does not appear that there is sufficient data to specifically identify the cost differential. In his testimony, Dr. Richard Leavitt presented statistics based on the most recent Society of Actuaries ("SOA") LTD Claim Termination Study. He observed that more than 99% of all group LTD insurance policies limit the benefit duration for MH/SUD claims.[16] Fewer than 1% of all group disability insurance policies examined in the most recent SOA study of this topic are identified as having no limit on benefits for MH/SUD conditions. The rarity of plans with no MH/SUD duration limit makes it difficult for carriers to assess the value of the limit or the premium increase needed to pay for removing it.

Although Vermont eliminated duration limits on LTD benefits, rate filings in Vermont showed no observable change regarding cost, nor did they report any specific data on cost differentials, according to Phil Keller, formerly of the Vermont Department of Financial Regulation.

Further, data shows a significant portion of the at-work population has a mental health condition. Of employed participants surveyed in 2015, 35.8% reported a psychiatric disability and 11.3% reported an intellectual disability. Importantly, since most employers follow employment and job guarantee rules

---

[15] Available at https://www.ssa.gov/policy/docs/statcomps/di_asr/2021/sect03c.html.
[16] Available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/about-us/erisa-advisory-council/2023-long-term-disability-benefits-and-mental-health-disparity-leavitt-written-statement-09-21.pdf (citing https://www.soa.org/resources/experience-studies/2019/group-ltd-experience-study/).

such as those required by the Family Medical Leave Act ("FMLA") and the ADA, active employment status often ends prior to 24 months — so, it is not clear whether worker behavior would change should the duration limit be eliminated.

A study of rate filings noted in Dr. Leavitt's testimony showed the cost of going from the most common 24-month limit to an unlimited plan averages 17.6%, with all carriers falling between 9%–25%.[17]

As discussed during the testimony of Steve Clayburn, Senior Actuary at ACLI:

- Milliman annual surveys consistently show LTD premium averages between $250– $300 a year, so, 25% of average premium would be less than $75 a year.
- While averages can be deceiving, the average added cost to remove the duration limit is significant in percentage terms but not in dollar terms.

Mr. Clayburn cited BLS surveys on STD and LTD coverage, where the premium for all group coverage is fully employer paid.[18] Where the approximately $50–$75 per person increased annual cost is considered significant, and the plan sponsor is unwilling to bear the additional burden, employers have lots of experience in adjusting employee contributions and benefit levels, as confirmed by numerous health surveys.

**D. Another expressed reason for maintaining the limitation that is related to the preceding rationale is that if costs go up, fewer employers will buy coverage for their employees.**

As noted in Observation C, it is unknown how much premiums would ultimately increase with the removal of the duration limits. Therefore, it is difficult to say how an increase in cost would affect an employer's willingness to continue to offer LTD coverage.

As also noted in Observation C, employers have considerable experience dealing with increased costs in health coverage. For example, according to the Kaiser Family Foundation, the cost for single coverage in private-sector employer health plans increased from $2,196 in 1998 to $8,435 in 2023, or

---

[17] Available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/about-us/erisa-advisory-council/2023-long-term-disability-benefits-and-mental-health-disparity-leavitt-written-statement-09-21.pdf.
[18] Available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/about-us/erisa-advisory-council/2023-long-term-disability-benefits-and-mental-health-disparity-clayburn-written-statement-09-19.pdf (citing the U.S. Bureau of Labor Statistics' 2022 National Compensation Survey).

5.53% per year over that time. Premiums increased despite increases in the average single deductible from $175 to $1,735 and the percentage of plans with a general annual deductible from 51% to 88%. Similarly, the percentage of plans with non-contributory single coverage declined from 49+% to 13%, and the average employee monthly contributions for employee-only coverage increased from $32 to $123.

A decision to eliminate the duration limits on MH/SUD conditions would depend partly on the cost sharing between an employer and its employees. It would also depend on the dollar cost for the change. A large percentage increase in the premium may still be small as a percentage of an employers' overall payroll or an individual employee's pay. Finally, it is important that employers and employees be informed about why removal of the limit is appropriate and how the removal will benefit not only employees but also the company.

**E. Most insurance companies offer access to disability coverage with no duration limits, but fewer than 1% of plans selected no duration limitations; when offered, premium costs are significantly higher.**

Witnesses testified that some small group plans are not able to purchase disability coverage without limitations. After hearing all testimony, industry experts indicated that only a small number of disability insurers do not offer LTD without MH/SUD duration limits.

Steve Clayburn, Senior Actuary at ACLI, stated that 34% of private-industry workers (33.7 million workers) are covered by LTD insurance, primarily through plans offered by employers.

According to an ACLI survey of its member companies that sell group disability income insurance, a supermajority offers a choice of coverage without duration limitations for MH/SUD. Policies without duration limitations carry an increased premium load of 20% on average. According to the survey, fewer than 1% of employers choose the option with no duration limits.

Dr. Leavitt, a consulting actuary at the Smith Group, testified, "All carriers offer the unlimited plan as one of their product offerings. They assign a fairly significant cost to an unlimited plan. But also, they kind of have underwriting rules which restrict the offer." Several witnesses questioned whether there is sound actuarial justification for the price differentials.

In summary, almost all employers currently have the option to purchase LTD coverage without duration limits.

Coverage without duration limits is not the default; instead, it is an option the plan sponsor must affirmatively select. When the option is provided, it is typically the higher cost that dissuades plan sponsors from selecting that option even though a 25% increase would be less than $75 per year per participant on average.

**F.  Uncertain cost impact of and differing opinions on eliminating duration limits.**

There is a cost to removing limits on the duration of benefits, as this increases the insurer's risk exposure. The extent of any cost increase, however, is unknown.

There is limited data currently available as a basis for estimating increased costs since few employers currently provide this coverage, and those that do so might have certain similarities in the demographics or risk profiles of their employees. Without a significant amount of data, it is difficult to estimate the cost for a broader number of employers providing coverage without limitations. An expansion in the number of policies provided without limitations would not only provide more data on which to base premiums but might also moderate the increase in cost through a broader and more diverse risk pool and greater competition in the market.

Additionally, removing the limitation would create a greater incentive to support employees in returning to work to limit costs. For example, treatment might be proactively provided soon after diagnosis to facilitate an employee's potential recovery and return to work, as opposed to allowing disability benefits to continue for up to two years without early interventions for treatment. Such actions would also lessen the increase in cost and may more than offset the cost of removing the duration limit.

**G.  While the Council heard testimony that 99% of plans have 24-month duration limits, the data to understand the actual extent to which limits are imposed is not current or readily available.**

Dr. Richard Leavitt, who has over 30 years of experience working as an actuary in the group insurance industry, conducts evaluation and pricing projects focusing on LTD, STD, voluntary disability and state-mandated family leave products. His employer, the Smith Group, conducts numerous rate

studies, collects hundreds of thousands of potential prospect cases and has evaluated those cases to determine the prevalence of LTD insurance policies without MH/SUD duration limits. Dr. Leavitt noted that fewer than 1% of all LTD policies are sold with an unlimited provision. This is consistent with the testimony of ACLI's Steve Clayburn, who noted that while most carriers offer a LTD insurance policy without a duration limit, fewer than 1% of employers choose this option.

Dr. Leavitt testified that the prevalence of policies with a 24-month limit makes it difficult to assess the cost of removing that provision. He also noted other factors that make it difficult to understand the extent to which the 24-month limit is actually enforced.

Dr. Leavitt testified that 7–8% of LTD claims have a mental health diagnosis. More than half of these claims, however, involve individuals who return to work before the 24-month limit is reached. Of the remaining claims, roughly 44% reach the 24-month limit; these cases comprise 2–3% of all LTD claims. Further, many of those remaining claims also include a physical disability diagnosis.

Dr. Leavitt also noted that anti-selection, the idea that the consumer has more information than the insurance company and will make a selection accordingly, must also be considered. Thus, employers that ask for a policy with an unlimited provision may have some prior knowledge that their employees will need a policy with an unlimited provision. Given all of this — the relatively small percentage of claims that are subject to the 24-month limit, the complicating factor of mental health disability claims that also have a physical disability claim component and the anti-selection factor — it is difficult to evaluate how the 24-month limit is enforced and the cost of removing it.

According to Dr. Leavitt, "This is a hard assessment to make…. I think that the rarity of the unlimited provision…and the presence of an anti-selection load makes it very difficult for a carrier to use their old experience to come up with an accurate rate."

**H.  Experience from mandated parity in Vermont and Canada should be highlighted. Analysis of Vermont data showed no increase in cost; Canada reported a significant number of MH/SUD claimants.**

Witnesses testified about two different jurisdictions that instituted mandated parity for LTD coverage for MH/SUD conditions: Vermont and Canada. In Vermont, there was no increase in the cost of the disability policies following the initiation of mental health parity. Further, in a study conducted on the

Federal Employees Health Benefits Program ("FEHBP"), there was little to no impact on total health care spending. The Council was not able to obtain specific claims data or the total spend impact for Canada, other than a statement that premiums likely increased because mental health claims are more expensive.

Vermont issued Revised HCA Bulletin 127, effective November 2009, which prohibited disability insurers from excluding or limiting the coverage of disabilities resulting from mental health conditions. At the time, disability insurers estimated the cost for disability insurance would go up significantly, by as much as 25%. However, according to Phil Keller, Director of Insurance Regulation for the Vermont Department of Financial Regulation from 2015–2022, he was not aware of any complaints from consumers or agents that the cost of disability insurance had risen due to this change. Further, according to a 2015 Advisors Committee of the Commonwealth of Massachusetts review of eight years of Vermont disability rate filings by five major insurers, the extension of LTD coverage for mental health conditions had little or no impact on the pricing of disability policies.

According to Christine Hildebrand, mental health conditions are not treated differently than physical disabilities in Canada, and insurance carriers have no restrictions tied to mental health. While these provisions have been in place for almost 30 years, Hildebrand was unable to provide specific estimates for the cost impact of requiring parity; she believed the premiums would have increased because mental health claims are more expensive. She did provide some statistics based on Canada Life data:

- Mental health conditions are the leading driver of claims overall.
- Mental health conditions represent approximately 21% of claims and 33% of the total amount paid for STD.
- Mental health conditions represent approximately 39% of approved LTD claims and 41% of the total amount paid for approved LTD claims.
- Top conditions are depression, anxiety and adjustment reaction.
- The actual percentage of accepted LTD claims with a mental health component is 47.77% (factoring in secondary diagnosis).
- In most LTD policies Canada Life insures, the member pays part or all of the premium.

In 2001, President Clinton mandated parity for MH/SUD coverage in the FEHBP plans. According to Patrick Kennedy and David Lloyd, a study of the FEHBP plans "demonstrated that there was no increase

in health care premiums."[19] The study showed parity improved, there was no increase in total spending and there was no large increase in the use of MH/SUD services. The findings further noted that "the implementation of parity was associated with significant reductions in out-of-pocket spending in five of the seven plans" reviewed in the study.

However, the Council did not receive any testimony that LTD policy experience is similar to health plan experience. One Council member with decades of plan sponsor experience asserted that there are significant differences between health plan and LTD claims experience and that no such inference regarding LTD benefits can be drawn from the study of FEHBP plan claims experience. Importantly, disabled federal employees may receive sick leave and disability retirement benefits, but not LTD insurance, so there is no measure of the impact, if any, on sick leave or disability retirement from the health plan change.

### I. There has been an evolution of stringent testing used to evaluate MH/SUD conditions that are used to diagnose conditions with a fair degree of confidence.

Dr. Leavitt addressed a study that examined Canada's MH/SUD parity requirement noting, "It is certainly possible that part of the reason that mental health claims increased in proportion is due to the removal of the limit." He also noted that "unlike in the U.S. where LTD incidence has been declining, the overall incidence in Canada has been increasing over the last decade, with an increase in mental health claims being an important driver of this change."

While it may be more difficult to fake a mental health condition, the claims and appeals process for LTD benefits is often very complicated and extended in duration given that disputes over whether conditions are disabling are common. However, Dr. Leavitt debunked the contrary position of some that individuals can easily fake their condition. He stated that insurance companies have gotten much better at weeding out false claims. In addition, witnesses affirmed that current interpretive testing is working.

Even though only about 35% of workers are covered under employer-sponsored group LTD coverage, LTD coverage is often the most frequently litigated ERISA benefit plan issue.

---

[19] Available at https://www.nejm.org/doi/full/10.1056/nejmsa053737.

As noted in Observation B, "the brain is a part of the body." Duration limits that single out MH/SUD conditions are inappropriate where the individual has met the definition of disabled as defined in the plan or policy. Arbitrarily terminating benefits for an individual who is clearly disabled and unable to return to work may unnecessarily create employee relations and engagement issues for the plan sponsor.

Given improvements in claims administration, including objective means of verifying MH/SUD disabilities, a duration limit should not be maintained where its sole purpose is claims administration — to curtail benefits where proving disability is problematic or questionable. To minimize disputes, challenges and litigation involving claims for MH/SUD, the plan sponsor may wish to adjust employment policies, plan provisions and claims administration to:

- Identify, clarify and communicate when job guarantees, if any, end (FMLA, ADA, etc.)
- Differentiate each condition (mental health, substance use disorders) and specifically confirm any limits that apply to each condition. For example, the plan sponsor might decide to exclude specific serious mental health conditions from any duration limit.

Testimony suggested removing duration limits might change claims and appeals behavior. To reduce the potential for "moral hazard," a plan sponsor might incorporate specific plan provisions and take other steps as sentinels that are likely to minimize any "fake" claims, such as:

- Adding a pre-existing conditions exclusion (3-, 6- or 12-month exclusions).
- Consistent with January 2017 changes by Social Security, providing that the plan will not give special weight or greater deference to the opinions of a disability claimant's treating physician.
- Requiring a health evaluation/assessment upon enrollment in LTD coverage.
- Requiring documentation of a substantial change in medical, physical or mental condition, such as an inability to perform one or more activities of daily living, that is a direct and proximate result of a specific injury or onset of a specific illness.
- Reviewing "own occupation" and "any occupation" disability definitions.
- Requiring claimants receive appropriate care in relation to their conditions.
- Considering whether the "own occupation" disability definition should include an inability to perform any employment the participant is capable of by reason of experience, training or

education, whether or not a position exists or is currently available (perhaps coupled with a minimum income provision).

• Excluding consideration of medical conditions arising from events that occur or conditions that arise after the initial date of claimed disability.

**I. LTD plan duration limits may not be an issue for individuals who are eligible for a disability pension, including many unionized employees and participants in multiemployer pension plans.**

According to Gene Price, who has worked with multiemployer plans for more than 45 years, multiemployer plans generally do not offer an insured LTD benefit through their health and welfare plans. Instead, multiemployer plans participants typically receive long-term income replacement benefits, similar to an insured disability benefit, through the disability pension benefit available under those plans. Disability pension benefits under a multiemployer pension plan usually do not distinguish between disabilities caused by a physical condition or a mental health condition. He noted that, generally, the standard for qualifying for a disability pension benefit (in addition to being vested in the pension) is whether that individual qualifies for disability benefits from SSA (which would exclude substance use disorders as they are not covered by SSA), so "it does not matter whether it's a physical or a mental health issue."

**J. Use of the DSM as the determinant of which diagnoses should be subject to limitations is problematic and may result in misclassification since many conditions understood as being physiologic (e.g., sleep disorders) are included in the DSM.**

Many LTD insurance policies apply the mental health benefit limitation to any condition listed in the American Psychiatric Association's DSM. In many instances, this can be problematic and result in misclassification of physical conditions as psychiatric impairments. For example, sleep disorders, including sleep apnea, which are usually the result of an anatomic issue or obesity, are listed in the DSM. Likewise, neurocognitive conditions (such as Alzheimer's disease) are listed in the DSM, along with traumatic brain injuries.

Consequently, policies linking a condition's inclusion in the DSM with mental and nervous condition limitations unfairly subject conditions that are generally understood to result from physical

trauma or a physiologic condition affecting bodily organs or the musculoskeletal or nervous system to a duration limit. The risk of that occurring and the possibility of insurers taking advantage of the inclusion of certain physical conditions in the DSM gives rise to concern that mental illness limitations are inconsistent with general medical principles.

### K.  Improved treatment for mental illness has reduced the duration of work absence.

Since MH/SUD limitations were first placed in LTD insurance policies, the field of psychiatry has undergone a revolution. Much more is known today about the cause of certain behavioral health conditions than was known even just a few years ago. At the same time, improvements in pharmacologic and other treatments for psychiatric conditions, as well as enhancements in psychotherapy, have transformed conditions such as schizophrenia and bipolar disorder, which would have been considered chronic illnesses just a generation ago, into conditions that for most sufferers are manageable and allow persons suffering from those illnesses to engage in productive lives and long-term employment. Thus, the duration of work absence for most people who suffer from psychiatric illness has gone down markedly, although there remains a segment of the population who are unresponsive to treatment.

## VII.    RECOMMENDATIONS AND RATIONALES

**1. <u>Recommendation</u>:** *Encourage Congress to adopt LTD insurance parity requirements consistent with the spirit of MHPAEA mandates for MH/SUD and physical conditions, and strongly encourage employers to consider whether exclusions and MH/SUD limitations are necessary in the current environment.* While the Council is aware that Department authority extends to ERISA-covered plans only, the recommendation should be considered for all LTD plans and insurance policies.

The Council suggests that the Department take the following actions to encourage the expansion of MHPAEA to LTD plans:

- Propose to Congress that it adopt "MHPAEA-like" parity requirements for disability income programs.
- Interface with the National Association of Insurance Commissioners ("NAIC") to discuss how states can mandate an offer of an LTD option without duration limits, and to encourage the NAIC to eliminate duration limits on MH/SUD disabilities from its Model Policy 171 (which outlines the minimum standard of coverage for accident and insurance policies, including LTD).
- Strongly encourage plan sponsors to remove LTD duration limits on MH/SUD conditions that are not otherwise imposed on physical conditions.

**<u>Rationale</u>:**

- The Council acknowledges a strong and well-established public policy in favor of mental health parity in health care, as demonstrated by MHPAEA, the ADA and subsequent changes added by the Patient Protection and Affordable Care Act of 2010, which amended ERISA, the Internal Revenue Code and the Public Health Service Act.
- Concern expressed in testimony that unless all insurers adopt coverage without duration limits for mental health disabilities, no single company will go first due to fear of adverse selection.
- Lack of actuarial justification for perpetuation of coverage disparity based solely on the fact that the claimed disability is mental and not physical.
- Improved treatment for mental health conditions.
- Improved methods for detecting potential fraud.
- Risk of misclassification of physical conditions as mental or nervous conditions.

Currently, NAIC Model Policy 171, Section 6. Prohibited Policy Provisions, Item F provides, "F. A policy shall not limit or exclude coverage by type of illness, accident, treatment or medical condition, except as follows: (1) Preexisting conditions or diseases, except for congenital anomalies of a covered dependent child; (2) Mental or emotional disorders, alcoholism and drug addiction."

MHPAEA includes a cost exception. Specifically, if group health plans or insurance issuers would incur an increased cost of at least 2% in the first year that MHPAEA applies (or at least 1% in any subsequent plan year) if they implemented the parity requirements, the plan or issuer may claim an exemption from MHPAEA requirements. There were a wide variety of opinions among Council members regarding whether there should be a cost exception if there is a requirement to extend "MHPAEA-like" parity requirements to disability benefits. Some Council members would support parity requirements that include cost exceptions. Some Council members think the LTD cost exception should be set at a higher percentage appropriate to disability benefits, applied concurrently with the effective date of parity requirements (not retroactively or annually after the fact). Other members oppose including cost exceptions.

Additionally, one Council member objected to the parity recommendation generally because in their view such a requirement would likely result in fewer workers having employer-sponsored LTD coverage. The Council heard testimony that employers have limited dollars to allocate to benefits and any increase in the cost of LTD coverage could reduce the likelihood that employers will offer and pay for it.

The same Council member also disagrees with including SUD in the recommendation without further evaluation involving this condition, for the reasons stated below:

- The Council's recommendation that parity requirements be extended to LTD insurance for MH/SUD conditions was primarily based on two premises: 1) requiring parity is "the right thing to do" and 2) testing/diagnostic capabilities used to identify and develop treatments for these conditions is sophisticated enough to mitigate fraud and unintentional misdiagnosis risks.
- On the second premise we heard from two medically substantive witnesses. Dr. Rothke discussed various available neuropsychological testing and provided several examples of how those tests work with various mental health conditions; however, there was absolutely no discussion of substance use disorder.

- The next medically substantive witness speaking on the topic of improved medical testing was Dr. Conroe. Dr. Conroe made no mention of substance use disorder in his testimony and even framed his remarks in a manner that could be interpreted to suggest that SUD was not being covered by the testimony he was providing. This is evidenced by the fact that Dr. Conroe began his testimony framing his remarks around the proposition that SSA does not distinguish between mental health and physical conditions for purposes of coverage, (See Aug. 29th Transcript lines 20-22), when in fact we did learn that the SSA covers mental health conditions but DOES NOT cover substance use disorders. This framing is significant because it evidences the reality that even medical experts on this topic do not think of substance use disorders as necessarily being synonymous with mental health conditions. Certainly, Dr. Conroe, who has worked for the SSA for disability benefits since 1979, is aware that the SSA does not cover SUDs even though they are classified as mental nervous conditions in the DSM. Therefore, taking Dr. Conroe's opening framing into consideration it seems apparent that when Dr. Conroe spoke about the testing sophistication that enables SSA to provide coverage without regard to whether the condition is a mental health condition or a mental nervous condition, he could not have been speaking about this topic inclusive of substance use disorders. Without Dr. Conroe's testimony, the Council has no medical expert testimony about the intricacies of the diagnosis or treatment of substance use disorders. Without this substantive understanding recommending parity with respect to these conditions could produce consequences that have not be sufficiently vetted by the Council.  These consequences could result in higher-than-expected cost and the loss of access to or more limited disability insurance coverage for small businesses and lower income individuals. This would not then be "the right thing to do."
- Additionally, Gene Price talked about using the SSA disability standard for multiemployer LTD coverage ,and he stated that leveraging that standard means that they do not distinguish between mental nervous conditions and physical disabilities however again since the SUD mental health condition is excluded by the SSA disability insurance there remains some distinction for these plan types and this statement further bolsters my conclusion that our witnesses think of SUD as being separate from MH conditions.
- Substance use disorders are different from traditional mental nervous conditions even though they are classified as falling into the same category in the DSM. The inclusion of substance use disorder as a mental health condition is a newer development as "substance use disorder" was added to the DSM in 2013. There is much more to learn about these conditions and the circumstances under

which this disorder occurs and manifest. At the very least there are some instances in which this condition occurs solely because of destructive and often illegal choices made by the user.

- Substance use disorder is not being consistently approached or perceived within our society. In many instances substances (e.g. Marijuana) that may be viewed as causing these conditions are being legalized making it more likely that individuals will suffer the brain changes that result in this debilitating condition. Consequently, to the extent that we're increasing the opportunities and acceptability for individuals to engage in conduct that causes substance use disorder, we are creating the very circumstances which drive up the cost of LTD insurance. This occurrence could be detrimental and ultimately cause price increases that make this benefit unaffordable for less culpable conditions necessitating this protection.

For the reasons stated above, one Council member disagrees with including SUD in the recommendation without further evaluation involving this condition.

2. **Recommendation:** *Commission research of LTD plans to address unknown actuarial and cost implications of removing the duration limits and to identify the underlying rationale for these limitations, if any. Suggest the Department take the following actions:*

- Commission research to better understand why and to what extent certain self-insured plan sponsors include duration limitations for MH/SUD or other conditions, since they are not subject to restrictions or increased premiums from insurance companies.
- Investigate why the duration limitations put in place 60 years ago have not been updated, especially given adoption of MHPAEA, changes to Social Security disability benefits and advances in research, claims administration and fraud detection.
- Actuarially validate the increase in premium from removing duration limits. Examine whether removal of the duration limits would increase adverse selection and trigger behavioral changes, in turn, increasing premiums.
- Determine whether there is an evidence-based rationale or actuarial justification for setting the mental health disability duration limit at 24 months, which is aligned with the end of the "own-occupation" disability determination.

- Seek to understand how an expanded market of plans without duration limitations might impact costs.

**Rationale**:

- Expert testimony suggests most data to support duration limits is outdated. Vermont's experience since it instituted parity did not identify any increase in LTD premiums.
- Canadian experience since mandating parity is unclear and may not be comparable to claims experience in the U.S. However, Canada Life claims experience confirms "mental health conditions are the leading driver of claims costs overall … represent(ing) approximately 39% of approved LTD claims and 41% of the total amount paid for LTD approved claims."
- Social Security disability benefits do not have duration limits on disabilities arising due to a mental health condition, but SSA does not provide disability benefits due to substance use disorders. A significant percentage of Social Security recipients are disabled with mental health conditions. Dr. Marion McCoy of the SSA shared Table 40, which indicated that Social Security awards to disabled workers by diagnostic group, 1960–2021, where mental disorders ranged from a low of 8.3% in 1960, to a high of 26.1% in 1993 to 12.1% in 2021.
- Where cost differentials are identified, even a large percentage increase such as 15%–20% is likely to be a nominal one-time premium increase averaging less than $60 a year per person (estimated as 20% of the $281.50 average annual LTD premium as documented in Milliman's 2023 survey).

One Council member disagrees with this recommendation as it relates to SUD, and as described above in Recommendation 1.

**3. Recommendation:** *Urge the insurance industry to present plan sponsors with coverage options without duration limits for MH/SUD conditions. Suggest the Department take the following actions - encourage:*

- All insurers to offer the same LTD benefits for disabilities due to MH/SUD conditions as are provided for physical conditions.
- All insurers to offer LTD benefits without MH/SUD duration limits in every offer/renewal, regardless of the size of the plan sponsor.

- Changes to the offer/renewal process so as to propose LTD coverage without duration limits, to ensure plan sponsors have affirmatively opted out of the coverage option without MH/SUD duration limits.

- Insurers to price policies in accordance with the best available actuarial data.

**Rationale**:

- Concern expressed in testimony heard by the Council that unless all insurers adopt coverage without duration limits for MH/SUD conditions, no single company will go first due to fear of adverse selection. The Council noted that a survey conducted by ERIC indicated there already are a small number of employers that have removed the duration limit on LTD benefits for MH/SUD conditions.

- Parity would encourage insurers to manage claims more aggressively to get employees back to work rather than assume benefits will just end after 24 months.

- Claimants would be encouraged to seek treatment for all their medical needs and not try to hide psychiatric conditions out of fear of losing benefits.

- This would address situations where there is often no clear distinction between physical and MH/SUD conditions, or where there are comorbidities.

When insurers present disability policies, it should be clear that the default coverage options are LTD with and without MH/SUD duration limits, rather than only presenting an LTD policy with MH/SUD limits. This would help alleviate situations where the insurer avoids a choice between LTD with MH/SUD limits or no LTD coverage at all, or LTD where duration is limited for some disabilities.

**4. Recommendation:** *Provide education to LTD plan sponsors on impact of duration limitations in LTD plans. Suggest the Department take the following actions:*

- Educate LTD plan sponsors about the existence of these limitations and the impact that they have on those with MH/SUD conditions.

- Explore ways to inform and educate LTD plan sponsors to heighten awareness of improved objective testing and operational processes.

- Collaborate with the actuarial community to better understand risks and potential premium increases where LTD benefits would not include duration limits for MH/SUD conditions.

- Educate LTD plan sponsors on improved methods of diagnoses, treatment and validation of MH/SUD conditions.

**<u>Rationale</u>**:

- Many plan sponsors appear to be unaware that their LTD plans include duration limits for disabilities resulting from MH/SUD conditions. Also, expert witness testimony suggests plan sponsors generally do not actively select whether to include such limits in their plans.
- At a minimum, where the plan or claims administrator has adjudicated a disability claim and confirmed that the individual is in fact disabled per the definition in the plan document, arbitrary duration limits (as opposed to intentional duration limits on all disabling conditions) should not apply.

Some Council members noted plan sponsors had concerns related to perception that mental health disability claims are more subjective than other types of claims involving cardiac, neurological, endocrine or musculoskeletal disorders. In response, other Council members noted expert witness testimony established that tests to validate the presence and severity of MH/SUD conditions are widely used by LTD insurers as part of the regular claims determination and administration process.