**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF TEXAS**

**SAN ANTONIO DIVISION**

CHARLES T. BRUFF,

Plaintiff,

v.

USAA HEALTH AND WELFARE BENEFITS PLAN,

USAA EDUCATIONAL ASSISTANCE PLAN,

UNITED STATES AUTOMOBILE ASSOCIATION, AND

LINCOLN NATIONAL LIFE INSURANCE COMPANY,

Defendants.

Case No. 5:26-CV-01720-XR

**DECLARATION OF CHARLES T. BRUFF IN SUPPORT OF**

**MOTION FOR PRELIMINARY INJUNCTION PENDING APPEAL**

I, Charles T. Bruff, declare as follows:

**I.      BACKGROUND AND PURPOSE OF THIS DECLARATION**

1. I am the Plaintiff in this action. I submit this declaration in support of my Motion for Preliminary Injunction Pending Appeal. The facts stated herein are within my personal knowledge and are true and correct.

2. I am a 31-year-old man with Hemiplegic Spastic Cerebral Palsy, high-functioning Autism Spectrum Disorder, and Post-Traumatic Stress Disorder. I was born at 26 weeks gestation with a brain injury known as Periventricular Leukomalacia, which is the cause of my

1

cerebral palsy. My autism and cerebral palsy have been present since birth and are permanent conditions.

3.  I was employed by USAA as a Senior Software Engineer from August 2016. I took disability leave from approximately January 2021 through approximately June 2022, after which I was re-employed by USAA and returned to work. My termination was effective April 1, 2025. My Short-Term Disability claim was approved retroactively to March 21, 2025. (Exhibit A.) I was approved for Long-Term Disability benefits on September 18, 2025. (Exhibit B.) I have been receiving LTD benefits continuously since that date.

4.  I am proceeding pro se. I am doing the best I can. This declaration is voluminous because I only have the written word to communicate with. I am at a significant disadvantage in an oral argument context as a pro se plaintiff with autism. The record must speak for me because I struggle to speak for myself in high-stress situations due to my disability.

## II.  THE NATURE OF MY DISABILITY: STRENGTHS, LIMITATIONS, AND THE REALITY OF MY CURRENT FUNCTIONING

5.  On March 16, 2026, I filed ECF No. 5, a Notice of Use of Artificial Intelligence in Preparation of Pro Se Filings. I submit this section to explain what that notice means in practice, because I believe the Court may otherwise draw incorrect inferences from the sophistication of my filings or from the volume of my initial submissions.

6.  My autism gives me the ability to process complex regulatory data structures, identify patterns across large document sets, and hold large amounts of factual information in working memory. I used those strengths to build the exhibit structure supporting this case — Exhibits A through SSDI1 — and to identify the regulatory violations documented throughout my filings. These are genuine cognitive strengths that I bring to this litigation.

7. Peer-reviewed research has consistently documented that autistic individuals have a heightened tendency toward truthfulness rooted in neurological differences rather than choice. Persons with high-functioning autism have been described in the clinical literature as possessing "an above average moral conscientious objection against deception" and as "attractively morally innocent" in their orientation toward truth-telling. Berger, N. et al., "Living the categorical imperative: autistic perspectives on lying and truth telling — between Kant and care ethics," Med. Health Care Philos. (2012); see also J. Autism Dev. Disord. 31(1):29-36 (2001). Rule-based thinking — a prominent cognitive style in autism — manifests as rigid adherence to established principles, including truth-telling as a fundamental principle to be upheld regardless of situational context. This is not a personality trait. It is a documented neurological characteristic. It is the reason I cannot rationalize submitting an incomplete claims file to the SSA under penalty of perjury, even when Lincoln's conduct leaves me no alternative.

8. This same characteristic — the neurological compulsion toward complete and accurate disclosure — explains the volume of my initial filings. On March 16, 2026, I filed a complaint accompanied by thirty-two exhibits. (ECF No. 12.) I also filed ECF No. 5, a Notice of Use of Artificial Intelligence, and ECF No. 3, a motion requesting permission to file electronically, in which I asked the Court to use a RECAP-enabled email address so that all filed documents would be automatically available through CourtListener free of charge — not just to me, but to all parties, including defense counsel. I did this deliberately so that Lincoln's counsel would have immediate access to every document I filed without cost or delay, and so that the public record of this case would be as accessible as possible.

9. I am aware that this volume of upfront filing may have appeared to the Court as an attempt to flood the docket. It was not. It was the product of the same neurological characteristic that makes me constitutionally unable to withhold information I believe is material. I did not know which facts the Court would need to understand the complexity of this case. I did not know which documents Lincoln might dispute. I did not know how much time the Court would have to engage with filings submitted later. My response to that uncertainty was to present the entire picture at the outset — every document, every timeline entry, every exhibit — so that all parties and the Court would have equal and simultaneous access to the complete factual record. That is what honesty looks like for me. It is not strategic. It is not adversarial. It is an autistic response to uncertainty: present everything, let nothing be omitted, and trust that the truth of the complete record speaks for itself.

10. What my autism does not provide is the ability to translate those cognitive strengths into the social-communicative format that formal legal writing requires. Legal writing is a social form with conventions, tones, and structural expectations that are not self-evident to me and that I do not intuitively produce. My unassisted written expression — visible in the email chains documented in Exhibits H, J, K, L, M, and CONFLICT2 — tends toward precision and literalism in ways that do not conform to legal conventions. AI tools serve as a translation layer. I provide the factual content, the legal research, the strategic framework, and the arguments. The AI assists me in converting that content into the formal register courts expect. The substance of every filing in this case is mine. The AI does not generate arguments I have not formulated. It converts the tone of my autistic thinking into a format the legal system can receive.

11. This distinction matters for the Court's assessment of my pending request for appointed counsel (ECF No. 2). The sophistication of my filings does not mean I am functioning as an attorney. It means I have found a tool that partially compensates for one specific deficit — formal register — while leaving every other deficit of pro se litigation unaddressed. I cannot conduct depositions. I cannot negotiate with opposing counsel on equal footing. I cannot assess litigation risks the way a trained attorney would. I cannot always recognize when I am being procedurally outmaneuvered until after it has happened. AI provides formatting assistance. It does not provide legal representation.

12. I also note that AI tools require articulated input to produce articulated output. When this Court issues a text-only order with no findings of fact and no conclusions of law, I have nothing to provide to the AI to analyze. The absence of judicial reasoning does not just disadvantage me as a litigant. It disables the assistive technology I depend on to participate in this proceeding. A one-sentence denial is not a data structure I can process — with or without assistance. This is part of why the Rule 52(a)(2) violation described in the motion is not merely a procedural defect. It is a functional barrier to my participation as a litigant with a disability.

13. The limitations of my disability are not abstract. Beginning approximately May 22, 2025, I experienced three independent psychiatric hospitalizations spanning approximately 67 days in total through early August 2025. The length of those hospitalizations was not driven solely by my clinical condition. My treatment team could not identify a safe discharge plan given my inability to manage basic life structure independently — including meal preparation, daily scheduling, and activities of daily living. The discharge plan that finally permitted my release was structured around part-time enrollment in a master's degree

program at the University of Texas at San Antonio. That enrollment provides me with a meal plan that compensates for my inability to cook reliably for myself, and an academic schedule that provides the external structure I require to function safely in the community. Without that structure, I cannot be safely discharged. That is a medical finding documented by my treatment team, not a preference.

14. I am currently enrolled as a part-time graduate student pursuant to that discharge plan. I was originally enrolled in two courses this semester. Due to the cumulative cognitive and psychological burden of the circumstances that led me to file this lawsuit — including Lincoln's undefined and unpredictable review standards, the SSDI application process, and the demands of navigating this litigation without counsel — I was forced to drop from two courses to one. That reduction directly implicates the structural foundation of my discharge plan. I communicated to my treating providers and to Lincoln generally that I could not keep up, that the stress of everything happening simultaneously had become unmanageable, and that my functioning was being affected. Lincoln was aware, through those communications, that its conduct was affecting my health and my ability to maintain the structured plan on which my safe community living depends.

15. I am currently receiving community services through the Alamo Area Council of Governments (AACOG), which administers general developmental disability services for my county. These are non-Medicaid community services. They are provided because I have been formally determined to meet the eligibility criteria for services for persons with developmental disabilities. They are not elective supports. They are services I require because my disabilities impair my ability to function independently in the community without structured assistance.

6

16. I am not providing this information to generate sympathy. I am providing it because it is factually relevant to the irreparable harm analysis in this motion, and because Lincoln already has this information — it is documented in my claims file, in my medical records that Lincoln has requested, and in the written communications between me and Lincoln's claims personnel. My LTD benefit is not income in the ordinary sense. It is the financial foundation of a medically-structured discharge plan built around supported community living. The loss of that benefit does not simply reduce my income. It removes the financial substrate on which my entire post-hospitalization functioning depends. That harm is not compensable through retroactive damages. It cannot be remedied by waiting for this appeal to resolve. It is the kind of harm that, once it occurs, cannot be undone.

## III. THE PERJURY TRAP: CONFLICTING FEDERAL OBLIGATIONS

17. Lincoln approved my LTD benefits on September 18, 2025. (Exhibit B.) That approval letter applied the 24-month Mental Illness/Substance Abuse/Non-Verifiable Symptoms Limitation without providing me any written explanation of the clinical basis for that classification. (Exhibit B; see also Exhibit LTDPOL — LTD Policy defining the limitation but providing no criteria for its application.) Lincoln also denied my vocational rehabilitation request without issuing a Section 503 adverse benefit determination letter. (Exhibits E, F.)

18. Each of those adverse determinations independently triggered Lincoln's disclosure obligation under 29 C.F.R. § 2560.503-1(m)(8), which defines a "claim file" to include all documents, records, and other information relevant to the claimant's benefit determination — including documents relied upon, considered, or generated in connection with any adverse determination. Lincoln's position that the claims file is produced only upon a final

denial of benefits is inconsistent with this regulation as applied to both the 24-month limitation and the vocational rehabilitation closure. I requested the claims file in writing on more than five documented occasions. (Exhibit DOC-REQ.) Lincoln refused each request and has never produced a written policy basis for that refusal. (Exhibit H.)

19. On April 14, 2026, Lincoln's litigation counsel confirmed in writing that the claims file Lincoln produced as its initial disclosures is incomplete on a material category. (Exhibit DISCLOSURE, ECF No. 18.) Lincoln has not identified what is missing or when it will be provided.

20. Lincoln has separately directed me to apply for Social Security Disability Insurance. Lincoln's December 23, 2025 letter demanded I file for SSDI by February 2, 2026, and threatened to estimate and reduce my benefits if I did not comply. (Exhibit G.) Lincoln's February 2, 2026 letter renewed and escalated that demand with a hard deadline of March 6, 2026. (Exhibit R.) The SSA requires me to sign forms under penalty of perjury certifying the completeness and accuracy of the information I submit under 42 U.S.C. § 1320a-8a. Under 20 C.F.R. § 404.1512, I have an ongoing duty to provide evidence that is material to my disability determination.

21. I have a good-faith belief that submitting a claims file that Lincoln's own litigation counsel has identified as incomplete constitutes a material omission under the federal perjury standard. I raised this concern in writing to Lincoln on February 12, 2026, explicitly citing 20 C.F.R. § 404.459 and requesting either a complete file or a written statement that relevant information exists that Lincoln will not release. (Exhibit H, Document 2.) Lincoln did not provide either.

8

22. My autism causes me to interpret legal obligations in concrete and literal terms. When a federal form asks me to certify completeness under penalty of perjury, I understand that to mean what it says. Lincoln has placed me in a position where I must choose between complying with Lincoln's SSDI application requirement and complying with my federal obligation to submit complete and accurate information to the SSA. Once I sign the SSA's forms under penalty of perjury, there is no process to correct or withdraw that submission if Lincoln later produces the missing material. This is not a theoretical concern. I previously suffered a retroactive SSA denial as a child that generated a $19,000 overpayment demand against my family. An Administrative Law Judge subsequently reversed that determination. I disclosed this history to Lincoln in writing. Lincoln withheld the claims file regardless.

## IV.  LINCOLN'S REFUSAL TO PROVIDE INTERNAL GUIDELINES

23. The SSA publishes its Program Operations Manual System (POMS), which allows me to verify precisely what the federal disability system requires and how it is applied. When I asked Lincoln's claims administrator Kristianne Corporan for Lincoln's equivalent internal guidelines — the criteria Lincoln uses to determine when and how to conduct medical reviews — she stated that Lincoln does not publish any.

24. Under 29 C.F.R. § 2560.503-1(h)(2)(iii), a plan must provide free of charge, upon request, all documents, records, and other information relevant to a claimant's benefit determination, including internal rules, guidelines, protocols, or similar criteria relied upon in making the determination. I requested this information in writing on multiple occasions. (Exhibit DOC-REQ, Category 5 — Limitation Definition and Review Frequency.) It has never been provided. Without it, I cannot determine whether Lincoln's three-month review

9

cycle for a claimant with permanent, lifelong disabilities has any clinical basis, or whether it is inconsistent with the permanent nature of the conditions established by the prior federal disability adjudication in Exhibit SSDI1.

## V. THE FAILURE OF BROWN & BROWN AND BLOCKED ACCESS TO THE CLAIMS FILE

25. In connection with Lincoln's SSDI application demand (Exhibits G, R), Lincoln arranged for Brown & Brown Absence Services Group to serve as my SSDI representative. Lincoln's packet included a Brown & Brown authorization form for Lincoln to release my complete LTD claims file to Brown & Brown for SSA purposes — which I executed. (Exhibit I — Authorization for Release of Long-Term Disability File, dated January 12, 2026.)

26. Lincoln's claims administrator subsequently blocked the release of the claims file to Brown & Brown, despite the executed authorization. This blocked the primary mechanism by which the SSA was to receive the documentary foundation for my application. When I asked Lincoln's claims administrator whether I could sign a release authorizing Lincoln to send the file directly to me so I could fulfill my SSA obligation personally, she refused.

27. Brown & Brown currently remains my authorized representative under Form SSA-1696 (Exhibit Brown1). However, they are not actively assisting with my Expedited Reinstatement application. Their current role is to monitor whether the application fails, at which point they intend to represent me in a new initial application. I am therefore legally represented in the eyes of the SSA, yet I am navigating the documentation requirements and the fight for my claims file entirely without functional assistance, while Lincoln continues to block access to the records it controls and that the SSA requires.

## VI.  THE TIMELINE OF LINCOLN'S CONFLICTING DEMANDS

28. On December 23, 2025, Lincoln demanded I file for SSDI and introduced Brown & Brown as its vendor. (Exhibit G.) This directly contradicted Lincoln's own September 17, 2025 letter, which stated I was not a good SSDI candidate. (Exhibit SS1, Document 1.) I resisted the SSDI filing requirement specifically because Lincoln had not released my complete claims file, and I understood I was legally obligated to provide complete information to the SSA.

29. Lincoln's February 2, 2026 letter renewed and escalated the SSDI demand with a hard deadline of March 6, 2026, threatening benefit reduction for non-compliance. (Exhibit R.) I completed the filing on March 9, 2026 — one day after the deadline — because navigating a complex federal benefits process on short notice, without functional representation from Brown & Brown, and with an incomplete claims file Lincoln had refused to release, is not something I am able to do instantaneously.

30. On March 20, 2026 — eleven days after I complied with Lincoln's SSDI application requirement under threat of benefit reduction — Lincoln initiated a reevaluation of my disability status. Lincoln provided no explanation of the basis for this review, no identification of the clinical criteria it intended to apply, and no acknowledgment of the conflict between directing my SSDI application and simultaneously reevaluating the disability determination that SSDI application was intended to confirm. The complete timeline of these events is documented in Exhibit TIMELINE.

## VII.  THE PRIOR SSA DISABILITY DETERMINATION AND ITS SIGNIFICANCE

31. The Social Security Administration issued me a Benefit Verification Letter on February 27, 2026, confirming that the SSA found me disabled under its rules as of October 12, 1993

11

— my date of birth. (Exhibit SSDI1, filed herewith.) I have provided this letter to Lincoln on multiple occasions, including at the time of my STD approval (Exhibit A) and my LTD approval (Exhibit B). Lincoln approved both claims with knowledge of this prior federal disability adjudication.

32. I received both Supplemental Security Income and Social Security Disability Insurance benefits concurrently. The SSDI benefit was received as a Disabled Adult Child on my father's earnings record under 42 U.S.C. § 402(d). Both programs use the same disability standard. Payments ceased when my income at USAA exceeded applicable thresholds. That cessation was a payment suspension based on earnings — not a reversal of the underlying disability determination. The SSA's finding that I became disabled as of October 12, 1993 remains in effect. The Benefit Verification Letter references SSI because that program is indexed to my own Social Security number. The SSDI DAC benefit is indexed to my father's record. The underlying disability determination applies to both programs.

33. I am aware Lincoln may argue that the benefit verification letter references SSI rather than SSDI. That argument misunderstands how SSA records are indexed. More importantly, it does not change the operative fact: the SSA found me disabled under its rules at birth, under the most demanding federal disability standard, and Lincoln has been in possession of that determination since at minimum the date of my LTD approval. Lincoln has never identified any clinical development that would be inconsistent with that prior adjudication. The contradictory positions Lincoln has taken on SSDI eligibility are documented in Exhibit SS1.

34. The fear that Lincoln's current reevaluation will produce a retroactive adverse determination is not hypothetical for me. When I was six years old, the SSA randomly and retroactively denied my disability status back to birth, generating a $19,000 overpayment demand. An Administrative Law Judge subsequently reversed that determination. The same conditions that existed then — permanent disability present since birth — exist now. Lincoln's review, conducted by personnel with litigation awareness (Exhibit CONFLICT1, ECF No. 17; Exhibit CONFLICT2, filed herewith), without disclosure of the criteria being applied, while blocking access to the file the SSA requires, recreates the structural conditions of that prior adverse event.

## VIII.  MY CONDUCT IN THIS LITIGATION AND MY INTENT

35. Lincoln's counsel has stated in substance that she does not understand why I am suing if my benefits are currently being paid. I want to address that directly because my intent is a material fact.

36. I did not want to sue. I stated in writing to Lincoln's claims administrator, on multiple occasions over a period of nearly one year, that I should not have to sue to obtain documents I am legally entitled to receive. I documented each of those requests in writing. (Exhibit DOC-REQ.) Lincoln did not respond substantively to those requests. I was directed to this Court by the structure of the statute and by Lincoln's refusal to engage with my administrative requests.

37. Benefits that are paid through a process that is contaminated, opaque, and structurally designed to generate grounds for future denial are not secure benefits. They are contingent ones. The DOL's 2018 regulations exist precisely because the Department recognized that contingent approval — approval without a transparent, independent, and documented

process — is not meaningful protection for disabled claimants. I am pursuing this case because I believe the regulations mean what they say, and because I understand from personal experience what happens to a disabled person when the process fails without warning.

## IX.  MY ATTEMPTS TO OBTAIN ACCOMMODATION FROM THIS COURT BEFORE AND AFTER FILING A PUBLIC MOTION

38. Before filing my motion for appointment of counsel (ECF No. 2) as a formal matter on the public docket, I attempted to obtain disability accommodations from this Court by contacting Judge Rodriguez's deputy clerk. I directed that contact to the deputy clerk specifically in order to avoid any ex parte communication with the Court on the substance of the case. That contact was directed to the procedural question of how to request disability accommodations — not to the merits of any pending matter. I did not reach the Court's access coordinator at that time. My contact with the deputy clerk did not result in a response identifying a standard process for requesting Section 504 accommodations in a pending civil case.

39. I was not provided with a form, a procedure, a designated contact, or a standard mechanism for requesting disability accommodations from this Court. The Western District of Texas does not appear to have a published standard procedure for requesting Section 504 accommodations in connection with a pending civil motion, as distinguished from physical access accommodations to the courthouse.

40. This placed me in a position I did not know how to resolve. In every other context in which I have required disability accommodations — school, employment, community services, and medical care — accommodations are requested and granted through what the law calls

14

an interactive process. That process is informal, bilateral, and iterative. It involves a direct conversation between the person requesting accommodation and the entity responsible for providing it. The purpose of the interactive process is to identify what the person actually needs, what the institution can actually provide, and whether any alternative accommodation might achieve the same result. It is flexible by design because disability needs are individual and context-specific.

41. A formal motion filed on the public docket — adversarial in format, litigated between parties, ruled upon by the judge who is also the subject of the accommodation request — is the structural opposite of an interactive process. It requires me to reduce a nuanced, individualized accommodation need to a legal standard in a formal brief, without any prior conversation with the Court about what accommodations might be available, what the Court's constraints are, or whether a less formal resolution might serve everyone's interests. It requires Lincoln to take an adversarial position on a request that has nothing to do with the merits of the underlying dispute. And it produces a ruling that is either granted or denied, with no middle ground and no dialogue.

42. I filed ECF No. 2 because I had no other available path. I had contacted the deputy clerk and received no guidance on a standard procedure. The case was moving forward. The complexity of the litigation was already visible from the complaint and the initial exhibit set. I recognized that if I did not raise the accommodation issue formally, I would be deemed to have waived it. Filing a public motion was not my preferred approach. It was the only approach the system made available to me after the informal path produced no result.

43. This Court denied ECF No. 2 in a single sentence applying the word "necessity" — a standard that does not appear in any of the three legal frameworks I invoked: Section 504 of the Rehabilitation Act, 28 U.S.C. § 1915 applied equitably, or ERISA § 502(g) fee-shifting under the Ulmer framework. The order did not acknowledge the Section 504 argument. It did not engage with the Ulmer factors. It did not suggest any alternative accommodation the Court might provide. It did not identify a process through which I might renew the request in a different form. It offered no interactive element whatsoever.

44. Within the past week, I contacted Judge Rodriguez's deputy clerk a second time regarding my disability accommodation needs. On April 24, 2026, I spoke formally for the first time with this Court's access coordinator. She confirmed two things that are material to the record.

45. First, she confirmed that the Western District of Texas does not have a standard motion or procedure for requesting Section 504 accommodations in connection with a pending civil case. There is no form. There is no designated process. There is no mechanism that would have allowed me to make my accommodation request through any channel other than an adversarial public motion.

46. Second, she confirmed that the access coordinator is not generally permitted to discuss a case with a litigant — even when the litigant's disability has direct communication implications for the case itself. The office designed by this Court to provide disability access to its proceedings cannot engage with the precise situation in which disability access is most urgently needed: where the disability affects not physical access to the courthouse but the litigant's ability to communicate, understand, and participate in the proceedings themselves.

47. I raise this not to relitigate ECF No. 2, which is the subject of the pending appeal (ECF No. 26). I raise it to document, under oath, that I did not go straight to a public adversarial motion. I tried the informal path before filing. The informal path produced no guidance and no process. The formal path produced a one-sentence denial with no findings and no alternative. The access coordinator confirmed after the denial that no standard process exists and that her office cannot discuss the case in any event. At every stage, I have done what the system made available to me. At every stage, the system has closed the path I used and offered no other.

48. The absence of a standard Section 504 accommodation process for civil litigants in this district is itself a structural barrier worth noting for the record. A system in which a disabled civil litigant cannot identify how to request an accommodation without filing an adversarial motion on the public docket — in which that adversarial motion is then denied in a single sentence without engaging with the statutory framework invoked — and in which the court's own access coordinator confirms after the fact that no standard process exists and that her office cannot discuss the matter, does not satisfy the meaningful access requirement of Section 504. This is not a criticism directed at any individual. It is a documented structural gap that this case has made visible, and that the Fifth Circuit will have the opportunity to address on appeal.

49. I want to document one additional fact that illustrates what the gap between formal access and meaningful access looks like in practice at this courthouse. On or around March 16, 2026, when I came to the clerk's office to file documents in this case before I had obtained ECF access, I used the handicap-accessible door buttons to enter the building. After completing my business at the clerk's office, I went to press the button to exit the building

and discovered that the buttons were not working. Security informed me that the accessible door buttons turn off at exactly 5:00 PM and that I would simply have to push the door open myself. On that particular day I was able to push the door. That is not the point. The point is that a federal courthouse that provides accessible entry buttons is required to provide accessible exit buttons for the same period the courthouse is open to the public. A disabled person who conducts lawful business in a federal courthouse and then cannot exit through an accessible path because a timer turned off the accommodation has not received meaningful access. They have received access conditioned on completing their business before an arbitrary cutoff that has nothing to do with their needs.

50. When I raised the issue with a clerk's office staff member on a subsequent filing visit, I was told that the solution was to get to the courthouse earlier. I understand that comment was not made with any intent to harm. I am recording it because it illustrates the institutional default when a disabled person raises an access problem: the burden of accommodation is placed on the person with the disability rather than on the institution. That is precisely what Section 504 prohibits. On April 24, 2026, when I spoke with this Court's access coordinator, she informed me that the button issue would be fixed. The Western District of Texas opened its new federal courthouse at 214 West Nueva Street with a dedication ceremony in April 2022. The accessible door buttons have apparently been turning off at 5:00 PM for approximately four years since that opening. It took a disabled litigant raising the issue in the context of active litigation to prompt a response. That timeline is itself evidence of the structural gap this section of this declaration describes.

## XII.  THE COURT'S CHARACTERIZATION OF MY CLAIMS AS "COMPLAINTS"
## AND WHY THAT CHARACTERIZATION MISREADS THE RECORD

59. This Court's April 22, 2026 text order described my motion as "complain[ing] that Lincoln has not yet provided a complete claim file as part of its initial discovery disclosures." I want to address that characterization directly, because it reflects a fundamental misreading of what is actually happening and why.

60. What the Court characterized as a complaint about an initial discovery disclosure is the final chapter of a pattern of stonewalling across both defendants that began in August 2025 — seven months before this lawsuit was filed and more than eight months before Lincoln's initial disclosure. (Exhibit DOC-REQ.) My document requests span six categories across both Lincoln and USAA: the LTD claims file, the 2021 STD claims file, plan documents and instruments, vocational rehabilitation documentation, internal guidelines governing the 24-month limitation and review frequency, and SSDI-related documents. Not a single one of those categories has been fully satisfied. From Lincoln, I have not received a single internal guideline in response to any request I have made, regardless of the category, regardless of the stated reason, and regardless of the regulatory obligation that required production. Lincoln has not provided a substantive written response to any document request I have submitted. Its responses, where they exist at all, have been either a statement that the file is withheld as standard practice, a one-sentence redirection, or silence.

61. USAA's withholding began at the same time and was equally complete. Beginning in August 2025, USAA denied me active-employee health insurance rates during my STD period — stripping benefits I had received during my 2021 disability leave — without issuing a single formal ERISA § 503 denial notice identifying the plan provision relied

upon or describing my appeal rights. When I attempted to obtain the plan documents that would have told me what I was entitled to receive, USAA artificially limited the scope of documents it provided to its own third-party appeal vendor, Claim Appeal Fiduciary Services. That vendor confirmed in writing on September 16, 2025 that it could only provide "the documents that USAA asked us to provide." (Exhibit USAA2.) The documents USAA chose not to provide to its own appeal vendor included the SPDs for the Educational Assistance Plan, the Annual Performance Incentive Plan, the 401(k) Plan, and the Pension Plan — each of which contains provisions preserving benefits for employees on disability leave. I would never have known those provisions existed had I not independently saved copies from USAA's internal portal before my termination.

62. When I subsequently requested the governing plan documents directly from USAA — including the employee handbook in effect on March 22, 2025, the date of my disability onset — USAA directed me to arbitration. That response is not just inadequate. It is legally incoherent. The arbitration agreement that governs my relationship with USAA specifically carves out ERISA disputes from its scope by its own express terms. USAA directed me to a dispute resolution process that its own agreement excludes for exactly this type of claim. I raised that conflict in writing. USAA did not respond substantively. The effect was to leave me with no available mechanism for obtaining documents I have a statutory right to receive. I could not pursue arbitration because the agreement excludes ERISA disputes. I could not obtain the documents through normal administrative channels because USAA had closed them. The only path that remained was this Court.

20

63. I want to be honest about what this experience has been like, because I believe it is relevant to the Court's understanding of why I filed what I filed and when I filed it. The degree to which both defendants were willing to go to withhold information I have a statutory right to receive — information I actually needed to complete processes they themselves required me to complete — was shocking to me. I have navigated disability benefit systems for my entire adult life. I have dealt with Medicare, Medicaid, the SSA, and multiple private insurers, including in adversarial contexts. I have never experienced a situation where an insurer directed me to apply for a federal benefit, required me to sign federal forms under penalty of perjury certifying the completeness of the information I submitted, and then refused to produce the records that application required — while simultaneously refusing every other document request I made, across every category, for months, and directing me to a dispute resolution process its own agreement said I could not use. That is not a discovery dispute. That is a systemic pattern of withholding that made it impossible for me to fulfill obligations both defendants had imposed on me. Filing this lawsuit was not my first choice. It was the only remaining option after every administrative path had been closed.

64. My first documented written request for my LTD claims file was sent to Lincoln's claims administrator on January 11, 2026 — approximately two months before I filed this lawsuit, in direct response to Lincoln's December 23, 2025 demand that I file for SSDI. (Exhibit H, Document 1; Exhibit DOC-REQ, Category 2.) From that date forward I made repeated written requests for the claims file, documented in Exhibits H, J, K, L, M, and DOC-REQ, in every case grounded in the same practical need: I could not accurately complete a federal SSDI application that Lincoln required me to file without a certified complete copy of the

file Lincoln controls. No one has disputed that I have an independent statutory right to this information under ERISA § 104(b)(4) and 29 C.F.R. § 2560.503-1. Lincoln invented a basis for refusal — that claims files are produced only upon a final denial of benefits — that appears nowhere in the statute or the regulation.

65. I want to be precise about something the Court's characterization obscures: I never asked Lincoln's litigation counsel for my claims file. I asked Lincoln. I asked Lincoln's claims administrators — Kristianne Corporan, Sasha Thornton, Shericka Wilkerson — through the normal clinical channels that every insurance company I have ever dealt with has used to produce documents relevant to my coverage. I did not anticipate that the answer to my request would be a litigation disclosure. I did not expect to receive my own medical records from an attorney's office. I did not expect that the first time I would see a copy of my claims file it would arrive as a litigation production, compiled by counsel, potentially incomplete as counsel herself acknowledged, having bypassed every clinical review process that normally ensures that medical information transmitted to a third party is relevant, complete, and appropriately scoped to its intended purpose.

66. In every prior experience I have had with disability or health insurance — including relationships that became contested and required formal appeals — the root documents have always been produced by the program or insurer itself through its own administrative processes. When an appeal becomes adversarial, the appeal reviewer receives the original plan documents from the plan. The insurer's clinical department ensures that what is transmitted is accurate, complete, and relevant to the determination at hand. Litigation counsel does not compile the claims file and produce it as a discovery disclosure. That is not how this process has ever worked for me with any insurance company, any Medicare

22

program, or any third-party appeal process I have participated in over the course of my life as a person with disabilities who has navigated these systems since birth.

67. What I received instead was a production of more than 2,000 pages transmitted directly by litigation counsel — a file containing some of the most sensitive medical documentation of my life, detailing my mental health and physical health struggles during a period of acute crisis in 2021 that is four years removed from the conduct at issue in this lawsuit. I requested documentation extending back to 2021 because the Social Security Administration has a five-year look-back period and Lincoln required me to file for SSDI. The 2021 records are relevant to the SSA's determination. They are not obviously relevant to Lincoln's defense of process claims whose merits do not depend on whether I am disabled. My disability is not in question in the operative complaint. The claims at issue are process claims — violations of 29 C.F.R. § 2560.503-1's independence requirements, ERISA § 510 interference, and ERISA § 404(a)(1) fiduciary breach. I do not understand how more than 2,000 pages of my most intimate medical records, compiled by litigation counsel and produced as a discovery disclosure, serve the purpose of a claims file that I requested from Lincoln's clinical department to fulfill a federal obligation Lincoln itself imposed on me. I have not yet been able to fully articulate that question in a form this Court will receive, which is itself evidence of why I need counsel.

68. The core of what I have been trying to say in every motion I have filed in this case is this: I am being subjected to the full adversarial burdens of federal civil litigation for a document I have a statutory right to receive outside of litigation, through Lincoln's normal fiduciary processes, under an obligation that has existed since the first day Lincoln approved my benefits. I did not ask for litigation. I asked Lincoln to do what every other insurer I have

ever dealt with has done without being sued: produce my own records to me, through its own administrative processes, so that I could meet the federal obligations Lincoln itself created. Lincoln's refusal to do that is what brought me to this Court. The fact that Lincoln's litigation counsel ultimately produced a version of the file — more than 2,000 pages, potentially incomplete, compiled outside the clinical process, transmitted through litigation channels — does not resolve the underlying fiduciary failure. It confirms it.

69. Lincoln did not passively redirect me to the state of Texas. Lincoln's Vocational Rehabilitation Counselor, Aleysia Chambers, scheduled a phone call with me and walked me through a four-step process for qualifying for Texas Workforce Commission Vocational Rehabilitation Services. That four-step process included completing a FAFSA and submitting a UTSA scholarship application. She then personally entered my information into the state's online referral portal. (Exhibit F.) The same day — January 28, 2026 — she sent me a written email closing my Lincoln vocational rehabilitation referral. (Exhibit F.) The closure email applied a "transferable skills" threshold that does not appear anywhere in the LTD policy. (Exhibit LTDPOL.) No formal ERISA § 503 denial letter was ever issued. No plan provision was cited. No appeal rights were described.

70. In that same email, Chambers acknowledged in writing that the Texas state vocational rehabilitation program is the payer of last resort and that qualification for the state program requires prior private-source denials. She then closed my Lincoln referral without providing the private denial letter that the state program requires before it can act. The state program cannot serve me without that letter. Lincoln declined to provide it.

24

71. During our phone call, Chambers disclosed that her prior employment was with a state vocational rehabilitation agency. Because of the way my mind works — I process systemic patterns quickly even when I struggle to articulate them in real time — I recognized immediately that something was wrong. I did not know how to name it precisely in the moment. But the structure was clear: a Lincoln vocational rehabilitation counselor with prior state agency employment was walking me through state qualification requirements, submitting my information to the state portal, and closing my private referral in the same transaction — without producing a plan-based denial, without documenting her reasoning, and without explaining what Lincoln's program could have provided that she had determined I did not qualify for. I later articulated the concern in writing and reported it to Lincoln's corporate investigations unit, the EBSA, and other authorities. (Exhibit F, Plaintiff response email January 28, 2026.)

72. The financial logic of what happened is not difficult to follow, even if I could not fully articulate it in the moment. Under the LTD policy, if Lincoln approves a Rehabilitation Program and I fully participate, Lincoln is contractually required to increase my monthly benefit from 60% to 70% — a ten-percentage-point increase representing a direct, ongoing, additional cost to Lincoln for the duration of the program. (Exhibit LTDPOL.) Referring me to the state of Texas eliminates two simultaneous financial obligations: the cost of providing the private rehabilitation program itself, and the contractual obligation to pay the increased monthly benefit during participation. Doing so without issuing a formal ERISA § 503 denial letter means I cannot appeal the determination, the state cannot verify what Lincoln declined to provide, and Lincoln never has to explain — in writing, under any regulatory standard — what plan-based criteria it applied. I am not asserting that this was

a coordinated scheme. I am asserting that the financial incentive existed, the procedural protection that would have required Lincoln to justify its decision was bypassed, and the result was that a counselor with prior state agency employment personally entered my information into the state portal and closed my private referral in a single transaction. That combination of facts raises questions I have been unable to get answered, and that I lack the legal skills to pursue on my own. (Exhibit E; Exhibit F; Exhibit LTDPOL.)

73. I asked Chambers directly what the Texas state program could provide that Lincoln could not, given that I was asking only for funding support for part-time graduate education — the same program my treatment team had documented as the structural foundation of my medical discharge plan. I never received a substantive answer. I also requested Lincoln's internal guidelines governing how it approves participants for vocational rehabilitation, what vocational rehabilitation consists of under the policy, and what criteria it applied to my situation. (Exhibit DOC-REQ, Category 3; Exhibit E.) None of that information appears in the policy. (Exhibit LTDPOL.) None of it was produced. Corporan's February 6, 2026 response to my follow-up request was: "We have already provided answers to your questions and there is no other information that will be provided to you."

74. The practical consequences of the missing denial letters extend beyond my individual situation. The Texas Workforce Commission Vocational Rehabilitation program is currently unable to complete my intake because it cannot determine whether it has an obligation to serve me until it receives formal written denial letters from Lincoln and USAA establishing that all private sources have been exhausted. Under 34 C.F.R. § 361.53 and Texas Labor Code § 352.052, state vocational rehabilitation programs are programs of last resort — they act only after private obligations have been formally disclaimed. Lincoln

acknowledged this requirement in writing and then declined to fulfill it. USAA has never produced a formal educational assistance denial letter despite my repeated written requests. (Exhibit APIP4; Exhibit DOC-REQ.) The state is waiting. My discharge plan — the structured educational and community living arrangement that allowed me to be released after 67 days of hospitalization — depends on financial support that was supposed to flow from Lincoln, USAA, or the state of Texas as a backstop. Not one of them has produced the paperwork necessary for that flow to occur.

75. These are not discovery disputes. The missing denial letters are administrative documents that every insurer and employer subject to ERISA is required to produce when it makes an adverse benefit determination. They are the paperwork the entire downstream system depends on to function. When Lincoln and USAA decline to issue them, they do not just deprive me of my right to appeal. They freeze every downstream process — state agency intake, alternative funding evaluation, appeal procedures — that depends on knowing what primary sources have and have not accepted responsibility. That is not a complaint. That is a description of what a systematic refusal to comply with ERISA's most basic procedural requirements looks like in practice, for a person whose medical stability depends on those requirements being met.

## XIII.  THE PUBLIC INTEREST IN THIS LITIGATION

76. I filed my motion for appointed counsel (ECF No. 2) on three independent grounds: Section 504 of the Rehabilitation Act, 28 U.S.C. § 1915 applied equitably, and ERISA § 502(g) fee-shifting under the Ulmer framework. This Court denied that motion in a single sentence without engaging with any of those three frameworks. I want to explain why that denial implicates a public interest that extends beyond my individual case.

27

77. The DOL was prompted to revise the disability claims procedure regulations specifically because of the volume of LTD litigation relative to other ERISA disputes. The Federal Register for the Final Rule expressly states: "[group] disability cases dominate the ERISA litigation landscape today. Insurers and plans looking to contain disability benefit costs may be motivated to aggressively dispute disability claims." 81 Fed. Reg. 92316, 92317 (Dec. 19, 2016). The DOL's December 2023 Advisory Council Report further documented the structural problems in LTD administration that the 2018 regulations were designed to address. (Exhibit LTDREPORT, ECF No. 12.) The process I am experiencing is the process the DOL identified as the problem.

78. The Fifth Circuit has described ERISA as presenting "the labyrinthine complexities of ERISA law and practice." Manuel v. Turner Industries Group, LLC, No. 17-30835 (5th Cir. Oct. 1, 2018). The Supreme Court has called ERISA "a comprehensive and reticulated statute." Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 447 (1999). These characterizations describe the legal environment in which every LTD claimant must navigate a denial or adverse determination — almost always without counsel, because the economic structure of ERISA litigation makes contingency representation difficult to obtain.

79. Section 504 of the Rehabilitation Act requires courts to provide meaningful access to litigants with disabilities. Tennessee v. Lane, 541 U.S. 509 (2004). In most contexts, meaningful access is achieved through physical or procedural accommodations. In complex ERISA litigation, for a pro se plaintiff with autism who cannot intuitively navigate the social-communicative demands of legal proceedings, the only accommodation that provides meaningful access is assistance of counsel. Other accommodations — extended

deadlines, modified formatting requirements — do not address the substantive cognitive barriers that autism imposes on adversarial legal practice.

80. Congress addressed the access gap in ERISA specifically by requiring fee-shifting when a participant "succeeds on the merits." ERISA § 502(g). Courts have interpreted this standard broadly. This fee-shifting provision was designed to make ERISA litigation economically viable for appointed or pro bono counsel — it is the funding mechanism Congress created for exactly the gap that Section 504 identifies. My motion for appointed counsel argued that these two frameworks, read together, provide a pathway to meaningful access in LTD litigation that does not require the court to create a new funding source or draw from a pool of civil legal aid attorneys.

81. Had this Court engaged with the Section 504 argument and the Ulmer factors — whether for or against appointment — that engagement would have produced a reasoned standard for addressing disability accommodation requests in LTD litigation. LTD claimants are, by definition, people the relevant plan administrator has determined to be disabled. They are therefore disproportionately likely to have conditions that affect legal participation. A precedent addressing how Section 504 applies to their access needs in the specific context of LTD ERISA litigation would have served a public interest that extends to every disabled LTD claimant in this Circuit who cannot obtain counsel and faces the process the DOL has already identified as systematically problematic. That opportunity was foreclosed by a single-sentence denial that did not acknowledge the statute.

82. I also want to note one broader concern that I was grappling with throughout the vocational rehabilitation process described in Section XII, and that I believe is relevant to the public interest dimension of this case. ERISA § 503 and 29 C.F.R. § 2560.503-1 require private

carriers to issue formal written adverse benefit determinations before a claimant can be directed to alternative sources of funding. That requirement exists for a reason: it creates a documented record of what the private carrier declined to provide and why, which allows the claimant to appeal, allows alternative funders to assess whether they have an independent obligation, and allows regulators to evaluate whether the carrier complied with its contractual and statutory obligations. State vocational rehabilitation programs are explicitly structured as programs of last resort under federal and state law. They are funded by taxpayers and designed to serve individuals who have no other source of vocational rehabilitation funding available to them. I am not in a position to know whether the referral I experienced reflects a pattern of conduct by private LTD carriers. I do not have access to information that would allow me to answer that question. But I am aware that if private carriers were to refer claimants to state-funded last-resort programs at scale — without issuing the formal denial letters that would allow state agencies to evaluate whether a private obligation existed — the financial and administrative consequences for those state programs could be significant, and the state agencies receiving those referrals might not be in a position to identify that a private carrier had an independent contractual obligation that was never formally disclaimed. I am raising this not as an accusation but because it is a question I found myself unable to stop thinking about, and because I believe it is the kind of question that ERISA's procedural requirements were designed to make answerable. In my case, those requirements were not followed, and the question remains unanswered.

## XIV. CONCLUSION

83. I am doing the best I can. I am using every tool available to me, including AI assistive technology, to participate in a legal system that was not designed for someone with my

cognitive profile. The sophistication of my filings reflects the quality of those tools and the intensity of my effort. It does not reflect the absence of the barriers this Court has been asked to address.

84. I hope that this declaration has helped the Court and the defendants understand why I have conducted myself in the way that I have throughout this process — producing more information rather than less, filing notices when conduct did not appear to be above board, and raising issues that may have appeared to be collateral complaints but that I experienced as interconnected parts of a single ongoing pattern. My conduct has been driven by the same neurological characteristics described in Section II: an inability to withhold information I believe is material, a compulsion toward complete disclosure, and a rule-based orientation that makes it genuinely difficult for me to rationalize silence when I observe conduct that appears inconsistent with the obligations the relevant parties have undertaken.

85. Before I filed this lawsuit, I was already grappling with a pattern of systemic withholding across both defendants spanning six document categories and eight months, combined with a vocational rehabilitation referral that bypassed every procedural protection ERISA requires and directed me to a state program that cannot serve me because Lincoln declined to issue the paperwork that program requires. I was simultaneously being required to file a federal SSDI application under penalty of perjury while being denied the claims file that application required. None of that had resolved when I filed this lawsuit on March 16, 2026.

86. Upon filing, I was provided Lincoln's initial disclosures months before they were due under the Federal Rules — including the claims file I had been requesting since January

31

2026. I recognized that as a significant step and I appreciated receiving it. But within days of receiving that production, Lincoln's litigation counsel informed me in writing that the file might be incomplete on a material category — the categories the Department of Labor's regulations specifically require a claims file to contain. (Exhibit DISCLOSURE, ECF No. 18.) One day later, the same attorney certified to this Court that the production was complete. I filed a notice placing that contradiction on the record because I did not know what else to do with it and because I believed, consistent with my obligations as a litigant, that it was something the Court needed to know. (ECF No. 18.) Until the file is certified as complete in a manner I can rely upon, I cannot provide it to the SSA without risking the federal perjury exposure described in Section III of this declaration.

87. That contradiction — incomplete one day, certified complete the next, still unresolved as of the date of this declaration — is not an initial discovery issue for me. It is the most recent chapter of a pattern that began in August 2025 and has not ended. The withholding, the referral to the state without a denial letter, the SSDI application demanded without the file it required, the initial disclosure that may not be complete, the certification that may not be accurate — these are not separate problems. They are the same problem expressing itself in different forms across different contexts over a period of many months. I have been documenting that pattern in writing, in real time, since it began, because documentation is how I protect myself when I am unable to predict what will happen next. That is why I have filed what I have filed. That is why this declaration is as long as it is. And that is why I am asking this Court to act before May 4, 2026.

88. I want to close with one final observation. This declaration presents the facts of my situation in an integrated narrative, weaving together circumstances that have unfolded

32

across many months and many different contexts. But none of this information is new to this Court. Every fact I have described here was already in the record before the text denials were issued. On April 6, 2026, I filed ECF No. 12, a notice of filing containing thirty-two exhibits — including Exhibits A through TIMELINE, DOC-REQ, LTDPOL, SS1, Brown1, and every other exhibit cited throughout this declaration. On April 8, 2026, I filed Exhibit LTDREPORT as ECF No. 15. On April 10, 2026, I filed Exhibit CONFLICT1 as part of ECF No. 17. On April 14, 2026, I filed Exhibit DISCLOSURE as ECF No. 18. The three substantive text denials that are the subject of this appeal — the denial of the counsel motion on April 13, the denial of the protective order on April 16, and the denial of the preliminary injunction on April 22 — were all issued after the complete exhibit record was on the docket. The SSDI demand letters are in Exhibits G and R. The claims file withholding is in Exhibits H, J, K, L, and M. The vocational rehabilitation referral and closure are in Exhibits E and F. The contamination of the clinical channel is in Exhibit CONFLICT1 (ECF No. 17). The document request pattern is in Exhibit DOC-REQ. The DOL Advisory Council Report is in Exhibit LTDREPORT. The timeline is in Exhibit TIMELINE. I filed those exhibits precisely because I wanted this Court to have the complete picture before it ruled on anything. This Court denied every substantive motion I filed — by text order, without findings, before briefing was complete — while all of that was already on the docket, available to be read. This declaration does not tell a story that was not already there. It explains, for the record and for the Fifth Circuit, what that story means to the person who has been living it.

33

I declare under penalty of perjury under the laws of the United States of America that the foregoing

is true and correct.

Executed on: **April 24, 2026**

/s/ **Charles T Bruff**

Charles T. Bruff

4835 Medical Dr. #29643

San Antonio, TX 78229

318-452-8978

cbruff13@outlook.com

Plaintiff in Pro Se

34