UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

**CHARLES T. BRUFF,**

Plaintiff,

v.

**USAA HEALTH AND WELFARE BENEFITS PLAN, et al.,**

Defendants.

Case No. SA26CA1720

**EXHIBIT REG — NOTICE OF REGULATORY BACKGROUND**

**Department of Labor Rulemaking History:**

**29 C.F.R. § 2560.503-1 and the Disability Claims Procedure Final Rule**

and

**DOL Interpretive Guidance on ERISA § 104(b)(4)**

## I. THE 1977 FRAMEWORK AND ITS ORIGINS

The Department of Labor first promulgated claims procedure regulations under the Employee Retirement Income Security Act of 1974 at 29 C.F.R. § 2560.503-1 in 1977. That framework established baseline procedural requirements for benefit claims under ERISA-covered plans, including notice of adverse determinations and the right to a full and fair review. The 1977 rule was designed primarily around health benefit claims and applied to disability benefit claims without modification or distinction.

The original framework imposed general disclosure obligations on all plan administrators. It required that adverse benefit determination notices state the specific reasons for denial and the plan provisions relied upon. It did not, however, require disclosure of internal guidelines, protocols, or criteria used to evaluate claims. It imposed no independence requirements on the reviewers making benefit determinations. And it did not address the relationship between plan determinations and findings by the Social Security Administration.

For health benefit claims, these gaps were largely addressed through industry practice: health insurers voluntarily developed and published coverage policies and clinical criteria that governed their benefit determinations. Participants and their treating providers could access these standards. Disputes could be framed with reference to disclosed criteria. The disclosure baseline the 1977 rule established proved workable in the health context.

For disability benefit claims, the same gaps produced a different outcome. Long-term disability insurers as a class did not voluntarily develop public-facing criteria. They administered claims through internal standards that were not disclosed to claimants, treating providers, or the courts reviewing disputed determinations. The 1977 framework's silence on internal guidelines became, in the disability context, an operational practice of systematic non-disclosure.

## II. EMERGING JUDICIAL RECOGNITION OF SYSTEMIC PROBLEMS: 1980s–1990s

Federal courts began encountering disability claims administration problems in the 1980s and 1990s as ERISA-covered long-term disability plans became widespread in employer benefit packages. Recurring issues emerged across circuits: plan administrators applying limitations and exclusions without disclosing the standards governing their application; adverse determinations that did not identify which plan provision was triggered or what evidence was relied upon; and limitations drafted with subjective or open-ended language that gave administrators broad discretion without corresponding accountability.

Courts addressed the enforceability of mental illness and symptom-based limitations across multiple circuits. In Lynd v. Reliance Standard Life Ins. Co., 94 F.3d 979, 984 (5th Cir. 1996), the Fifth Circuit found a mental illness limitation necessarily ambiguous when undefined and susceptible to multiple reasonable interpretations. In Patterson v. Hughes Aircraft Co., 11 F.3d 948, 949–50 (9th Cir. 1993), the Ninth Circuit found a mental illness limitation ambiguous because it was unclear whether it referenced the cause of disability or the symptoms presented. In Phillips v. Lincoln National Life Ins. Co., 774 F. Supp. 495, 501 (N.D. Ill. 1991), aff'd 978 F.2d 302 (7th Cir. 1992), a court found a disability insurer's mental illness limitation overbroad because extending it to conditions no reasonable person would consider mental illness revealed a definition lacking any principled limiting scope.

These cases shared a common feature: claimants could not evaluate the basis for an adverse determination because the standards governing it had never been disclosed. The judicial record accumulated evidence that the 1977 framework's silence on internal criteria was generating a category of claims in which meaningful review was structurally impossible. The claimant could not appeal effectively. The court could not review a standard that had never been articulated. The administrative record contained a determination but not the criteria that produced it.

By the late 1990s and into the 2000s, the disproportion between disability claims litigation and other ERISA benefit litigation had become statistically visible. Disability cases were generating a share of ERISA litigation entirely inconsistent with their share of ERISA-covered benefit claims. The Department of Labor began studying the disproportion as a policy matter.

## III. THE DOL RULEMAKING RECORD: 2010–2016

The Department of Labor formally initiated rulemaking on disability claims procedures in 2015, publishing a Notice of Proposed Rulemaking. 80 Fed. Reg. 72014 (Nov. 18, 2015). The

rulemaking record compiled by the DOL through public comment and agency study documented specific findings that formed the factual predicate for the Final Rule.

The DOL found that disability cases accounted for 64.5 percent of all ERISA benefits litigation — a share disproportionate to any other plan type. 81 Fed. Reg. 92316, 92317 (Dec. 19, 2016). The DOL expressly identified the mechanism: insurers and plans looking to contain disability benefit costs may be motivated to aggressively dispute disability claims. Id. The financial conflict of interest between the entity evaluating claims and the entity paying them was not a theoretical concern — it was a documented driver of litigation volume.

The rulemaking record documented that disability insurers were routinely withholding internal review criteria, guidelines, and protocols on the grounds that those materials were proprietary or confidential. Claimants received adverse determinations without knowing what standard had been applied. Treating physicians documented limitations without knowing what standards the insurer applied. Appeals were filed without knowing what the plan's internal criteria required. Courts reviewed administrative records that contained determinations but not the criteria producing them. The DOL identified this practice as a primary structural driver of the disproportionate litigation volume. 81 Fed. Reg. 92316, 92354.

The rulemaking record also documented the captured reviewer problem. In some instances, compensation, promotion, and retention decisions for claims personnel were influenced by the likelihood that the individual would support denial of benefits. The DOL found this created a structural conflict of interest embedded in the claims administration function itself, independent of the plan-level conflict identified in Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105 (2008).

The DOL further documented the Social Security Administration conflict. Disability insurers were directing claimants to apply for SSDI, in some instances funding those applications through third-party vendors, and then issuing adverse benefit determinations without explaining their disagreement with the federal disability finding that resulted. The DOL identified this as a specific information gap the enhanced rule needed to address.

The insurance industry, through its trade associations, actively opposed the proposed rule during the comment period. Industry commenters argued that disclosure of internal criteria would increase litigation, that independence requirements were unworkable, and that the existing framework was adequate. The DOL considered and rejected these arguments, finding that the documented evidence of systematic non-compliance by disability insurers — a category of fiduciary that was uniquely and persistently withholding information that every other class of ERISA fiduciary was voluntarily disclosing — required targeted regulatory intervention. 81 Fed. Reg. 92316, 92318–19.

**IV. THE 2016 FINAL RULE — PROVISION BY PROVISION**

The Department of Labor published the Final Rule amending 29 C.F.R. § 2560.503-1 on December 19, 2016. 81 Fed. Reg. 92316. The rule became applicable to claims for disability benefits filed on or after April 1, 2018. 29 C.F.R. § 2560.503-1(p)(3). The following provisions are directly relevant to disability claims administration.

### A. Adverse Benefit Determination — Notice Requirements

The amended rule requires that adverse benefit determination notices for disability claims identify the specific internal rules, guidelines, protocols, standards, or other similar criteria of the plan relied upon in making the determination, or affirmatively state that no such criteria exist. 29 C.F.R. § 2560.503-1(g)(1)(vii)(A). This requirement applies at the time of the initial determination — not only on appeal. The notice must also identify which plan provision was applied and the specific reasons for the determination with reference to that provision. Id. § 2560.503-1(g)(1)(i), (ii).

### B. Internal Guidelines — Confidentiality Claims Prohibited

The 2016 rule added an express prohibition directly responsive to the practice documented in the rulemaking record. Internal rules, guidelines, protocols, standards, or other criteria relied upon in making an adverse benefit determination must be provided to the claimant upon request, and that information may not be withheld on grounds of confidentiality or that such information is proprietary. 81 Fed. Reg. 92316, 92354; 29 C.F.R. § 2560.503-1(g)(1)(vii)(A). The prohibition on confidentiality claims is explicit, unambiguous, and was drafted in direct response to the industry practice of claiming proprietary protection for internal criteria.

### C. Social Security Administration Conflict — Explanation Required

The amended rule requires that if an adverse benefit determination is inconsistent with a Social Security Administration disability determination, the notice must contain a specific explanation of the basis for the disagreement with the SSA finding. 29 C.F.R. § 2560.503-1(g)(1)(vii)(B); 81 Fed. Reg. 92316, 92350. This provision was enacted because the DOL found disability insurers were overriding SSA findings without explanation, in some cases after having directed and funded the very SSA application whose outcome they were rejecting.

### D. Independence and Impartiality — § 2560.503-1(b)(7)

The amended rule significantly strengthened independence requirements for disability claims. All disability benefit claims and appeals must be adjudicated in a manner designed to ensure the independence and impartiality of the individuals involved. Decisions regarding hiring, compensation, termination, promotion, and other similar matters with respect to any claims adjudicator or medical expert must not be made based upon the likelihood that the individual will support the denial of benefits. 29 C.F.R. § 2560.503-1(b)(7). The final rule expressly extended these independence requirements to vocational experts, in addition to claims adjudicators and medical experts. 81 Fed. Reg. 92316, 92347.

### E. Deemed Exhaustion — Consequence of Non-Compliance

The 2016 rule added a deemed exhaustion provision with material consequences for non-compliant plans. If a plan fails to adhere to all the requirements of the claims processing regulation, the claimant is deemed to have exhausted administrative remedies and may immediately pursue relief in federal court. 29 C.F.R. § 2560.503-1(l). Additionally, if the plan fails to follow its own procedures, fiduciary discretion is forfeited and any adverse determination is reviewed de novo rather than under the abuse-of-discretion standard. The deemed exhaustion provision was enacted because the DOL found that procedural non-compliance by disability insurers was not being remedied through the administrative appeals process.

## F. New or Additional Evidence — Pre-Determination Disclosure

The amended rule requires that any new or additional evidence considered, relied upon, or generated by the plan in connection with a disability claim on appeal must be provided to the claimant automatically and free of charge before the final decision is issued, with a reasonable opportunity to respond. 29 C.F.R. § 2560.503-1(h)(4)(i). This provision was enacted to address the practice of plans generating new evidence on appeal — such as independent medical reviews — without giving claimants an opportunity to respond before the determination was issued.

## V. DOL INTERPRETIVE GUIDANCE ON ERISA § 104(b)(4) AND INTERNAL GUIDELINES

Section 104(b)(4) of ERISA provides that the administrator shall, upon written request of any participant or beneficiary, furnish a copy of any documents, records, or other information relevant to the participant's claim for benefits, including any contract or other instrument under which the plan is established or operated. Unlike the disability claims procedure regulations, § 104(b)(4) has not been the subject of comprehensive formal rulemaking. The DOL has instead addressed its scope through formal advisory opinions and official agency guidance, each of which carries interpretive authority.

In DOL Advisory Opinion 96-14A, and again in Advisory Opinion 97-11A, the Department of Labor concluded that any document or instrument that specifies procedures, formulas, methodologies, or schedules to be applied in determining or calculating a participant's benefit entitlement constitutes an instrument under which the plan is established or operated within the meaning of § 104(b)(4), and must be disclosed upon written request. DOL Adv. Op. 97-11A (Nov. 3, 1997). Advisory Opinion 97-11A further addressed third-party administrator contracts, holding that any contract that establishes a claims procedure or specifies procedures to be applied in determining benefit entitlement is subject to mandatory disclosure under § 104(b)(4).

The DOL's official Benefit Claims Procedure Regulation FAQ, published by the Employee Benefits Security Administration, confirmed this interpretive position with respect to internal guidelines specifically. The DOL stated: "The department also has taken the position that internal rules, guidelines, protocols, or similar criteria would constitute instruments under which a plan is established or operated within the meaning of section 104(b)(4) of ERISA and, as such, must be

disclosed to participants and beneficiaries." DOL, Benefit Claims Procedure Regulation FAQs (EBSA). This position predates and is independent of the 2016 Final Rule. The DOL's interpretive conclusion that internal guidelines are § 104(b)(4) instruments has been the agency's stated position since at least 1997.

The 2016 Final Rule reinforced this interpretive position through the regulatory framework of § 2560.503-1. Under § 2560.503-1(m)(8), a document is relevant to a claimant's claim if it was relied upon in making the benefit determination, was submitted or considered in making the determination, demonstrates compliance with administrative processes and safeguards, or constitutes a statement of policy or guidance with respect to the plan concerning the denied benefit. Documents meeting this definition must be provided to the claimant upon request and free of charge under § 2560.503-1(h)(2)(iii). The § 503 relevance standard and the § 104(b)(4) instrument standard therefore operate in parallel: internal guidelines that constitute statements of policy or guidance concerning a benefit determination are relevant documents under § 503 and instruments under which the plan is operated under § 104(b)(4), and must be produced under both provisions independently.

The DOL's FAQ further addressed the relationship between the confidentiality prohibition in the 2016 rule and prior agency guidance: where a rule, guideline, protocol, or similar criterion serves as a basis for making a benefit determination, either at the initial level or upon review, it must be provided to the claimant upon request. This obligation is not qualified by any proprietary or confidentiality exception. DOL, Benefit Claims Procedure Regulation FAQs (EBSA).

The DOL's rationale for the 2016 Final Rule's disclosure requirements reflects a finding that was explicit in the rulemaking record: the protections being extended to disability claimants in 2016 were already applicable to group health plan claims under the Affordable Care Act, and the rule's purpose was to make disability claims procedures parallel those already in place for health benefits. 81 Fed. Reg. 92316, 92317. In other words, the 2016 rule did not invent a new disclosure obligation — it extended to disability claimants a transparency standard that health plan participants already enjoyed. The Social Security Administration's own claims administration practice illustrates this point concretely. SSA administers disability determinations under the strictest disability standard in federal law, and it publishes the complete criteria its examiners use to evaluate every category of claim in the Program Operations Manual System (POMS) — a document that is publicly available and identical to the version used by SSA employees. SSA's Listing of Impairments, the Blue Book criteria, and the POMS evaluation procedures for every condition including mental health impairments are all publicly accessible. The agency that administers the largest disability program in the United States by volume does not treat its internal evaluation criteria as proprietary. The 2016 Final Rule reflects the DOL's determination that private LTD insurers should be held to the same transparency standard as the federal program with which they coordinate — and to which they direct their own claimants.

## VI. CIRCUIT COURT INTERPRETATION OF § 104(b)(4): THE PRE-2018 SPLIT AND ITS CURRENT STATUS

Because § 104(b)(4) has not been the subject of comprehensive DOL rulemaking, federal courts have been the primary interpreters of the statute's scope. The result has been a circuit split that developed primarily in the 1990s and has not been fully resolved by subsequent decisions. The following summarizes the circuit positions as they stand, with attention to the most recent appellate authority in each circuit.

### A. The Sixth Circuit — Broad Disclosure Standard

The Sixth Circuit adopted the broadest interpretation of § 104(b)(4) in Bartling v. Fruehauf Corp., 29 F.3d 1062 (6th Cir. 1994). The court held that the purpose of ERISA's disclosure requirements is to ensure that "the individual participant knows exactly where he stands with respect to the plan," and that "all other things being equal, courts should favor disclosure where it would help participants understand their rights." Id. at 1070. Under this standard, the court required disclosure of actuarial valuation reports and benefit calculation procedures. The Sixth Circuit's framework focuses on the participant's need to understand his or her rights and benefit entitlements, rather than on the formal character of the document requested.

### B. The Seventh Circuit — Express Reliance Rule

The Seventh Circuit addressed the specific question of internal guidelines in Mondry v. American Family Mutual Insurance Co., 557 F.3d 781 (7th Cir. 2009). The court held that when an insurer expressly cites an internal document as the authoritative basis for denying a claim, that express reliance effectively renders the internal document a plan instrument subject to mandatory disclosure under § 104(b)(4). Id. at 799–800. The court declined to hold that private reliance alone, without express citation, would bring an internal document within the disclosure obligation. However, the court assessed statutory penalties for 309 days of non-production following the insurer's express reliance on its internal tools. The Mondry framework establishes that the express-reliance trigger transforms an otherwise internal document into a mandatory disclosure item.

### C. The Second and Fourth Circuits — Narrow Formal Instrument Standard

The Second and Fourth Circuits have adopted a narrower interpretation, limiting § 104(b)(4) to formal legal instruments that directly govern the plan's relationship with participants. Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein, 107 F.3d 139, 142–45 (2d Cir. 1997); Faircloth v. Lundy Packing Co., 91 F.3d 648, 652–54 (4th Cir. 1996). Under this framework, internal interpretive tools that are not binding on the claims administrator and do not formally govern the plan's operation are not subject to mandatory disclosure. The Second Circuit characterized the term "instruments" as implying only formal legal documents, and rejected an interpretation that would require production of all documents relevant to a plan. Weinstein, 107 F.3d at 142.

## D. The First Circuit — Internal Interpretive Tools Excluded

The First Circuit held in Doe v. Travelers Insurance Co., 167 F.3d 53, 60 (1st Cir. 1999), that mental health guidelines used to decide a claim were not "other instruments" required to be disclosed under § 104(b)(4), characterizing such guidelines as internal interpretive tools that were not binding on the claims administrator and therefore did not formally govern the operation of the plan. The DOL's subsequent Request for Information on ERISA disclosure obligations, 65 Fed. Reg. 55860 (Sept. 14, 2000), cited Doe as an example of a court decision whose approach to disclosure the Department was studying in connection with potential guidance. The DOL's own interpretive position, expressed in Advisory Opinion 97-11A and the EBSA FAQ, is broader than the First Circuit's holding in Doe.

## E. The Ninth Circuit — Participant-Centric Standard

The Ninth Circuit, sitting en banc, adopted a participant-centric standard in Hughes Salaried Retirees Action Committee v. Administrator of the Hughes Non-Bargaining Retirement Plan, 72 F.3d 686 (9th Cir. 1995). The court held that § 104(b)(4) requires disclosure of documents that allow a participant to know where he or she stands regarding the plan, including benefits to which the participant may be entitled, circumstances that may result in denial of benefits, and procedures for obtaining benefits. Id. at 690. This standard has been applied narrowly in practice. In Zavislak v. Netflix, Inc., No. 24-4156 (9th Cir. Sept. 24, 2025) — the most recent circuit court decision addressing § 104(b)(4) — the Ninth Circuit reaffirmed its Hughes precedent and held that claims administration agreements that governed only the relationship between the employer and claims administrator were not subject to mandatory disclosure. Zavislak involved a health plan and did not address how the 2016 Final Rule affects the § 104(b)(4) disclosure analysis for disability claims.

## F. The Fifth Circuit — Binding Instrument Standard with Independent Fiduciary Pathway

The Fifth Circuit has applied a binding-instrument framework to § 104(b)(4): documents fall within the catch-all clause only if they are binding on the administrator in the sense that they define rights, duties, entitlements, or liabilities. See In re SuperMedia Inc., No. 13-11117 (5th Cir. Oct. 15, 2014) (unpublished). However, the Fifth Circuit simultaneously confirmed that § 404(a)(1)'s fiduciary duty may independently obligate responsive disclosure of relevant plan materials upon a specific request by a plan member, even where § 104(b)(4) does not compel disclosure. This fiduciary duty pathway was recognized in Kujanek v. Houston Poly Bag I, Ltd., 658 F.3d 483, 488–89 (5th Cir. 2011), where the court held that withholding specifically requested plan documents constituted a breach of the fiduciary duty to act in the participant's best interest. The Fifth Circuit has not addressed how the 2016 Final Rule's express disclosure requirements under § 2560.503-1 interact with its § 104(b)(4) framework in the disability claims context.

## G. Current Status of the Split

The circuit split that developed in the 1990s remains unresolved as of the date of this Notice. No circuit court has directly addressed how the 2016 Final Rule's express prohibition on withholding internal guidelines on confidentiality grounds — codified at 29 C.F.R. § 2560.503-1(g)(1)(vii)(A) and applicable to disability claims filed on or after April 1, 2018 — affects the pre-existing § 104(b)(4) framework. The most recent circuit decision addressing § 104(b)(4), Zavislak v. Netflix, Inc. (9th Cir. 2025), involved a health plan and did not engage that question. The § 503 disclosure obligation created by the 2016 Final Rule operates independently of the § 104(b)(4) framework and is not subject to the circuit split analysis, as it arises from a federal regulation with an express confidentiality prohibition rather than from judicial interpretation of the statutory catch-all clause.

## VII. POST-2018 ADVISORY COUNCIL FINDINGS

In December 2023 — five years after the enhanced rule took effect — the Department of Labor's ERISA Advisory Council issued a report titled Long-Term Disability Benefits and Mental Health Disparity. The Advisory Council is a statutory body established under ERISA § 512 to provide advice and recommendations to the Secretary of Labor on ERISA matters. Its December 2023 report was the product of a formal study into long-term disability claims administration practices, including the scope and impact of duration limitations on LTD benefits for mental health and substance use disorder conditions. The study received testimony from actuaries, physicians, mental health professionals, attorneys, representatives of the Social Security Administration, and representatives of the disability insurance industry.

The Advisory Council's findings are significant in several respects. First, the Council documented that only 1 percent of group LTD policies sold in the United States do not contain mental health and substance use disorder duration limitations — meaning the 24-month cap structure is effectively universal in the industry. Second, the Council found that most group LTD plans offer coverage until retirement age for disabilities arising from physical conditions, while the same policies limit coverage to 24 months for disabilities attributed to mental health or substance use disorder conditions, regardless of the objective severity of those conditions. Third, the Council concluded that duration limits for mental health and substance use disorder conditions are discriminatory and unsupported by current clinical standards. The Council noted that advances in psychometric testing, radiologic imaging, and evidence-based treatment have significantly improved the ability to objectively document and validate the severity of mental health conditions, and that the clinical basis for treating such conditions as categorically more susceptible to fraud or feigning than physical conditions no longer exists.

Fourth, and directly relevant to the claims administration practices at issue in this litigation, the Advisory Council examined whether certain physical conditions have been misclassified as subject to mental health and substance use disorder limitations. The Council found that open-ended symptom-based definitions — of the type that had been challenged in federal courts since the 1990s — create a documented risk of misclassification of physical conditions as psychiatric impairments and are inconsistent with general medical principles. The Advisory Council was

aware of the judicial history of such limitations, including the longstanding circuit court decisions finding them ambiguous or overbroad, and reached its conclusions in that context.

The Advisory Council's recommendations to the Secretary of Labor included urging Congress to adopt LTD insurance parity requirements consistent with the Mental Health Parity and Addiction Equity Act, commissioning actuarial research on the cost implications of removing duration limits, and providing education to plan sponsors on the impact of these limitations on participants. The Council noted that Vermont — the only state that has mandated mental health parity in disability insurance — and Canada, where human rights laws have been interpreted to require parity, reported no notable increase in cost or fraud following the removal of duration limits.

The Council's findings have generated legislative response. In June 2025, H.R. 3758 was introduced in the House of Representatives, building directly on the Advisory Council's report and seeking to extend mental health parity requirements to long-term disability insurance plans offered through employers. While the legislation has not been enacted, its introduction reflects the federal policy direction established by the Advisory Council's findings.

The December 2023 report represents the most recent formal federal assessment of long-term disability claims administration practices. It was produced five years after the 2016 Final Rule took effect, with the participation of the disability insurance industry, and its findings confirm that the structural conditions the 2016 rulemaking was designed to address — including the misclassification of conditions, the use of overbroad symptom-based limitations, and the absence of clinical standards for limitation determinations — remain present in long-term disability claims administration.

## VIII. PURPOSE OF THIS NOTICE

This Notice is submitted to ensure that all parties and the Court share a common understanding of the regulatory framework governing the disability claims administration practices at issue in this litigation. The 2016 Final Rule, effective April 1, 2018, is not a recent development — it has been the operative legal standard for seven years. The DOL's interpretive position that internal guidelines constitute § 104(b)(4) instruments has been the agency's stated position since at least 1997. The arguments presented in Plaintiff's pending motions arise from, and are evaluated against, the requirements of this framework. This Notice is intended to provide the historical and regulatory baseline from which those arguments proceed, without argument or advocacy as to how that framework applies to the specific facts of this case.

Respectfully submitted,
/s/ Charles T. Bruff
Charles T. Bruff
4835 Medical Dr. #29643
San Antonio, Texas 78229
318-452-8978

cbruff13@outlook.com
Plaintiff in Pro Se

Dated: May 3, 2026

**TABLE OF AUTHORITIES**

**CASES**

Bartling v. Fruehauf Corp., 29 F.3d 1062 (6th Cir. 1994)    Section VI.A

Board of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein,    Section VI.C
    107 F.3d 139 (2d Cir. 1997)

Doe v. Travelers Insurance Co., 167 F.3d 53 (1st Cir. 1999)    Section VI.D

Faircloth v. Lundy Packing Co., 91 F.3d 648 (4th Cir. 1996)    Section VI.C

George v. Reliance Standard Life Ins. Co., 776 F.3d 349 (5th Cir. 2015)    Section II

Hughes Salaried Retirees Action Committee v. Administrator of the Hughes    Section VI.E
    Non-Bargaining Retirement Plan, 72 F.3d 686 (9th Cir. 1995) (en banc)

In re SuperMedia Inc., No. 13-11117 (5th Cir. Oct. 15, 2014) (unpublished)    Section VI.F

Kujanek v. Houston Poly Bag I, Ltd., 658 F.3d 483 (5th Cir. 2011)    Section VI.F

Lynd v. Reliance Standard Life Ins. Co., 94 F.3d 979 (5th Cir. 1996)    Section II

Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105 (2008)    Sections III, IV

Mondry v. American Family Mutual Insurance Co., 557 F.3d 781 (7th Cir. 2009)    Section VI.B

Patterson v. Hughes Aircraft Co., 11 F.3d 948 (9th Cir. 1993)    Section II

Phillips v. Lincoln National Life Ins. Co., 774 F. Supp. 495 (N.D. Ill. 1991),    Section II
    aff'd 978 F.2d 302 (7th Cir. 1992)

Zavislak v. Netflix, Inc., No. 24-4156 (9th Cir. Sept. 24, 2025)    Sections VI.E, VI.G

**STATUTES**

Employee Retirement Income Security Act of 1974 (ERISA)
    29 U.S.C. § 1024(b)(4) (ERISA § 104(b)(4))    Sections V, VI
    29 U.S.C. § 1133 (ERISA § 503)    Sections I, IV
    29 U.S.C. § 1132(c)(1) (ERISA § 502(c))    Section V
    29 U.S.C. § 1104(a)(1) (ERISA § 404(a)(1))    Section VI.F
    29 U.S.C. § 1142 (ERISA § 512)    Section VII

**REGULATIONS**

29 C.F.R. § 2560.503-1 (Claims Procedure Regulation)    Sections I, IV, V
    § 2560.503-1(b)(7) (Independence and Impartiality)    Section IV.D
    § 2560.503-1(g)(1)(i), (ii) (Notice — Specific Reasons)    Section IV.A
    § 2560.503-1(g)(1)(vii)(A) (Internal Guidelines — No Confidentiality)    Sections IV.A, IV.B, VI.G

§ 2560.503-1(g)(1)(vii)(B) (SSA Conflict — Explanation Required)    Section IV.C

§ 2560.503-1(h)(2)(iii) (Right to Relevant Documents)    Section V

§ 2560.503-1(h)(4)(i) (Pre-Determination Disclosure)    Section IV.F

§ 2560.503-1(l) (Deemed Exhaustion)    Section IV.E

§ 2560.503-1(m)(8) (Definition of Relevant Document)    Section V

§ 2560.503-1(p)(3) (April 1, 2018 Applicability Date)    Sections IV, V

**FEDERAL REGISTER**

Claims Procedure for Plans Providing Disability Benefits, 80 Fed. Reg. 72014 (Nov. 18, 2015) (Notice of Proposed Rulemaking)    Sections III, IV

Claims Procedure for Plans Providing Disability Benefits, 81 Fed. Reg. 92316 (Dec. 19, 2016) (Final Rule)    Sections III, IV

Disclosure Obligations Under ERISA; Request for Information, 65 Fed. Reg. 55860 (Sept. 14, 2000)    Section VI.D

**DOL ADVISORY OPINIONS AND AGENCY GUIDANCE**

DOL Advisory Opinion 96-14A (1996)    Section V

DOL Advisory Opinion 97-11A (Nov. 3, 1997)    Sections V, VI.D

DOL, Benefit Claims Procedure Regulation FAQs, Employee Benefits Security Administration (EBSA), available at dol.gov/agencies/ebsa    Section V

DOL, ERISA Advisory Council, Long-Term Disability Benefits and Mental Health Disparity (Dec. 2023)    Section VII

DOL, ERISA Advisory Council, Managing Disability Risks in an Environment of Individual Responsibility (2012)    Section III

**LEGISLATIVE AND AGENCY REFERENCES**

H.R. 3758, Long-Term Disability Mental Health Parity Act (119th Cong. 2025)    Section VII

Social Security Administration, Program Operations Manual System (POMS), publicly available at secure.ssa.gov/apps10/    Section V

SSA Listing of Impairments (Blue Book), 20 C.F.R. Pt. 404, Subpt. P, App. 1    Section V