# Exhibit CONFLICTDEADLINE

## Notice of Conflicting Deadlines and Provider Communication Deficiencies — March 24–31, 2026 Medical Records Request

This cover sheet describes deficiencies apparent on the face of the three documents attached as Exhibits MAR24PACKET-A, MAR31PACKET-B, and MYCHART-C. Exhibit A is Lincoln's March 24, 2026 provider request packet (42 pages), including the cover letter to Plaintiff, fax cover sheets to providers, provider request letters, blank clinical forms, and HIPAA authorizations. Exhibit B is a second provider request packet sent March 31, 2026 to UT Health San Antonio's Release of Information department. Exhibit C is a MyChart message exchange between Plaintiff and Dr. Laavanya Raju dated April 1–6, 2026.

### I. THREE SIMULTANEOUS DEADLINES

The documents reflect three distinct deadlines running simultaneously across the same medical records review:

| Deadline | Source Document |
|---|---|
| April 7, 2026 | Packet 1 — Letters to providers, sent March 24, 2026. Stated deadline for provider response. |
| April 14, 2026 | Packet 2 — Second request to UT Health San Antonio, sent March 31, 2026. Different deadline for the same provider. |
| May 7, 2026 | Cover letter to Plaintiff, dated March 24, 2026. 45-day deadline for Plaintiff's overall response. NOT SENT TO PROVIDERS |

The cover letter to Plaintiff states that if all requested information is not received by May 7, 2026, benefits will be suspended. The letters sent directly to providers state that failure to provide the requested information by April 7, 2026 may result in an adverse benefit or claim determination. These are materially different deadlines for the same review, communicated to different parties, with no explanation of the discrepancy provided to either Plaintiff or his providers.

Lincoln's case manager subsequently characterized the April 7 provider deadline as a placeholder date. The provider letters do not use that characterization. They state that failure to respond by April 7 may result in an adverse benefit or claim determination.

### II. PROVIDERS CONTACTED AND DOCUMENTS REQUESTED

Packet 1, dated March 24, 2026, reflects outreach to the following five destinations simultaneously:

| Recipient | Channel | Form Requested | Notes |
|---|---|---|---|
| Dr. Azalia Martinez, Phoenix Mental Health TMS PLLC | Fax: (210) 994-6441 | Behavioral Health Form — Ongoing | No prior STD relationship |
| Dr. Laavanya Raju, UT Health San Antonio | Fax: (210) 450-6007 (Release of Information) | Attending Physician's Statement | Fax sent to records department, not physician. Provider had |

| | | | prior STD relationship with Lincoln. |
|---|---|---|---|
| Dr. Monica Verduzco Gutierrez, 8300 Floyd Curl, San Antonio | Fax: (210) 567-5354 | Attending Physician's Statement | Provider had prior STD relationship with Lincoln. |
| Dr. Janice Brunstrom-Hernandez, 7709 San Jacinto Pl, Plano TX | Fax: (469) 331-0031 | Attending Physician's Statement | Provider had prior STD relationship with Lincoln. |
| **INFO@REVELATIONLPC.COM** | Automated email, 1:42 PM March 24 | PDF attachment | **Not Plaintiff's provider. Plaintiff had never been treated at or associated with this clinic.** |

## III. THE SECOND PACKET TO UT HEALTH — MARCH 31, 2026

On March 31, 2026, Lincoln sent a second provider request packet to UT Health San Antonio. This packet was addressed to the UT Health Release of Information department at the same fax number used in Packet 1 — (210) 450-6007. The deadline stated in this packet was April 14, 2026, seven days later than the April 7 deadline in Packet 1.

The Release of Information department at UT Health San Antonio processes outbound records requests from authorized parties. It does not receive and complete inbound clinical forms such as an Attending Physician's Statement. A clinical form requiring a physician's signature and medical assessment cannot be completed by a records department. Plaintiff notified Lincoln's case manager that the fax number used reached the records department rather than Dr. Raju's clinic. Lincoln sent a second packet to the same fax number regardless.

The result was two packets addressed to the same provider, sent to the same department that could not complete either of them, with two different deadlines — April 7 and April 14 — neither of which matched the May 7 deadline stated in Plaintiff's cover letter.

## IV. PLAINTIFF DID NOT RECEIVE THE PACKET UNTIL APPROXIMATELY MARCH 31, 2026

The provider request letters are dated March 24, 2026. Lincoln sent them directly to providers on that date. Plaintiff did not receive a copy of the packet until approximately March 31, 2026 — one week after Lincoln had already distributed requests to four providers and one unrelated clinic.

As a result, Plaintiff had no opportunity to review the provider list, verify the fax numbers, identify the Revolution LPC error, or coordinate with his physicians before the requests went out. By the time Plaintiff

received the packet, the April 7 deadline was approximately one week away. Plaintiff then undertook to notify each provider directly through the MyChart patient messaging system, forwarding the relevant packet contents, in order to ensure the requests actually reached the intended recipients.

The Revolution LPC packet — which appears to have been intended for Plaintiff's behavioral health counselor at UT Health — was forwarded by Plaintiff directly to that provider through MyChart after Plaintiff discovered the misdirection. Plaintiff also sought to determine the source of the Revolution LPC email address, as he had never been treated at or associated with that clinic.

## V. THE MYCHART EXCHANGE — DR. RAJU

The MyChart exchange attached as Exhibit □-C documents the following:

On April 1, 2026, Plaintiff notified Dr. Raju that the request had been sent to UT Health's records department rather than to her clinic, that the deadline of April 7 was approximately nine business days away, and that Plaintiff was communicating to Lincoln that 30 days from April 1 would be required. Plaintiff also noted that Lincoln had given providers different deadlines than it had given him.

On April 5, 2026, Dr. Raju responded that she was out of clinic until midweek and asked whether Lincoln would provide an extension. She also suggested Plaintiff's psychiatrist might be able to complete the form sooner.

On April 6, 2026, Plaintiff confirmed his belief that an extension would be available, noting that Lincoln's cover letter to him stated a May 7 deadline, and that he would forward the exchange to Lincoln to document the need for additional time.

The exchange reflects that Dr. Raju, a provider who had assisted with Plaintiff's prior STD claim and whose contact information was already in Lincoln's file, was first notified of the review through Plaintiff's MyChart message on April 1 — not through Lincoln's direct outreach — because the original packet went to the wrong department and the second packet had not yet been sent.

## VI. REVIEW FREQUENCY: THE SSA BENCHMARK AND LINCOLN'S UNDISCLOSED STANDARD

Lincoln has conducted medical reviews of Plaintiff's LTD claim at approximately 90-day intervals since the claim was approved in September 2025. No contractual provision in the LTD policy authorizes a specific review frequency. Lincoln has not disclosed the internal guidelines governing when reviews are initiated, what criteria trigger a review, or what clinical information a given review is designed to obtain. Plaintiff has requested that documentation in writing on multiple occasions. Lincoln's case manager stated in writing that no such guidelines exist.

The Social Security Administration's Program Operations Manual System (POMS DI 28001.020) establishes a federal benchmark for disability review frequency. Under that framework, SSA schedules continuing disability reviews based on the likelihood of medical improvement: every 6 to 18 months for conditions where improvement is expected, every 3 years where improvement is possible, and every 5 to 7 years for permanent impairments where improvement is not expected. SSA applies this framework because frequent reviews impose significant costs and burdens on the agency, on claimants, and on treating providers — costs that are only justified when there is a clinical basis for expecting change.

SSA has determined that Plaintiff is disabled. Lincoln directed and funded that determination through Brown and Brown under the most demanding disability standard in federal law. Plaintiff's diagnosed conditions — cerebral palsy and post-traumatic stress disorder, both permanent — are not conditions where medical improvement is expected. Under SSA's framework, a claimant with Plaintiff's profile would be reviewed every 3 to 7 years, not every 90 days.

Lincoln is not legally required to follow SSA's review schedule. However, the 2016 Final Rule amending 29 C.F.R. § 2560.503-1 requires Lincoln to disclose the internal guidelines governing its review process and to explain any disagreement with an SSA disability finding. 29 C.F.R. § 2560.503-1(g)(1)(vii)(A), (B). Lincoln has produced no internal guidelines governing review frequency and has offered no explanation for conducting reviews at a rate substantially more frequent than the federal benchmark for the most aggressively reviewed disability category. Without disclosed criteria, neither Plaintiff nor his treating providers can determine what clinical information a given review is designed to obtain or whether the review has a clinical basis at all.

The practical consequences of the undisclosed 90-day review schedule are documented in the attached exhibits. Each review cycle generates packets sent simultaneously to multiple providers with compressed deadlines and blank clinical forms that do not identify what changed since the prior review. The March 24, 2026 packet does not state what clinical development prompted the review, what the prior review found, or what threshold Plaintiff must meet to satisfy Lincoln's proof standard. The provider letters state only that the information is necessary to complete an ongoing claims investigation. That characterization does not tell a treating physician what to document, why existing records are insufficient, or what clinical question the review is designed to answer.

These costs are not borne by Lincoln alone. Each review cycle imposes compliance burdens on Plaintiff's treating providers, who must complete clinical forms, compile records, and respond to requests within compressed timeframes without adequate context. Lincoln's argument that frequent reviews serve the interests of plan participants is difficult to sustain when the criteria governing those reviews have never been disclosed, the clinical basis for each review has never been identified, and SSA — the federal agency whose disability determination Lincoln itself sought and funded — would not conduct a review of Plaintiff's conditions for years under its own framework.