**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

CHARLES TERRENCE BRUFF,

Plaintiff,

v.

USAA EDUCATIONAL ASSISTANCE PLAN, et al.,

Defendants.

Case No. 5:26-CV-01720-XR

# EXHIBIT S-504
**SECTION 504 OF THE REHABILITATION ACT OF 1973:**

**HISTORICAL DEVELOPMENT, JUDICIAL BRANCH APPLICABILITY,**

**AND THE STRUCTURAL PROCESS GAP**

Filed in Support of Plaintiff's Motion for Stay and Appellate Brief

No. 26-50345 (5th Cir.)

## PREFATORY NOTE

This exhibit documents the legislative and regulatory history of Section 504 of the Rehabilitation Act of 1973, the federal judiciary's self-declared exemption from Section 504 and the Americans with Disabilities Act, the Judicial Conference's September 1995 accommodation policy and its structural limitations, and the constitutional and statutory arguments that the exemption claim cannot survive scrutiny under the Civil Rights Restoration Act of 1988 and Tennessee v. Lane, 541 U.S. 509 (2004). This exhibit is submitted in support of Plaintiff's motion for stay, which cites lack of accommodation as an irreparable harm. This exhibit presents the Section 504 and Due Process accommodation arguments as a question of first impression in the Fifth Circuit.

1

### SECTION 1 — THE STATUTE AND ITS ORIGINAL SCOPE (1973)

Section 504 of the Rehabilitation Act of 1973 states: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794.

Section 504 was the first federal civil rights law in the United States to explicitly address the rights of disabled people, shifting disability from a medical classification to a civil rights framework. The provision first appeared as Section 503 of the Vocational Rehabilitation Act of 1972, which was pocket-vetoed by President Nixon. Congress re-enacted it as Section 504 of the Rehabilitation Act of 1973, Pub. L. 93-112, 87 Stat. 355 (Sept. 26, 1973).

The statute's promise was not immediately realized. After Section 504 was signed into law, the federal regulations needed to enforce it were delayed for four years. This delay prompted disability advocates to organize the historic 28-day sit-in at the Federal Building in San Francisco in 1977, demanding implementation. The Department of Health, Education, and Welfare issued the first implementing regulations in 1977. 45 C.F.R. Part 84 (1977). Those regulations established the foundational requirement that covered entities provide reasonable accommodations and engage in an interactive process to identify appropriate modifications for disabled individuals.

The Supreme Court interpreted Section 504 in Southeastern Community College v. Davis, 442 U.S. 397 (1979), holding that Section 504 requires covered entities to make "reasonable accommodations" when necessary to provide disabled individuals with "meaningful access" to their programs — not merely formal or theoretical access. The meaningful access standard has governed Section 504 analysis ever since.

**SECTION 2 — GROVE CITY COLLEGE v. BELL (1984) AND THE PROGRAM-SPECIFIC READING**

In Grove City College v. Bell, 465 U.S. 555 (1984), the Supreme Court adopted a narrow, program-specific reading of Section 504. The Court held that Section 504's non-discrimination requirements applied only to the specific program or activity receiving federal financial assistance — not to the institution as a whole. Under this reading, a university that received federal financial aid only in its financial aid office was bound by Section 504 only in the administration of that financial aid — not in its academic programs, admissions, or other activities.

The federal judiciary's self-declared Section 504 exemption appears to rest, at least implicitly, on a Grove City-era understanding: that because no specific "program" within the federal judiciary can be identified as receiving federal financial assistance in the direct grant sense, the judiciary as a whole falls outside Section 504's reach. This reasoning was never expressly adopted by the Supreme Court with respect to the judiciary. It was assumed. And it was assumed before Congress specifically overrode Grove City four years later.

**SECTION 3 — THE CIVIL RIGHTS RESTORATION ACT OF 1988**

Congress responded to Grove City directly and comprehensively. The Civil Rights Restoration Act of 1988, Pub. L. 100-259, 102 Stat. 28 (Mar. 22, 1988), amended Section 504 to explicitly reject the program-specific reading. The Act expanded the definition of "program or activity" to encompass entire institutions — not just the specific program receiving federal funds — whenever any part of the institution receives federal financial assistance. 29 U.S.C. § 794(b).

The legislative history of the Civil Rights Restoration Act makes Congress's intent unmistakable. The statute was enacted specifically to override Grove City and restore the broad institutional coverage that Congress had originally intended when it enacted Section 504. Congress stated explicitly that it was restoring the pre-Grove City understanding of Section 504's scope.

The Judicial Conference adopted its accommodation policy in September 1995 — seven years after the Civil Rights Restoration Act took effect. The Judicial Conference never engaged

3

with the 1988 amendments. It did not analyze whether the Civil Rights Restoration Act altered the basis for its exemption claim. It did not commission a legal opinion on the question. It simply continued to assert the pre-1988 exemption as if the statute had not been amended. The accommodation policy adopted in 1995 reflects a 1984 understanding of a statute that Congress had specifically and comprehensively amended seven years earlier.

## SECTION 4 — THE ARTICLE III INDEPENDENCE ARGUMENT AND ITS TWO FAILURES

The federal judiciary's exemption claim rests on an Article III independence theory: that the constitutional separation of powers insulates the federal judiciary from congressional process requirements that might compromise judicial independence. Multiple federal district courts have stated this explicitly. See, e.g., W.D. Okla. ADA Accommodations Page ("The Rehabilitation Act of 1973 does not apply to the federal courts," citing 29 U.S.C. § 794's limitation to "any Executive agency or by the United States Postal Service"). The theory has two independent and fatal flaws.

***Failure One: Congress Already Governs the Court Process Extensively — Including Through Statutes It Can Abolish.***

The Article III independence argument proves far too much. Article III, Section 1 provides that Congress may "from time to time ordain and establish" inferior federal courts. The Constitution Annotated, prepared by the Congressional Research Service, states the established constitutional principle directly: "Because Congress has the authority to decide whether the lower federal courts should exist, the legislature is also understood to enjoy broad power to structure the lower courts, make procedural rules for them, and regulate their jurisdiction." ArtIII.S1.8.4 (Constitution Annotated, Congress.gov).

Congress's power to abolish inferior courts is not theoretical. In Stuart v. Laird, 5 U.S. (1 Cr.) 299 (1803), the Supreme Court upheld Congress's abolition of circuit courts created by the Judiciary Act of 1801. The courts simply ceased to exist. A court that Congress can dissolve by statute — as it dissolved the circuit courts in 1802 — cannot simultaneously claim that Congress lacks authority to require it to modify the process by which it exercises power. The lesser power

4

(process modification) cannot be unavailable where the greater power (abolition) is established. A court whose very existence depends on a congressional grant cannot claim immunity from the process requirements Congress attaches to that grant.

The congressional governance of the court process is comprehensive and longstanding. The Federal Rules of Civil Procedure are promulgated by the Supreme Court but authorized and governed by Congress under the Rules Enabling Act, 28 U.S.C. §§ 2071-2077. Section 2072 explicitly gives Congress power to supersede any rule by statute. The Federal Rules of Appellate Procedure operate under the same framework. The Declaratory Judgment Act, 28 U.S.C. § 2201, creates an entire category of relief by congressional statute. The right to proceed in forma pauperis under 28 U.S.C. § 1915 is a congressional creation. Federal subject matter jurisdiction is defined by Congress. None of these required a specific Article III grant. None has been held to violate judicial independence. The Article III argument, if accepted, would invalidate not only Section 504 but the Federal Rules of Civil Procedure, Section 1915, and the Declaratory Judgment Act — results no court has reached or suggested.

Section 504 asks courts to modify the process by which litigants access the court — the same function the FRCP performs. Section 504 does not ask courts to decide cases differently. It asks courts to ensure that disabled litigants can participate in the process. That is structural accommodation, not judicial interference. The Article III independence argument was never designed to insulate courts from process requirements that facilitate equal access. It was designed to protect judicial decision-making from political pressure. Section 504 touches neither.

The judiciary's exemption claim is further undermined by the DOJ Office of Legal Counsel's authoritative 1983 opinion on Section 504's scope. The OLC concluded that "Executive agency" as used in Section 504 "must be construed broadly to include all government entities which are not within either the legislative or judicial branches." DOJ OLC, Applicability of Section 504 of the Rehabilitation Act to Certain Governmental Entities (May 3, 1983), 7 Op. O.L.C. 110. The OLC applied this principle to conclude that the Federal Reserve System and the Federal Deposit Insurance Corporation — neither of which is a traditional executive agency in

any constitutional sense — are bound by Section 504. Id. The Federal Reserve is an independent entity created by Congress, staffed by presidentially appointed governors confirmed by the Senate, but deliberately structured to operate outside the direct executive chain of command. It is not an executive agency. It is bound by Section 504 because it receives congressional appropriation and because Congress intended Section 504 to reach "every department or agency of the Federal Government." Id. (quoting 124 Cong. Rec. 38551 (1978)). The Smithsonian Institution — a congressionally chartered independent establishment that receives direct congressional appropriation — is similarly bound by the Rehabilitation Act's nondiscrimination requirements. See 29 U.S.C. § 791 (Section 501 binding the Smithsonian Institution by name). The federal judiciary also receives direct congressional appropriation through the annual federal courts budget enacted by Congress. The judiciary is funded by Congress. The Federal Reserve is funded by its own operations and is bound. The Smithsonian is funded by congressional appropriation and is bound. The basis on which the federal judiciary claims exemption that these entities do not have has never been squarely examined. The OLC's interpretive principle — construing Section 504 to reach every government entity outside the legislative and judicial branches — confirms that Congress intended maximum breadth. Whether the judicial branch falls within or outside that intended breadth given the 1988 Civil Rights Restoration Act's expansion and Tennessee v. Lane's due process foundation is a question of first impression that this Court has authority to address.

***Failure Two: Tennessee v. Lane Already Applied the ADA to State Courts — Under a Weaker Independence Theory.***

Tennessee v. Lane, 541 U.S. 509 (2004), held that Congress validly abrogated state sovereign immunity to ADA Title II claims in the context of access to courts. State courts have co-equal common law independence arguments and sovereign immunity protections that federal courts do not. The Supreme Court nonetheless held that Congress could reach state courts through the ADA's due process foundation. The Court emphasized that access to courts is a fundamental right protected by the Due Process Clause and that Congress acted within its

Section 5 authority to enforce that right by requiring disability accommodations in courthouse access.

Federal courts — which are creatures of congressional statute, whose entire procedural framework is congressionally authorized, and which Congress can abolish — have a weaker independence argument than state courts, not a stronger one. State courts lost in Tennessee v. Lane. The federal judiciary's claim of exemption from disability accommodation requirements is constitutionally backward: the courts with stronger independence arguments are bound; the courts with weaker independence arguments claim exemption.

The empirical record refutes the theoretical concern that providing accommodations under a section 504 framework would disrupt court proceedings. All fifty state court systems and every local court have operated under disability accommodation requirements for decades under ADA Title II and Section 504. The state court process has not collapsed. Judicial independence has not been compromised. The accommodation requirements have produced more accessible courts — not less independent ones. The theoretical argument that Section 504 would corrupt the federal court process has been tested in practice across fifty state systems for more than thirty years, and the practice refutes the theory.

## SECTION 5 — THE JUDICIAL CONFERENCE'S 1995 POLICY AND ITS INTERNAL INCONSISTENCY

In September 1995, the Judicial Conference of the United States adopted a policy mandating that all federal courts provide reasonable accommodations to persons with "communications disabilities." Guide to Judiciary Policy, Vol. 5, § 255.10. The policy specifically requires each federal court to provide, at judiciary expense, sign language interpreters or other appropriate auxiliary aids and services to participants in federal court proceedings who are deaf, hearing-impaired, or have other communications disabilities. The policy's specific mandate is hearing accommodation for sensory impairments.

Multiple federal district courts state the policy's scope and the underlying exemption claim explicitly. The Western District of Oklahoma states: "The Rehabilitation Act of 1973 does

not apply to the federal courts. See 29 U.S.C. § 794 . . . Since 1995, the Judicial Conference . . . has mandated that all federal courts provide reasonable accommodations to persons with communications disabilities." W.D. Okla. ADA Accommodations Page. The Southern District of Georgia describes the scope precisely: the Communication Access Coordinator is responsible for "coordinating sign language interpreters or other appropriate auxiliary aids and services to participants in federal court proceedings who are deaf, hearing-impaired or have communication disabilities." S.D. Ga. Communication Access Coordinator Page.

The policy contains a structural internal inconsistency that goes to the heart of this case. The Judicial Conference declared that its 1995 policy covers "communications disabilities." Autism Spectrum Disorder is, by clinical and legal definition, a communications disability. The DSM-5 defines ASD by reference to "persistent deficits in social communication and social interaction across multiple contexts." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013). The ADA Amendments Act of 2008 explicitly lists "communicating" as a major life activity protected by federal disability law. 42 U.S.C. § 12102(2)(A). Cerebral Palsy, which Plaintiff also has, similarly affects motor aspects of communication.

The Judicial Conference's own policy — the one it substituted for Section 504 compliance — covers communications disabilities. Plaintiff's disabilities are communications disabilities by clinical definition and federal statutory classification. The policy still provided nothing. Either the policy does not mean what it says, or the Judicial Conference never contemplated that "communications disabilities" would include anything other than sensory impairments — deafness, hearing impairment — when it drafted the 1995 policy. Either conclusion demonstrates the inadequacy of the framework. A communications-disability accommodation policy that does not cover autism is not a policy grounded in any current clinical or legal understanding of communications disabilities. It is a policy designed for 1995's narrower understanding of disability — one that predates the ADA Amendments Act of 2008 by thirteen years and has never been updated.

**SECTION 6 — TENNESSEE v. LANE AND THE DUE PROCESS FOUNDATION**

Tennessee v. Lane, 541 U.S. 509 (2004), established that access to courts is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment. The Court held that Congress validly exercised its Section 5 enforcement authority when it required states to make their courthouses and court proceedings accessible to disabled persons. The Court's reasoning was constitutional, not merely statutory: the ADA was the legislative vehicle; the Due Process Clause was the constitutional source.

The Due Process dimension of Tennessee v. Lane has implications beyond ADA Title II. If access to courts is a fundamental right protected by the Due Process Clause, and if a disabled litigant's disability specifically impairs meaningful access to that right in documented ways, then the Due Process Clause independently requires accommodation — regardless of whether Section 504 or the ADA formally applies. The Judicial Conference's self-declared statutory exemption does not address the constitutional question. A court may be exempt from a statute's reach while still being bound by the constitutional requirement that the statute was designed to implement.

As the Supreme Court observed in Tennessee v. Lane, "failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion." 541 U.S. at 531-32. The Judicial Conference's 1995 policy predates Tennessee v. Lane by nearly a decade. It has never been subjected to constitutional scrutiny under the due process framework that decision established. The question of whether the Judicial Conference's accommodation framework — which provides nothing for Plaintiff's documented disability profile — satisfies the constitutional minimum recognized in Tennessee v. Lane is a question of first impression.

Section 504 in the ERISA disability context carries a dimension that makes the due process argument particularly acute. Every plaintiff in an ERISA long-term disability case is disabled by definition. A person cannot have an LTD claim without a qualifying disability. The accommodation failures documented in this case therefore do not fall on a random subset of ERISA litigants. They fall predictably and structurally on every plaintiff in the entire category of cases. Section 504 is Congress's specific statutory implementation of what due process requires

for the population that brings ERISA disability claims. When the district court failed to engage with Section 504 in Plaintiff's attorney appointment motion, it was not ignoring one statute among many. It was ignoring Congress's answer to the question of what meaningful access looks like for the precise population whose access was at issue.

<strong>SECTION 7 — THE STRUCTURAL PROCESS GAP</strong>

Section 504's implementing regulations, and the ADA Title II regulations that inform the constitutional analysis under Tennessee v. Lane, contemplate an interactive process — a good-faith back-and-forth between the disabled individual and the covered entity to identify barriers and develop effective reasonable accommodations. The interactive process is not optional. It is the mechanism through which meaningful accommodation is achieved. A covered entity that refuses to engage in the interactive process violates Section 504 even if it ultimately might have provided an adequate accommodation — because the refusal to engage deprives the disabled individual of the opportunity to identify what would actually work.

The Judicial Conference's framework is architecturally incapable of providing the interactive process that Section 504 contemplates. The Communication Access Coordinator's function is categorically limited: the coordinator arranges sign language interpreters and auxiliary aids for in-person hearings. That is the entirety of the coordinator's authority. The coordinator does not conduct an interactive process. The coordinator does not assess individual accommodation needs outside of hearing accessibility for sensory impairments. The coordinator does not consult with the presiding judge. The coordinator does not have authority to address barriers in the filing process, the briefing cycle, the response timeline, or any aspect of litigation other than in-person hearing attendance. When Plaintiff contacted the district court's communication access coordinator twice by telephone to identify barriers to meaningful participation in this litigation — framing only the structural barriers and not the merits of any underlying motion — the coordinator accurately stated the limits of the framework: file a motion.

10

That answer was not a failure of effort or training. It was an accurate description of what the system can and cannot do. The coordinator has no authority to do anything else. The accommodation framework the Judicial Conference substituted for Section 504 compliance provides interactive engagement for exactly one category of disability — sensory impairment affecting in-person hearing participation — and nothing for any other disability in any other context. For every other barrier, the only pathway is a motion.

The motion requirement is not a reasonable accommodation alternative. It is a restatement of the barrier. Filing a motion requires the disabled litigant to navigate the adversarial system that is creating the barrier, in writing, on a litigation timeline, without the accommodation that has not yet been granted. A blind litigant who cannot read image exhibits cannot file a motion about it through a process that assumes they can read the exhibits needed to frame the motion. A litigant with ASD whose disability specifically impairs the ability to engage in unstructured adversarial communication — including the motion practice that is the only pathway to accommodation — cannot access accommodation through a system whose only accommodation mechanism requires exactly what the disability makes hardest. The system requires overcoming the barrier in order to report the barrier. That is not an interactive process. It is the structural absence of one.

This gap cannot be fixed by better training, more resources, or expanded coordinator authority within the existing framework. It is a failure of design. The Judicial Conference built a framework for one category of disability in one context — sensory impairment at in-person hearings — and declared that it satisfied its accommodation obligations for all disabilities in all contexts. It did not. The constitutional minimum recognized in Tennessee v. Lane requires more than a sign language interpreter and a suggestion to file a motion.

## SECTION 8 — THE EMPIRICAL RECORD ON DISABLED AND PRO SE LITIGANT OUTCOMES

The structural disadvantages identified in this exhibit are not theoretical. They are documented in the empirical literature on access to civil justice.

11

Pro se litigants lose at dramatically higher rates than represented parties. In federal district courts from 1998 to 2017, pro se plaintiffs won only approximately 3% of final judgments, while pro se defendants received final judgments in their favor approximately 12% of the time. In contrast, when both parties were represented, plaintiff and defendant win rates were approximately equal. Soffer, Self-Represented Litigants and the Pro Se Crisis, Cornell J.L. & Pub. Pol'y (2023). Academic research confirms the mechanism: "pro se status is associated with earlier dispositions, less favorable win rates, and less favorable award amounts" and "pro se status is also stigmatized in ways that may influence assessments of pro se litigants and their claims." Miller & Pecoraro, (Un)Changing Rates of Pro Se Litigation in Federal Court, 45 Law & Soc. Inquiry 567 (2020).

The Department of Justice's Office for Access to Justice has documented that disabled litigants face compounded barriers specifically including credibility challenges: "These access concerns are compounded by the stigma that people with disabilities face as they interact with justice system actors who question their credibility, their ability to make decisions in their legal matters, and whether they deserve redress for harms they have experienced." DOJ Office for Access to Justice, Advancing Equal Access to Justice for Americans with Disabilities (July 26, 2023).

The Federal Judicial Center has studied disability and access to the federal courts. See FJC, Disability and the Federal Courts: A Study of Web Accessibility (noting the structural access challenges facing disabled litigants in the federal system). The FJC has separately documented that many federal courts remain hesitant to provide CM/ECF electronic filing access to pro se litigants — creating an additional structural barrier that falls with particular severity on disabled pro se litigants for whom physical filing is itself an accommodation challenge. FJC, United States District Courts' Local Rules and Procedures on Electronic Filing by Self-Represented Litigants (2025).

The Pew Charitable Trusts' January 2026 study found that disability status shapes both court experiences and perceptions of courts, and concluded that "accessibility and modernization

efforts are needed to foster greater trust among people with disabilities and ensure equal justice for all." Pew Charitable Trusts, People With Disabilities Are More Likely Than Those Without to Have Court Experience (Jan. 2026).

These disadvantages compound. A disabled pro se litigant in ERISA disability litigation — which is itself one of the most complex areas of federal statutory law — faces every layer simultaneously: the ERISA complexity disadvantage, the pro se outcome gap, the disability-specific barriers to accessing the accommodation process, and the stigma that attaches to disabled litigants' credibility. These are not independent risks that can be evaluated separately. They interact and multiply.

## SECTION 9 — THE UNIVERSAL DIMENSION

Disability is not a fixed characteristic of a defined population. Anyone can become disabled at any time — through illness, injury, aging, or the progression of conditions that may have been present but not yet disabling. The accommodation framework that protects disabled litigants today protects everyone who might need it tomorrow. A court system that provides meaningful access to disabled litigants benefits the legitimacy and integrity of the entire system for everyone who uses it.

Disability also cuts across every demographic, ideological, socioeconomic, and political line. It is not a partisan issue. It is not a special interest. It is the human condition that any litigant, any juror, any witness, any attorney, or any judge may encounter at any point in their lives. The accommodation framework that exists at the time a person needs it is the one they will encounter. The argument that federal courts should provide meaningful accommodation for disabled litigants is not an argument for special treatment. It is an argument for equal treatment — the same treatment that Congress required of employers, schools, healthcare providers, public accommodations, and state courts decades ago, and that those institutions have provided without the process collapsing.

Federal courts enforce Section 504 and the ADA against every other category of covered entity. They issue injunctions requiring employers to engage in interactive processes. They find

13

defendants liable when the accommodation framework functions as a barrier rather than a solution. The courthouse where those judgments are entered should not apply a lesser standard to itself than the standard it imposes on every other institution whose practices come before it.

## SECTION 10 — QUESTIONS OF FIRST IMPRESSION PRESENTED FOR APPELLATE REVIEW

This exhibit supports the following questions of first impression in the Fifth Circuit:

1.   Whether the federal judiciary's self-declared exemption from Section 504 of the Rehabilitation Act survives scrutiny under the Civil Rights Restoration Act of 1988, which Congress enacted specifically to override the program-specific reading of Section 504 on which the exemption appears to rest, and which the Judicial Conference never engaged with when it adopted its September 1995 accommodation policy.

2. Whether the Article III independence argument supporting the judiciary's exemption claim is consistent with Congress's established broad power to structure the lower courts, make procedural rules for them, regulate their jurisdiction, and — as confirmed in Stuart v. Laird, 5 U.S. (1 Cr.) 299 (1803) — abolish them entirely.

3.   Whether the Judicial Conference's 1995 accommodation policy, which is limited to sign language interpreters and auxiliary aids for sensory impairments at in-person hearings and provides no interactive process for any other disability in any other litigation context, satisfies the constitutional minimum recognized in Tennessee v. Lane, 541 U.S. 509 (2004), for meaningful access to courts by disabled litigants.

4. Whether, in the ERISA long-term disability context specifically — where every plaintiff is disabled by definition — the absence of a meaningful accommodation process for neurodevelopmental disabilities constitutes a violation of the Due Process Clause's guarantee of meaningful access to the courts, independently of whether Section 504 formally applies.

15

**5.**    Whether a court that enforces Section 504's interactive process requirement against employers, schools, healthcare providers, and state courts may apply a lesser standard to its own accommodation framework than it imposes on those covered entities.


Respectfully submitted,

Charles Terrence Bruff
4835 Medical Dr. #29643
San Antonio, Texas 78229
(318) 452-8978
cbruff13@outlook.com
Plaintiff-Appellant, Pro Se